**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **EASTERN POINT TRUST COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:25-cv-1787** |
| | ) | |
| **FLATIRONS BANK,** | ) | |
| | ) | |
| **JAKOB Z. NORMAN,** | ) | |
| | ) | |
| **NICHOLAS J. COCCIMIGLIO,** | ) | |
| | ) | |
| **WILLIAM BUNNELL,** | ) | |
| | ) | |
| **MICHAEL UPCHURCH,** | ) | |
| | ) | |
| **COURTNEY BARBER,** | ) | |
| | ) | |
| **TIMOTHY KROCHUK,** | ) | |
| | ) | |
| **TRIAL LAWYERS FOR JUSTICE,** | ) | |
| | ) | |
| **JUSTICE FOR LIFE,** | ) | |
| | ) | |
| **FBHC SOFTWARE LLC,** | ) | |
| | ) | |
| **TRELLIS SOFTWARE, INC.,** | ) | |
| | ) | |
| **TOWN OF GLENROCK, WY,** | ) | |
| | ) | |
| **BRUCE ROUMELL,** | ) | |
| | ) | |
| **AMY IBERLIN,** | ) | |
| | ) | |
| **JOHN DOES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

COMES NOW Plaintiff Eastern Point Trust Company, by counsel, and for its Complaint

against Defendants Flatirons Bank; Jakob Z. Norman; Nicholas J. Coccimiglio; William Bunnell;

Michael Upchurch; Courtney Barber; Timothy Krochuk; Trial Lawyers for Justice; Justice for Life; FBHC Software LLC; Trellis Software, Inc.; Town of Glenrock, Wyoming; Bruce Roumell; Amy Iberlin; and John Does, states the following:

## TABLE OF CONTENTS

INTRODUCTION....................................................................................................... 1

PARTIES .................................................................................................................... 2

JURISDICTION AND VENUE .................................................................................. 3

    A.   Subject Matter Jurisdiction ............................................................................. 3

    B.   Personal Jurisdiction ....................................................................................... 4

    C.   Venue ............................................................................................................... 4

FACTS ....................................................................................................................... 5

I.    Eastern Point develops the QSF 360™ Platform, a revolutionary new method for establishing Qualified Settlement Funds ............................................... 5

    A.   Eastern Point is a proven innovator in the field of trust administration ......... 5

    B.   The QSF 360™ Platform introduces a first of its kind QSF service .............. 5

    C.   Eastern Point invested significant time, effort, and money to develop its trade secrets related to the QSF 360™ Platform, and has taken reasonable steps to protect them .............................................................................................. 7

    D.   Eastern Point's trade secrets related to the QSF 360™ Platform are critical to its competitive advantage in the market ..................................................... 8

        1.   The QSF 360™ Platform's feature-rich user interface ........................... 8

            a.   Workflows, intake processes, and questionnaires.............................. 8

            b.   User interface designs and configurations ........................................ 9

            c.   QSF documentation templates ........................................................... 9

            d.   Other specialized features ................................................................ 10

        2.   Eastern Point derives independent economic value from the QSF 360™ Platform's behind-the-scenes functionality ........................................... 10

        3.   Eastern Point's trade secrets and confidential information are critical to its success ................................................................................................ 12

    E.   Eastern Point imposes reasonable restrictions on the access and use of the QSF 360™ Platform to protect its investment and secure its trade secrets and confidential information ............................................................................... 13

iii

1.  Eastern Point implements reasonable technical and physical security measures to protect its trade secrets related to the QSF 360™ Platform................ 13

2.  Eastern Point implements reasonable contractual measures to protect its trade secrets related to the QSF 360™ Platform ..................................................... 14

    a.  Eastern Point's Terms of Use ................................................. 14

        i.  Access to the QSF 360™ Platform requires assent to the Terms of Use............................................................................................. 15

        ii.  The Terms of Use include reasonable restrictions on the disclosure and use of Eastern Point's trade secrets and confidential information....... 16

    b.  The Eastern Point QSF Agreements .................................. 21

        i.  The Trust Agreement................................................................ 21

        ii.  The Trust Administration Agreement ........................................ 21

        iii.  The Petitions for Distribution.................................................. 22

II.  **The JE Conspirators attempt to compete with Eastern Point using trade secrets and confidential information misappropriated from the QSF 360™ Platform ........... 22**

    A.  Norman, Coccimiglio, Bunnell, and Upchurch (the "Settlement Conspirators") combine to steal Eastern Point's trade secrets and confidential information, despite having assented to the Terms of Use hundreds of times ................................... 22

        1.  The Settlement Conspirators each assent to the Terms of Use and QSF Agreements hundreds of times ........................................................ 23

        2.  The Settlement Conspirators decide to defect after Eastern Point uncovers their tax evasion scheme........................................................................ 24

        3.  Operating under false pretenses, the Settlement Conspirators exploit their good relationship with Eastern Point to conduct industrial espionage................... 27

    B.  Using trade secrets and confidential information misappropriated from the QSF 360™ Platform, the Settlement Conspirators combine with Flatirons and others to create "Justice Escrow" .................................................................................. 30

        1.  Flatirons joins the JE Conspiracy to pivot from being just a fledgling bank to a fledgling bank masquerading as a QSF administrator ......................... 30

        2.  Krochuk designs the Justice Escrow platform to mirror the functionality and content of the QSF 360™ Platform ....................................................... 32

iv

3. The Settlement Conspirators and Flatirons market Justice Escrow as a knock-off of the QSF 360™ Platform in pitches to municipalities ........................ 34

4. Iberlin and WPDN solicit other municipalities—who are also their clients—to retroactively approve invalid QSFs and to approve new QSFs for Justice Escrow—in exchange for a fee .............................................................. 36

C. The Settlement Conspirators seek to unfairly win business away from Eastern Point to Justice Escrow ....................................................................... 40

III. The JE Conspiracy has harmed and continues to harm Eastern Point ........................ 41

COUNT I
BREACH OF CONTRACT (NORMAN) .................................................................... 43

COUNT II
BREACH OF CONTRACT (COCCIMIGLIO) ............................................................ 45

COUNT III
BREACH OF CONTRACT (BUNNELL) ................................................................... 47

COUNT IV
BREACH OF CONTRACT (UPCHURCH) ................................................................ 49

COUNT V
BREACH OF CONTRACT (TRIAL LAWYERS FOR JUSTICE) ..................................... 52

COUNT VI
BREACH OF CONTRACT (JUSTICE FOR LIFE) ...................................................... 54

COUNT VII
VIOLATIONS OF THE DEFEND TRADE SECRETS ACT ("DTSA")
18 U.S.C. § 1836 ET SEQ. .................................................................................. 56

COUNT VIII
VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT ("VUTSA")
VA. CODE § 59.1-336 ET SEQ. ........................................................................... 59

COUNT IX
VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT
VA. CODE § 18.2-152.12 .................................................................................... 61

COUNT X
VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
18 U.S.C. § 1030(g) .......................................................................................... 62

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)** ........................................................................................... **65**

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(c) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)** ........................................................................................... **69**

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)** ........................................................................................... **79**

**COUNT XIV**
**CONSPIRACY TO INJURE A BUSINESS**
**VA. CODE § 18.2-500** ....................................................................................... **80**

**COUNT XV**
**COMMON LAW CONSPIRACY** ................................................................... **81**

**PRAYER FOR RELIEF** .................................................................................. **81**

## INTRODUCTION

1.      This action arises out of a concerted conspiracy by Defendants to unfairly compete with Eastern Point Trust Company ("Eastern Point"), a recognized leader in the qualified settlement fund ("QSF") industry, by deliberately and systematically copying, disclosing, and using Eastern Point's trade secrets and confidential information in violation of Defendants' contractual obligations and trade secret laws.

2.      QSFs serve an important public function: they allow individuals and entities to resolve disputes efficiently while affording significant tax advantages. Eastern Point developed its proprietary platform, QSF 360™ (the "QSF 360™ Platform"), the first-of-its-kind comprehensive, online, turnkey solution for the creation and administration of QSFs, through years of sustained investment, research, and innovation. Eastern Point's QSF 360™ Platform empowers claimants to receive faster access to settlement proceeds, ensures tax compliance, and improves overall transparency and efficiency in the settlement process. It revolutionized how QSFs are established, reducing costs and delays and providing significant benefits to litigants, attorneys, and other settlement participants. The QSF 360™ Platform provides Eastern Point with substantial competitive advantages, and Eastern Point treats its QSF 360™ Platform and the underlying proprietary methods, processes, documents, and systems as confidential trade secrets.

3.      Defendants Coccimiglio, Norman, and Justice for Life were long-standing clients of Eastern Point. As such, they had client access to the QSF 360™ Platform, subject to express contractual obligations prohibiting them from taking Eastern Point's trade secrets and confidential information or using that information to unfairly compete with Eastern Point.  Each of Coccimiglio, Bunnell, and Norman knowingly abused their client access to the QSF 360™ Platform, in breach of their contractual obligations, by misappropriating Eastern Point's trade secrets and confidential information to create a competing platform.

1

4.      Coccimiglio, Bunnell, and Norman enlisted Flatirons Bank, Krochuk, and Trellis in this effort. Together, they formed "Justice Escrow," a trade name used by Flatirons to market a competing QSF platform. Their goal was simple: to replicate and repackage Eastern Point's innovations. Eastern Point brings this action to protect its rights, safeguard its innovations, and remedy the ongoing damage caused by Defendants' unlawful acts.

## PARTIES

5.      Plaintiff Eastern Point Trust Company ("Eastern Point") is a corporation organized under the laws of the United States Virgin Islands, with its principal office located in the United States Virgin Islands.

6.      Defendant Flatirons Bank ("Flatirons") is a corporation organized under the laws of the State of Colorado, with its principal office located in the State of Colorado, that holds a Colorado state banking license without trust powers.

7.      Defendant Jakob Z. Norman ("Norman") is an individual residing and domiciled in the State of Montana.

8.      Defendant Nicholas J. Coccimiglio ("Coccimiglio") is an individual residing and domiciled in the State of Wyoming.

9.      Defendant Will Bunnell ("Bunnell") is an individual residing and domiciled in the State of Florida.

10.     Defendant Courtney Barber ("Barber") is an individual residing and domiciled in the State of Montana.

11.     Defendant Timothy Krochuk ("Krochuk") is an individual residing and domiciled in the State of Florida.

12.     Defendant Trial Lawyers for Justice is a professional corporation organized under the laws of the State of Iowa, with its principal office located in the State of Iowa.

13.     Defendant Justice for Life is a limited liability company organized under the laws of the State of Wyoming, with its principal office located in the State of Wyoming.

14.     Defendant FBHC Software LLC ("FBHC") is a three-member limited liability company organized under the laws of the State of Delaware, with its principal office located in the State of Colorado, and members residing and domiciled in the State of Colorado, the State of Florida, and the Commonwealth of Massachusetts.

15.     Defendant Trellis Software, Inc. ("Trellis"), is a corporation organized under the laws of the State of Delaware, with its principal office located in the State of Massachusetts.

16.     Defendant Town of Glenrock, Wyoming ("Glenrock") is a municipality in the State of Wyoming.

17.     Defendant Bruce Roumell ("Mayor Roumell") is an individual residing and domiciled in the State of Wyoming.

18.     Defendant Amy Iberlin ("Iberlin") is an individual residing and domiciled in the State of Wyoming.

19.     Defendants John Does ("Does") are an unknown number of individuals or entities whose true identities and involvement are not fully known to Eastern Point at this time. Defendants Does are believed to be persons or entities in the legal community and settlement profession who associated or combined with the other members of the JE Conspiracy to willfully and maliciously injure and obtain an unfair business advantage over Eastern Point.

## JURISDICTION AND VENUE

### A.  Subject Matter Jurisdiction

20.     This Court has original jurisdiction of this matter under 28 U.S.C. § 1332(a)(1) because it is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

21.     This Court also has original jurisdiction of this matter, in part, under 28 U.S.C. § 1331, insofar as it is a civil action arising under the laws of the United States—*inter alia*, the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) ("CFAA"), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) ("RICO")—and supplemental jurisdiction of the remaining claims under 28 U.S.C. § 1367(a).

### B.  Personal Jurisdiction

22.     Consistent with the permissions and limitations of Virginia's long-arm statute and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, each Defendant in this action is subject to personal jurisdiction in the Commonwealth of Virginia because, either directly or through their participation in the JE Conspiracy, the Defendants purposefully availed themselves of the privilege of conducting activities in Virginia, Eastern Point's claims arise from Defendants' activities directed at Virginia, and maintenance of this suit in Virginia is constitutionally reasonable.

23.     At a minimum, the contacts with Virginia attributable to Defendants include transacting business in Virginia; causing tortious injury to Eastern Point in Virginia by acts or omissions inside Virginia; and causing tortious injury to Eastern Point by acts or omissions outside Virginia, where Defendants have engaged in a persistent course of conduct.

### C.  Venue

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Eastern Point's claims occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## FACTS

I.    **Eastern Point develops the QSF 360™ Platform, a revolutionary new method for establishing Qualified Settlement Funds**

    **A.  Eastern Point is a proven innovator in the field of trust administration**

    25.    With a legacy spanning thirty years, Eastern Point has long maintained a forward-looking mission to modernize trust services by integrating advanced technology and innovative processes into trust administration.

    26.    Since then, Eastern Point's innovative efforts have proven so successful that it now stands as a global leader in trust innovation.

    27.    Eastern Point serves over 20,000 clients internationally, ranging from individuals to multi-national institutions to nation-states, and administers trust assets in excess of 20 billion dollars in transactional flows.

    28.    Never one to rest on its laurels, Eastern Point again revolutionized the industry with its groundbreaking QSF 360™ Platform.

    **B.  The QSF 360™ Platform introduces a first of its kind QSF service**

    29.    A QSF is a statutory arrangement established pursuant to an order of, or approved by, a "governmental authority," as defined by 26 C.F.R § 1.468B-1(c)(1), that temporarily holds, as tax-deferred, settlement proceeds intended to resolve one or more qualifying claims.

    30.    Litigants often deposit settlement proceeds in QSFs because of the appreciable tax advantages afforded to both plaintiffs and defendants.

    31.    By placing settlement funds in a QSF, defendants can resolve their liability and take immediate tax deductions, while plaintiffs gain temporary tax-deferred tax treatment and time to organize distributions, resolve liens, and structure settlements without rushing decisions.

32.     This flexibility protects all parties and streamlines the often-complicated process of disbursing large settlements, but requires compliance with Internal Revenue Service ("IRS") rules.

33.     For those reasons, parties frequently establish QSFs to manage settlement proceeds in complex, multi-plaintiff litigation—like, for example, the Volkswagen "Dieselgate" mass action, in which a QSF created through Eastern Point's QSF 360™ Platform facilitated the exchange of settlement funds between Volkswagen and claimants.

34.     Parties to litigation of any size can benefit from QSFs, however, including disputes involving only a single plaintiff.

35.     Eastern Point recognized the immense opportunity available to the pioneering entrepreneur that could innovate and implement an efficient process for navigating the labyrinthine statutory and regulatory framework governing the establishment of QSFs.

36.     In or around 2018, Eastern Point sought to capitalize on that opportunity and began developing an innovative method for the rapid establishment and administration of QSFs.

37.     Operating from its offices located in Warrenton, Virginia, and drawing on its decades of experience, Eastern Point dedicated years of research and innovation and substantial financial investment into developing the QSF 360™ Platform and its related proprietary methods, processes, documents, and systems.

38.     A first of its kind, the QSF 360™ Platform leveraged Eastern Point's proprietary methods and processes to automate many of the steps required to establish a QSF under 26 C.F.R. § 1.468B-1 *et seq.*, thereby pioneering the rapid establishment and management of QSFs.

39.     The innovative QSF 360™ Platform is a full-service QSF solution allowing for the electronic establishment of QSFs in as little as one business day, comprehensive online QSF

management and administration, and same-day distributions to QSF beneficiaries—all at significantly reduced costs.

40.     Specific to QSF management and administration, the QSF 360™ Platform services also uniquely provided the first and only QSF online solution including account setup, fiduciary oversight, cash management, tax preparation, filing and payments, disbursement adjudication and processing, as well as QSF closing.

41.     Consistent with its mission of innovation, Eastern Point revolutionized the QSF industry and once again set itself apart from its peers with the introduction of the QSF 360™ Platform.

42.     Since then, Eastern Point has continued to improve the QSF 360™ Platform and the range of innovative services on offer—including introducing the first ever Confidential QSF; pioneering Sub-Master-Sub accounts; providing same-day distributions, 24-hour platform access, and Principal and Income Act compliant transaction reports; consolidating transactional reporting; and emailing daily transaction summary notices.

**C. Eastern Point invested significant time, effort, and money to develop its trade secrets related to the QSF 360™ Platform, and has taken reasonable steps to protect them**

43.     Eastern Point invested a considerable amount of time and effort, and large sums of money, in developing the QSF 360™ Platform. Eastern Point also drew on its decades of experience. The QSF 360™ Platform and its related proprietary methods, processes, documents, and systems are Eastern Point's trade secrets, and Eastern Point employs reasonable measures to protect them from unauthorized access and use.

**D. Eastern Point's trade secrets related to the QSF 360™ Platform are critical to its competitive advantage in the market**

44.     From its customer-facing features to its behind-the-scenes functionality, the QSF 360™ Platform is built on Eastern Point's trade secrets and confidential information. Eastern Point's trade secrets related to the QSF 360™ Platform include, without limitation, the methods, processes, documents, and systems described below.

### 1.     The QSF 360™ Platform's feature-rich user interface

45.     The QSF 360™ Platform's feature-rich user interface includes a range of features that streamline settlement fund administration on the QSF 360™ Platform while ensuring compliance and client satisfaction. Eastern Point developed the QSF 360™ Platform that includes these features over years and with the benefit of its significant experience in the QSF industry, and protects these features as its valuable trade secrets and confidential information.

### a.     Workflows, intake processes, and questionnaires

46.     Dynamic client workflows, online intake processes, and questionnaires are vital to the QSF 360™ Platform because they streamline the intake and QSF creation process, reducing the risk of errors and omissions, as well as administrative burdens.

47.     These customized tools enable clients to provide necessary information in a guided, user-friendly format, ensuring that each settlement fund is set up in compliance with legal requirements and tailored to the specific needs of the case.

48.     The efficiency and accuracy provided by these dynamic workflows not only minimize administrative burden and ensure compliance with federal tax laws and regulations, but also accelerate the onboarding process for clients, making Eastern Point's platform more attractive to attorneys and settlement administrators seeking reliable, compliant, and timely solutions.

49.    EPTC's proprietary workflows and processes include the process that allows EPTC to perform same-day QSF processing, which is sometimes referred to as EPTC's trust flow.

### b.    User interface designs and configurations

50.    The unique user interface designs and configurations incorporated into the QSF 360™ Platform also set Eastern Point apart from its competitors by offering an intuitive and streamlined user experience.

51.    These innovations simplify each step of the QSF creation process, making it accessible to users of varying technical backgrounds.

52.    By reducing complexity and enhancing usability, Eastern Point lowers the barriers to entry for clients, increases client satisfaction, and helps ensure that each QSF is established quickly and correctly.

53.    Eastern Point's focus on user-centered design is especially important in the settlement fund space, where clients often operate under tight deadlines and require clear, actionable interfaces.

### c.    QSF documentation templates

54.    Another key facet of Eastern Point's success is its proprietary and custom templates for QSF documentation, which include proprietary and custom templates for trust agreements, IRS filings, and other documents essential to the creation and management of QSFs.

55.    The product of careful development, Eastern Point's QSF templates are designed to promote operational efficiency and regulatory compliance, while still maintaining the flexibility necessary to accommodate the unique requirements of various settlement types across multiple jurisdictions.

56.    By providing clients with turnkey, legal and tax compliant templates and administration processes, the QSF 360™ Platform reduces the risk of costly legal or tax

compliance mistakes and expedites the documentation process—thereby conserving each client's time and resources and reinforcing Eastern Point's reputation as a trusted provider of QSF services.

57.    Eastern Point only shares the QSF templates themselves with clients that have agreed to strict limitations regarding the disclosure and use of Eastern Point's proprietary documentation.

### d.    Other specialized features

58.    Other specialized features that help the QSF 360™ Platform deliver a superior client experience include real-time updates, customizable reports, transaction downloads, and automated reminders.

59.    These tools empower clients to monitor the status of their settlement funds, receive timely notifications about key deadlines and developments, and generate custom reports for internal or regulatory use.

60.    By offering these advanced capabilities, Eastern Point ensures transparency, accountability, and proactive communication, which are essential for building trust and satisfaction among attorneys, beneficiaries, and other stakeholders involved in the settlement process.

61.    These customer-facing proprietary features streamline settlement fund administration on the QSF 360™ Platform while ensuring compliance and client satisfaction.

62.    Taken together with the QSF 360™ Platform's other features, these integrated elements create a platform that is not only efficient and reliable but also unique to Eastern Point, making them highly valuable.

### 2.    Eastern Point derives independent economic value from the QSF 360™ Platform's behind-the-scenes functionality

63.    In addition to the customer-facing features discussed above, other behind-the-scenes aspects of the QSF 360™ Platform are highly valuable to its success.

64.     Eastern Point has spent years assembling a proprietary network of FDIC-backed banks that affords Eastern Point the unique ability to custody assets up to $240 million per beneficiary/claimant and accommodate individual trusts up to $100 billion.

65.     This FDIC-backed banking network is essential to the operation of an online qualified settlement fund platform because it ensures that all funds held in trust on behalf of beneficiaries are secure, insured, and compliant with federal banking regulations.

66.     In the context of QSFs—where large sums are often placed under court supervision for the benefit of multiple claimants—having a robust, FDIC-insured network allows Eastern Point to guarantee the safety of assets against loss or insolvency, which fosters confidence among beneficiaries, attorneys, and courts.

67.     Moreover, the network's capacity to custody substantial amounts per claimant and per trust enables Eastern Point to efficiently handle settlements of all sizes, from routine matters to complex, multi-billion-dollar cases.

68.     This combination of regulatory compliance, financial integrity, and scalability makes Eastern Point's banking network a critical differentiator in the competitive landscape of online QSF administration.

69.     Eastern Point built its banking network over the course of years of investment in vetting and building relationships with prospective banks, and with the benefit of its significant experience in the QSF industry. Eastern Point protects its proprietary banking network, information about its banking partners, and related information such as its vetting process as its valuable trade secret and confidential information.

###### 3.    Eastern Point's trade secrets and confidential information are critical to its success

70.    Eastern Point's QSF 360™ Platform and its underlying proprietary methods, processes, documents, and systems—including, without limitation, the methods, processes, documents, and systems associated with each of the features identified above in subparts 1 and 2 of this section—are Eastern Point's trade secrets and confidential information.

71.    Without these features, the QSF 360$^{TM}$ Platform would lack the critical functionality that has made it a leading QSF administration platform trusted by customers worldwide.[1]

72.    Eastern Point invested years and substantial resources in innovating, developing, maintaining, and enhancing the QSF 360™ Platform and its underlying proprietary methods, processes, documents, and systems, including those associated with the features described above.

73.    Eastern Point's investment in developing its trades secrets and confidential information includes not just the time spent preparing the methods, processes, and documents themselves but also time spent improving and refining the QSF 360™ Platform over time with the benefit of experience.

74.    If a competitor were to obtain Eastern Point's trade secrets and confidential information, it could create a competing platform without investing in the significant research and development costs that Eastern Point incurred to develop its own product, then freeride off Eastern Point's efforts to unfairly take business away from Eastern Point.

---

[1] The QSF industry is a robust and highly competitive market that is highly fractionalized, with firms specializing in various elements of QSF processes, and is comprised of large and well-established providers, including publicly traded firms.

### E. Eastern Point imposes reasonable restrictions on the access and use of the QSF 360™ Platform to protect its investment and secure its trade secrets and confidential information

75.     Eastern Point has taken measures that are both commercially reasonable and reasonable under the circumstances to maintain the secrecy of the trade secrets and confidential information associated with the QSF 360™ Platform and to protect those trade secrets and confidential information from unauthorized use and disclosure. These include, without limitation, the technical, physical, and contractual protections discussed below.

#### 1. Eastern Point implements reasonable technical and physical security measures to protect its trade secrets related to the QSF 360™ Platform

76.     Regarding technical protection measures, by way of example, the QSF 360™ Platform is accessible only through an encrypted, online platform housed on a network of computers and servers located in Virginia.

77.     The QSF 360$^{TM}$ Platform is maintained on Eastern Point's network and servers in Virginia and is accessible only to authorized users with valid login credentials.

78.     All interactions with Eastern Point's computer network and servers are inherently one-sided, as all access occurs solely in Virginia and the user's browser merely acts as a passive display device to display the output of the server-side code execution occurring in Virginia, regardless of where the user or device may be located. Eastern Point does not offer a downloadable client-side application for the QSF 360™ Platform.

79.     Internal documents reflecting Eastern Point's trade secrets and confidential information are stored on Eastern Point's secure servers, which are accessible only to authorized users.

80.     The source code for the QSF 360$^{TM}$ Platform is similarly stored in a secured repository accessible only to authorized users.

81.     Additionally, Eastern Point maintains a robust information security policy and continuously monitors cybersecurity controls to prevent unauthorized access to the QSF 360™ Platform.

82.     Regarding physical protection measures, by way of example, Eastern Point's offices and workstations are access-controlled.

83.     Eastern Point's offices may only be accessed by authorized individuals utilizing key fobs with radio frequency identification technology.

84.     Authorized individuals may only access Eastern Point workstations after completing a two-factor identification process, and thereafter may only access the QSF 360™ Platform after entering a unique identifier and password.

> **2.     Eastern Point implements reasonable contractual measures to protect its trade secrets related to the QSF 360™ Platform**

85.     Eastern Point also employs extensive contractual protections for its trade secrets and confidential information.

86.     Eastern Point's relevant employees and vendors are bound by confidentiality obligations.

87.     And access to the QSF 360™ Platform is limited to authorized users bound by various agreements imposing confidentiality obligations and restrictions on use.

> **a.  Eastern Point's Terms of Use**

88.     In exchange for the benefits of accessing the QSF 360™ Platform, including the host website www.easternpointtrust.com, all interactions with the QSF 360™ Platform and Eastern Point's host website are governed by Eastern Point's Platform & Website Terms & Conditions (the "Terms of Use").

i.    **Access to the QSF 360™ Platform requires assent to the Terms of Use**

89.    Eastern Point conditions access to the QSF 360™ Platform upon each user agreeing to the Terms of Use with every login to the QSF 360™ Platform.

90.    In the process of creating a new account on Eastern Point's website, or accessing an existing one, Eastern Point requires every user to affirm their agreement with the Terms of Use (and the Privacy Policy) a minimum of two times.

91.    First, upon accessing the Eastern Point website home page, a banner running across the top of the page greets every user and states, in conspicuous language: "By using this site, you agree to our Privacy Policy and Terms of Use."

92.    The phrases "Privacy Policy" and "Terms of Use" appear in conspicuous bright blue font which are distinct in color from other words on the page, set against a contrasting background, and contain hyperlinks to printable copies of the respective policy agreements.

93.    Then, from the home page, users can click the "Log In" link to reach the log in page, where existing users can enter their email address and password to access their account and new users are invited to create an account.

94.    Whenever a new user creates an account, they are directed to an account creation page requiring them to enter their email address and create a password.

95.    Before continuing with the account creation process, new users are confronted with conspicuous language on the account creation page stating: "By clicking the 'CONTINUE' action button below to access the Platform, I reaffirm my agreement to these Terms and Conditions and this Privacy Policy."

96.    Again, the phrases "Terms and Conditions" and "Privacy Policy" appear in blue font and contain hyperlinks to printable copies of the respective policy agreements.

15

97. Once the user has created an account, each time they log in thereafter, they are confronted with conspicuous language on the log in page stating: "By clicking the 'LOG IN' action button below to access the Platform, I reaffirm my agreement to these Terms and Conditions and this Privacy Policy."

98. Again, the phrases "Terms and Conditions" and "Privacy Policy" appear in blue font and contain hyperlinks to printable copies of the respective policy agreements.

99. Additionally, each time a user creates a QSF on the QSF 360™ Platform, they agree to an Acknowledgement, Agreement, and Attestation (the "Attestation"), which expressly incorporates the Terms of Use, and they must type their name to signify their affirmative electronic execution of the Attestation and Terms of Use.

> ii. **The Terms of Use include reasonable restrictions on the disclosure and use of Eastern Point's trade secrets and confidential information**

100. Assenting to the Terms of Use binds each user to a robust complement of restrictions intended to preserve Eastern Point's proprietary rights and commercial interests in its trade secret and confidential information, and the economic expectations derived therefrom.

101. In articulating those restrictions, the Terms of Use relies upon certain defined terms and phrases, which are used throughout the agreement, including, in relevant part, the following:

102. "Collective Intellectual Property" means:

> without limitation, all of [Eastern Point's] Trade Secrets, all of [Eastern Point's] Intellectual Property, including but not limited to all of [Eastern Point's] Background and Foreground Intellectual Property, collectively.

103. "Industrial Property" means:

> in the broadest possible context, [Eastern Point's] Trade Secrets and [Eastern Point's] Collective Intellectual Property, along with any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of

Affiliates, Indemnified Parties, and [Eastern Point's] Third Parties, including suppliers, customers, and business partners.

104.    "Intellectual Property" means including (collectively and separately):

(a) Trademarks; (b) user interfaces functions and design; (c) process design; (d) lists; (e) pricing information; (f) business strategy; (g) financial information; (h) marketing and advertising strategies; (i) sales techniques; (j) methods of conducting business; (k) technology platforms; (l) software; (m) web sites, publications, databases, and other content; (n) business processes material to the operation of the business; (o) symbols; (p) artwork; (q) copyrights; (r) franchise systems; (s) object code; (t) trading platforms; (u) document design and component elements; (v) patents and patent applications (including any abandoned applications); (w) pending trademark and service mark applications; (x) domain names and domain name registrations; (y) all products and services currently produced, marketed, licensed, sold or distributed by [Eastern Point]; (z) all products and services currently under development that [Eastern Point] intend[s] to make commercially available within 24 months from [users] last use the Platform; (aa) inventions, whether or not patentable, whether or not reduced to practice, or whether or not yet made the subject of a pending patent application or applications; (bb) ideas and conceptions of potentially patentable subject matter, including, without limitation, any patent disclosures, whether or not reduced to practice and whether or not yet made the subject of a pending Patent application or applications; (cc) Trade Secrets and confidential, technical, or business information (including ideas, formulas, compositions, designs, inventions, and conceptions of inventions whether patentable or unpatentable and whether or not reduced to practice); and (dd) technology (including know-how), manufacturing and production processes and techniques, methodologies, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans, and customer and supplier lists and information. "Intellectual Property" further includes as intellectual property owned, commissioned, developed, or created by [Eastern Point]. Certain Intellectual Property may exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in a unique combination, affords a competitive advantage and is a protectable secret.

105.    "Limited Use License" means:

a limited, revocable, non-exclusive, non-transferable, and non-sublicensable license granted by [Eastern Point] to the [user] in order to access and use the Platform and Services solely for the purpose(s) outlined in the applicable Account Documents and these Terms of Use. The [user] may not copy, reproduce, modify, adapt, create derivative works, or otherwise alter any materials accessed and used in accordance with the Limited Use License. The Limited Use License does not grant the [user] any rights to sublicense, distribute, market, or otherwise use [Eastern Point's] Collective Intellectual Property and Trade Secrets outside of the

scope expressly outlined in the applicable Account Documents and herein. All other rights are reserved expressly reserved by and to [Eastern Point].

106. "Misappropriation of Our Collective Intellectual Property and Trade Secrets" means:

(i) the acquisition of [Eastern Point's] Collective Intellectual Property or Trade Secrets by improper means; or (ii) the disclosure or use of [Eastern Point's] Trade Secrets without [Eastern Point's] express, written consent. For purposes of this definition, "improper means" shall be defined as the theft, fraud, bribery, industrial espionage, breaching of a contractual duty to keep something confidential, or inducing others to breach that duty. For purposes of clarity and avoidance of doubt, actual knowledge shall have no bearing on the Misappropriation of [Eastern Point's] Collective Intellectual Property and Trade Secrets; the Parties in Interest Agree that they have a duty to ensure that they prevent the improper acquisition or unauthorized disclosure of [Eastern Point's] Collective Intellectual Property or Trade Secrets.

107. "Platform and Services" means:

(i) the website (www.easternpointtrust.com); and (ii) any other sub domains, linked or affiliated websites, including any content, functionality, and services delivered, directly or indirectly, by [Eastern Point], whether web-based, on line, or otherwise; and (iii) all related services, including, fiduciary services, ministerial, technology, administration, escrow, or other such types of and related services provided by [Eastern Point] (the preceding collectively the "Platform;" and (iv) all documentation received from [Eastern Point], whether via the Platform, mail, email, scan, fax, or any other transmission method. For purposes of clarity and avoidance of doubt, the word "documentation" as used in this definition shall include Account Documents.

108. "Relevant Business(es)" means:

the business or businesses (including but not limited to any form of commercial activity) from time to time carried on by [Eastern Point], or any other Associated Undertaking, in respect of which [user] bec[omes] aware of Confidential Information and Collective Intellectual Property arising from their use of the Platform and Services.

109. "Trade Secrets" means:

all information, materials, and data, whether in oral, written, electronic, or other forms, that are not generally known to the public and that derive independent economic value, actual or potential, from not being generally known to, or readily ascertainable by proper means by, others who can obtain economic value from its disclosure or use. Trade Secrets include, but are not limited to: technical

information, business information, customer and client information, research and development, confidential business communications, compilation(s) of information (meaning the combination or aggregation of information that, in its entirety, is more valuable or significant than any individual component when made public, including business intelligence, strategic insights, and internal reports, that are kept confidential), or otherwise. This definition of Trade Secrets is intended to cover all forms of confidential and proprietary information, whether or not it is in tangible or intangible form, and includes all information, techniques, methods, or processes that are protected by trade secret laws and are used by [Eastern Point] for the purpose of gaining a competitive or economic advantage in the marketplace. For purposes of clarity and the avoidance of doubt, Trade Secrets shall include any and all information that is subject to confidentiality protections under applicable law, such as the Uniform Trade Secrets Act (UTSA), or its applicable s[t]ate variant or any similar trade secrets or misappropriation statute(s).

110.    The Terms of Use includes a "Non-Compete and Non-Disclosure" provision

requiring each user to, among other things, acknowledge and agree that:

[Eastern Point] and the Platform and Services operate in a unique and highly specialized business sector, which is international in scope with a limited number of competitors; that [Eastern Point] possess[es] a valuable body of confidential information and Collective Intellectual Property and that the [user]'s access and use of such knowledge of confidential information and Collective Intellectual Property directly benefits them by enabling them to use and garner advantageous financial outcomes from said same; and that the protection of our confidential information, Collective Intellectual Property, suppliers, goodwill, the stability of the Platform and Services, and/or any other Associated Undertaking(s) are business interests requiring and deserving protection from misuse or disclosure.

…

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any

interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

111.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point premises each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

112.    Similarly, the "Industrial Espionage and Industrial Property Protection" provision explicitly prohibits the competitive use, unauthorized disclosure, and misuse of Eastern Point's proprietary information and all other intellectual property:

> The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

### b.    The Eastern Point QSF Agreements

113.    The documents associated with each QSF—specifically, the Trust Agreement, the Trust Administration Agreement, and the Petitions for Distribution (collectively, the "QSF Agreements")—include agreements that incorporate the Terms of Use by reference, and bind the Interested Parties, which include a QSF claimant's attorney and settlement planner, to the Terms of Use with the establishment of each QSF.

### i.    The Trust Agreement

114.    Each Trust Agreement includes an "Incorporation of Terms and Conditions" provision that expressly incorporates the Terms of Use:

> All terms, provisions, and agreements, and as may be amended from time to time, set forth in the Terms and Conditions, and Privacy Statement of the associated websites, including but not limited to www.EasternPointTrust.com, are incorporated by reference into the Trust Agreement and the Trust Administration Agreement with the same force and effect as though fully set forth therein. Any capitalized term not defined in this Trust Agreement or the Trust Administration Agreement incorporated by reference hereto shall have the meaning ascribed to it in the Terms and Conditions and Privacy Statement."

### ii.    The Trust Administration Agreement

115.    The Trust Administration Agreement also includes an "Incorporation of Terms and Conditions" provision":

> All terms, provisions, and agreements, and as may be amended from time to time, set forth in the Terms and Conditions, and Privacy Statement of the associated websites, including but not limited to www.EasternPointTrust.com, are incorporated by reference into this Trust Administration Agreement and the Trust Agreement with the same force and effect as though fully set forth therein. Any capitalized term not defined in this Trust Administration Agreement shall have the meaning ascribed to it in the Terms and Conditions and Privacy Statement."

116.    Additionally, the Trust Administration Agreement includes an "Intellectual Property" provision expressly stating that "[t]he business, operational processes, and documents

of the Trustee constitute Intellectual Property, proprietary information, and copyright works of [Eastern Point]."

### iii.    The Petitions for Distribution

117.    All requests for distribution from a QSF must be made using the Eastern Point approved Petition for Distribution, which includes the following language incorporating the Terms of Use and QSF Agreements into each distribution request: "All terms, provisions, and agreements set forth in the referenced QSF Trust are incorporated by reference into this Instrument with the same force and effect as though fully set forth herein. Any capitalized term not defined herein shall have the meaning ascribed to it in the QSF Trust."

## II.    The JE Conspirators attempt to compete with Eastern Point using trade secrets and confidential information misappropriated from the QSF 360™ Platform

118.    As explained more fully below, "Justice Escrow" is the trade name given to an online QSF platform claimed to be "Powered by Flatirons Bank" that, in reality, is a redressed derivative of the QSF 360™ Platform, powered by the confidential, trade secret innovations misappropriated from Eastern Point for misuse and exploitation by the combination of Norman, Coccimiglio, Bunnell, Upchurch, Barber, Flatirons, Krochuk, Trellis, the Town of Glenrock, Mayor Roumell, Iberlin, and John Does (collectively, the "JE Conspirators"), acting in concert to knowingly and intentionally deprive Eastern Point of its valuable contract and property rights and usurp Eastern Point's share of the QSF market, under the guise of legitimate competition (the "JE Conspiracy").

### A.    Norman, Coccimiglio, Bunnell, and Upchurch (the "Settlement Conspirators") combine to steal Eastern Point's trade secrets and confidential information, despite having assented to the Terms of Use hundreds of times

119.    Norman is a personal injury attorney and Chief Operating Officer of the law firm Trial Lawyers for Justice.

120.    Norman and Trial Lawyers for Justice regularly advocate for the use of QSFs when negotiating settlements on behalf of their clients.

121.    Coccimiglio is a settlement planner and the owner of Justice for Life, who regularly advocates for the use of QSFs to sell commissioned financial products.

122.    Bunnell, a settlement professional operating under the banners of both Delta Settlement and Justice for Life, who regularly assists Coccimiglio with various tasks, such as requesting the establishment of a QSF to receive settlement proceeds for Norman's and Justice for Life's clients and then participating in the sale of commissioned financial products.

123.    Upchurch, once the CEO of Delta Settlements, regularly assists Coccimiglio with various tasks, such as requesting the establishment of a QSF to receive settlement proceeds for Norman's and Justice for Life's clients, and the promoting and assisting the sale of commissioned financial products in support of Coccimiglio.

124.    Throughout the remainder of this Complaint, where appropriate, Norman, Coccimiglio, Bunnell, and Upchurch may be referred to collectively as the "Settlement Conspirators."

**1.    The Settlement Conspirators each assent to the Terms of Use and QSF Agreements hundreds of times**

125.    Each of the Settlement Conspirators is a registered user of the QSF 360™ Platform and has utilized the QSF 360™ Platform to request or monitor QSFs.

126.    The Settlement Conspirators each created an account for the QSF 360™ Platform from a location outside the Commonwealth of Virginia by using a computer connected to the internet to interact with Eastern Point's servers and computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

127.    In exchange for access to the QSF 360™ Platform, the Settlement Conspirators accepted the terms and conditions imposed under the Terms of Use and the QSF Agreements on numerous occasions and over a course of years.

128.    Cumulatively, the Settlement Conspirators and their agents logged into the QSF 360™ Platform more than 6,600 times—each time reaffirming their assent to the Terms of Use.

### 2.    The Settlement Conspirators decide to defect after Eastern Point uncovers their tax evasion scheme

129.    For years, the Settlement Conspirators and Eastern Point enjoyed a mutually beneficial business relationship.

130.    Unbeknownst to Eastern Point, however, the Settlement Planners harbored secret (and unlawful) ambitions.

131.    Consisting of three settlement professionals and a personal injury attorney, the Settlement Conspirators are all incentivized to maximize the monetary stake they can claim in a plaintiff's judgment or settlement proceeds.

132.    For the settlement professionals, that could mean attempting to increase the revenue generated from commissions and fees by upselling plaintiffs on unnecessarily complex products that carry commissions at least 33% higher than the industry average.

133.    Upon information and belief, reported complaints have accused Coccimiglio of doing just that—aggressively over-structuring and misrepresenting products, failing to disclose the details of commissions and fees, and potentially employing misleading sales tactics.

134.    For Norman, who receives a pre-fixed percentage of the plaintiff's recovery as attorney fees, the only way to maximize his post-award return is to limit his share's exposure to tax liability.

135.    To that end, upon information and belief, Norman engaged Coccimiglio in a years-long tax avoidance scheme involving layers of sham entities and promissory notes with client QSF accounts.

136.    Specifically, upon information and belief, Coccimiglio would assist Norman in establishing a shell company to serve as the "borrower" of funds held in a client QSF, in an amount approximating Norman's attorney fee percentage, which Norman and Coccimiglio would memorialize in a fraudulent promissory note, knowing the loan would never be fully repaid.

137.    For example, upon information and belief, in or around 2018, Coccimiglio helped Norman and other attorneys establish a limited liability company called Justice Consulting, LLC ("Justice Consulting").

138.    Further upon information and belief, at no point in its existence did Justice Consulting engage in any continuous, legitimate business activity.

139.    Indeed, Justice Consulting was not even continuously active during its brief, three-year existence—having been temporarily administratively dissolved for tax-related delinquencies from August 2019 through April 2020, and finally administratively dissolved for tax-related delinquencies in August 2021.

140.    Yet, despite being administratively dissolved, Justice Consulting somehow entered into a promissory agreement to borrow nearly $2.4 million from a Norman-associated QSF in or around October 2021.

141.    To facilitate the transaction, Norman served as Justice Consulting's authorized representative and Nicholas Rowley, Norman's law partner, served as the authorized agent for the QSF.

142.    On information and belief, Coccimiglio prepared or altered the promissory note to incorporate a 2% interest rate, which was well below the then-current Applicable Federal Rate, and to obscure the repayment terms.

143.    Although the QSF received a partial repayment in January 2022, it received no additional payments toward the principal or interest, despite repeated demands to Justice Consulting and Norman.

144.    The Justice Consulting scheme finally came to light when, during a routine audit of outstanding promissory arrangements, Eastern Point learned that Justice Consulting had been administratively dissolved before entering the agreement—a fact that Norman intentionally concealed from Eastern Point and misrepresented in the promissory agreement.

145.    Upon learning that Justice Consulting was a non-existent company, Eastern Point called the note and demanded repayment from Norman—requests Norman belligerently refused, even going so far as to falsely claim that the promissory note contained no payment date, which would have been inconsistent with applicable tax law.

146.    Curiously, in an apparent effort to cover his tracks, Norman established a new Wyoming limited liability company called Justice Consulting in January 2025.

147.    The Justice Consulting promissory agreement remains unpaid and in default to this day.

148.    In this particular instance, on information and belief, Norman's actions were apparently intended to delay or avoid paying taxes on over $1 million.

149.    On further information and belief, having orchestrated other fraudulent promissory agreements with client QSFs over a period of years, Norman and Coccimiglio developed a lucrative habit of tax avoidance they could not sustain under Eastern Point's watch.

     **3.**      **Operating under false pretenses, the Settlement Conspirators exploit their good relationship with Eastern Point to conduct industrial espionage**

150.    Unbeknownst to Eastern Point, the Settlement Conspirators had been secretly plotting against Eastern Point for years.

151.    Little by little, through clandestine efforts or seemingly innocuous interactions, the Settlement Conspirators exploited their close relationship with Eastern Point to extract as much information about the QSF 360™ Platform as possible.

152.    On information and belief, the first acts in furtherance of the JE Conspiracy occurred on or about March 20, 2020, when a team of JE Conspirators comprised of Norman, Coccimiglio, Barber, and Bunnell diverted their private flight to New York and made a stop in Virginia to visit Eastern Point's offices.

153.    With no discernible purpose or agenda, the meeting served primarily as an opportunity for the JE Conspiracy contingent to get a lay of the land and ask unusually detailed questions about Eastern Point's operations.

154.    Eastern Point respectfully avoided offering any substantive answers.

155.    Efforts in furtherance of the JE Conspiracy continued after that.

156.    For example, having carefully reviewed the Terms of Use, the Settlement Conspirators understood that their continued use of the QSF 360™ Platform was subject to specific contractual obligations and limitations.

157.    The Settlement Conspirators mistakenly believed they could avoid those obligations and limitations by, at times, utilizing a rotating variety of fabricated login credentials they shared amongst themselves to conceal their true identities—breaching the Terms of Use each time.

158.    For example, on information and belief, in furtherance of the Settlement Conspirators' industrial espionage efforts, Bunnell attempted to conceal his identity when pilfering the QSF 360™ Platform by using login credentials associated with a former Delta Settlements employee.

159.    As another example, at one point, Coccimiglio made multiple direct inquiries to Eastern Point employees, seeking sensitive process information regarding Eastern Point's network of third-party banking relationships, its bank oversight and vetting process, and internal interest calculators.

160.    On information and belief, to avoid creating a written record, Coccimiglio pursued this line of inquiry using only phone calls and refused or avoided email communications.

161.    Also on information and belief, Coccimiglio's requests to access this information were made under false pretenses. Specifically, Coccimiglio represented that he needed this information to advise a prospective client regarding their potential use of the QSF 360™ Platform for a very large transaction that would be lucrative to Eastern Point.

162.    When asked for the details of the case (case citation, amounts, and the prospective client's identity), however, Coccimiglio refused to provide them.

163.    In reliance on Coccimiglio's contractual obligations and representations, Eastern Point provided Coccimiglio with a partial response to the request on March 23, 2023, with the express, written caveat that the material provided was "not for public distribution and is limited to client use only as the foregoing contains intellectual property, trade secrets and proprietary information, including but not limited to Foreground Intellectual Property." Foreground Intellectual Property is defined in Eastern Point's Terms of Use and includes, among other items, Eastern Point's trade secrets.

164.    Indeed, this information is highly valuable to Eastern Point because it could allow a competitor to learn about the operational methods behind the QSF 360™ Platform, which could be used to shortcut the extensive investment and development time that Eastern Point put into its business.

165.    Similarly, access to internal financial tools such as interest calculators and check documentation would give a competitor a ready-made operational backbone.

166.    In short, the information Coccimiglio obtained from Eastern Point under false pretenses could enable a rival to replicate Eastern Point's infrastructure and service quality far more quickly and cheaply than developing them independently, thereby significantly eroding Eastern Point's competitive advantage.

167.    Beyond the information regarding Eastern Point's network of third-party banking relationships, in the fall of 2023, Coccimiglio and Bunnell also made direct phone inquiries with Eastern Point regarding its process for acquiring an Employer Identification Number (EIN).

168.    This information is critical to the creation of QSFs because each QSF must have its own IRS-issued EIN.

169.    Therefore, on information and belief, Coccimiglio and Bunnell sought to learn Eastern Point's method for obtaining EINs for QSFs, which would be necessary for Justice Escrow to operate as a viable competitor to the QSF 360™ Platform.

170.    Additionally, Bunnell made numerous requests to Eastern Point personnel for information about advance notice of tax, regulatory, and legal changes, as well as QSF funding information, both of which would be valuable to a competing entity.

171.    Shortly after these inquiries, on or about November 7, 2023, Justice Escrow sent its first QSF to the Town of Lovell for approval.[2]

172.    On information and belief, Justice Escrow would not have been able to send its first QSF to the Town of Lovell[3] for approval without its reliance on Eastern Point's trade secrets and confidential information.

**B.  Using trade secrets and confidential information misappropriated from the QSF 360™ Platform, the Settlement Conspirators combine with Flatirons and others to create "Justice Escrow"**

173.    After realizing Eastern Point would not play a passive role in their tax evasion scheme, the Settlement Conspirators combined with Flatirons and others to create a competing QSF platform, now known as "Justice Escrow," using trade secrets and confidential information misappropriated from the QSF 360™ Platform.

**1.  Flatirons joins the JE Conspiracy to pivot from being just a fledgling bank to a fledgling bank masquerading as a QSF administrator**

174.    Flatirons is a two-branch Colorado bank with one location in Boulder and another in Longmont.

175.    In or around 2021, before joining ranks with the Settlement Conspirators, Flatirons had a material capital erosion from approximately $28 million in capital to roughly only $19

---

[2] As a demonstration of the Settlement Conspirators' spurious intention, they hid the JusticeEscrow.com website from search engines to avoid detection by Eastern Point. By doing so, they garnered additional time to interfere with and solicit Eastern Point clients in violation of the non-competition provisions of the assailed agreements to which the Settlement Conspirators had agreed.

[3] The Town of Lovell did, in fact, access Eastern Point's website on multiple occasions to conduct industrial espionage and evaluate Eastern Point's QSF process and better understand their role in the JE Conspiracy. Lovell accessed the system at least six times, with sessions lasting up to around 21 minutes.

million in capital. Subsequently, in 2023, Weiss downgraded Flatirons to a C-rated institution (on a scale where an "A" rating is the best).[4]

176.    Flatirons maintains a C rating on the Weiss scale to this day, with reported capital of less than $25 million and a "weak" liquidity rating.[5]

177.    Because Flatirons is a privately held bank, it has fewer options for raising capital than a publicly traded bank.

178.    A regulated financial institution nonetheless, Flatirons served a specific need in the conspiracy: the appearance of legitimacy.

179.    For its part, incentivized to consider any alternative sources of additional capital and revenue, Flatirons had nothing to lose when the Settlement Conspirators pitched the plan to steal business from Eastern Point by employing the same methods and processes powering the QSF 360™ Platform, only repackaging it as a Flatirons product called Justice Escrow.

180.    Flatirons had every reason to know that the Settlement Conspirators intended to peddle stolen goods because, upon information and belief, the Settlement Conspirators made no secret regarding the source of the methods and processes that would power Justice Escrow.

181.    Indeed, upon information and belief, the Settlement Conspirators even pitched Flatirons using stolen Eastern Point intellectual property, which Eastern Point had clearly designated confidential.

182.    Thus, Flatirons agreed to join the JE Conspiracy fully informed of its unlawful purpose.

---

[4] Based on public reports from Weiss Ratings, available as of September 23, 2025.

[5] https://weissratings.com/en/bank/57280 (last accessed Oct. 3, 2025).

183.    Today, after entering the QSF industry in 2024, the once-fledgling Flatirons has seen its assets and profits grow by millions

### 2.    Krochuk designs the Justice Escrow platform to mirror the functionality and content of the QSF 360™ Platform

184.    Although adding Flatirons to the conspiracy solved one piece of the puzzle, the conspiracy required more participants, also equipped with special skills, to fully realize its unlawful objectives.

185.    Neither Flatirons nor the Settlement Conspirators possessed the technical expertise necessary to build the electronic platform needed to facilitate the various technical processes and user interactions required of an automated QSF service.

186.    To meet that need, Flatirons and the Settlement Conspirators recruited Krochuk and Trellis.

187.    Krochuk and Trellis participated in the conspiracy by knowingly using the trade secrets and confidential information stolen from Eastern Point as a template to develop and implement the Justice Escrow platform—which, in appearance and functionality, is a nearly-identical clone of the QSF 360™ Platform's processes, documents, forms, and methods.

188.    For example, certain Justice Escrow documents substantially match their counterpart QSF 360™ Platform document in content, language, wording, form, style, and design. On information and belief, these documents are copied from the QSF 360™ Platform documents.

189.    The similarity of content, verbiage (words and phrases), form, style, and design, as well as website and platform functionality and business processes, evidences both the JE Conspirators' intent to systematically copy the QSF 360™ Platform, and their intentional use of Eastern Point's trade secrets and confidential information to create Justice Escrow.

190.     The substantial similarity between Justice Escrow and the QSF 360™ Platform, including their highly similar user interfaces, functionality, structures, design elements, and content, further evidences the JE Conspirators' pervasive of Eastern Point's trade secrets and confidential information to create Justice Escrow.

191.     In other words, Justice Escrow is a knockoff of the QSF 360™ Platform.

192.     By developing Justice Escrow through the unauthorized use of the trade secrets and confidential information the Settlement Conspirators stole from Eastern Point, the JE Conspirators bypassed the years of research, development, experience, and capital investment that would otherwise have been required to independently create a similar product.

193.     On information and belief, Flatirons, Krochuk, and Trellis each maintain an ownership interest in the Justice Escrow platform through their relationship with FBHC Software LLC.

194.     Formed on or around August 19, 2024, on information and belief, FBHC serves as a holding company for certain assets related to Justice Escrow.

195.     For example, a Trademark/Service Mark Application for use of the mark "Justice Escrow," filed on or about December 18, 2024, identifies FBHC as the "Owner of Mark" and Krochuk as a "Principal" of FBHC.

196.     In fact, Krochuk is one of three members of FBHC.

197.     The other two members of FBHC are FBHC Holding Company, a subsidiary of Flatirons, and Identity Management LLC, a wholly owned subsidiary of Trellis.

198.     Upon information and belief, Flatirons, Krochuk, and Trellis agreed to funnel certain Justice Escrow assets through FBHC to legitimize their roles in the JE Conspiracy and divide the return on their efforts.

### 3. The Settlement Conspirators and Flatirons market Justice Escrow as a knock-off of the QSF 360™ Platform in pitches to municipalities

199. To complete their launch of Justice Escrow as a competing platform, the Settlement Conspirators and Flatirons also needed to enlist a willing and readily accessible "governmental authority" to approve Justice Escrow QSFs, as required under IRC §1.468B-1(c).

200. To that end, the Settlement Conspirators and Flatirons began reaching out to contacts in Wyoming.

201. Specifically, the Settlement Conspirators and Flatirons sought to make inroads with the Town of Evansville by exploiting Norman's connection with Scott C. Murray, a shareholder with Williams, Porter, Day & Neville, P.C. ("WPDN") and an Evansville town attorney.

202. On February 8, 2023, at Norman's direction, Bunnell emailed Murray a link to download and review various QSF-related documents from a zip folder titled "EPTC QSF Docs."[6]

203. Indeed, given that the documents disclosed to Murray all related to a specific QSF administered through the QSF 360™ Platform, the Settlement Conspirators and Flatirons clearly misappropriated them from Eastern Point.[7]

204. Among other Eastern Point trade secrets and confidential information, the document folder included "a breakdown of how EPTC put together their bank system"; "QSF Creation Docs" generated by Eastern Point's platform., including trust agreements, petitions for QSF approvals, certificates of trust, funding and wiring instructions, and QSF summary documentation; financial reporting generated by Eastern Point's platform; and detailed examples of Eastern Point's proprietary workflows and processes, including the EPTC "trust flow."

---

[6] "EPTC" is an acronym for Eastern Point Trust Company.

[7] These also contained the underlying client's personally identifiable information, violating the applicable Privacy Policy to which Bunell and Norman had agreed.

205.    The trust flow describes the process that allows EPTC to perform same-day processing, including by revealing specific agreements, documents, policies, procedures, and proprietary techniques that EPTC uses to create a QSF, generate the associated documents, obtain approval from the governmental authority, generate the certificate of trust, generate wire transfer instructions, and apply for an EIN.

206.    On information and belief, Bunnell provided this information to the Town of Evansville at the direction of Norman.

207.    In another email to Murray on March 4, 2023, Norman explained that the Justice Escrow platform was intended to replicate the QSF 360™ Platform.

208.    He referred to documents attached to the email as describing the QSF 360™ Platform's workflow and explained: "we would want to do the same."

209.    Norman added: "Right now EPTC has a deal with the Town where they prepare the documents for them so it can be processed the same day. In this case, I still think that would be best, but we just have a system that tracks/forwards/etc. the escrow accounts as they are set up. The work is 100% automated."

210.    Norman—along with the other Settlement Conspirators and Flatirons—sought to create a knockoff of Eastern Point's QSF 360™ Platform.

211.    In the same email, Norman also included a "sample trust flow" that Justice Escrow sought to create based on documents misappropriated from the QSF 360™ Platform.

212.    The "sample trust flow" included many pages of screenshots of Eastern Point instructions, filings, and other materials, including multiple documents bearing Eastern Point's name or logo.

213.    Notably, Norman copied Barber on most of his emails to Murray because, on information and belief, Barber was assisting the Settlement Conspirators and Flatirons in their efforts to steal Eastern Point's trade secrets and confidential information and market a competing QSF platform.

214.    In or about July 2023, Norman contacted the town administrator for the Town of Lovell, Wyoming, to solicit the town administrator's support in getting Lovell to act as a governmental authority for Justice Escrow.

215.    During discussions with the Town of Lovell in July and August 2023, Norman indicated that Justice Escrow could compete with another QSF platform to deliver a better product to the market and also shared the same "sample trust flow" as he shared with the Town of Evansville, which he represented was "proprietary" to Justice Escrow.

216.    The Town of Lovell briefly acted as Justice Escrow's governmental authority.

### 4.    Iberlin and WPDN solicit other municipalities—who are also their clients—to retroactively approve invalid QSFs and to approve new QSFs for Justice Escrow—in exchange for a fee

217.    On information and belief, Justice Escrow's relationship with Lovell began crumbling after an outside tax opinion supported Lovell's counsel's concerns that the Justice Escrow model violated federal tax law and Wyoming law because Flatirons is a mere bank with no Trust Charter or discretionary powers.

218.    Flatirons's lack of valid discretionary powers concerned counsel because, if Flatirons cannot exercise discretion with respect to QSF assets, it cannot legally possess any settlement funds paid into a QSF. Under such circumstances, control over the QSF passes automatically to the claimants, which triggers the constructive receipt and economic benefit doctrine, making the funds within the QSF immediately taxable and not eligible for assignment— thereby defeating the entire purpose of the QSF.

219.    Lovell also became concerned when Flatirons refused Lovell's repeated requests, made in accordance with its continuing jurisdictional powers, for specific information necessary for the town to fulfill its legal obligations.

220.    The information sought was basic and included, among other things, proof of tax returns, payment of tax obligations, and compliance with the operational aspects of 26 C.F.R. § 1.468B-1 *et seq.*—information necessary for Lovell to fulfill its legal obligation to ensure compliance with IRS regulations and Wyoming law.

221.    Despite previously representing to Lovell that such information would be available to the town on demand, Flatirons refused to comply with Lovell's requests.[8]

222.    In response to the deteriorating relationship with Lovell, the Settlement Conspirators and Flatirons sought to enlist other municipalities in Wyoming, including the Town of Glenrock, to act as qualified governmental authorities to retroactively approve disqualified QSFs (that were invalid as of Lovell's termination of continuing jurisdiction), as well as approve new QSFs.[9]

223.    To aid in that effort, the Settlement Conspirators enlisted WPDN shareholder Amy Iberlin, whose law firm acts as counsel for several Wyoming municipalities.

---

[8] If the administrator of a QSF refuses to comply with demands from the governmental authority for access to information and/or documents, or otherwise hinders continuing jurisdiction, leading the governmental authority to revoke or terminate its continuing jurisdiction of the QSF, the fund fails the requirement of 26 C.F.R. § 1.468B-1(c)(1) and thus loses qualification as a QSF under 26 C.F.R. § 1.468B-1(a), thereby exposing the transferors and claimants to adverse tax outcomes.

[9] Under 26 C.F.R. § 1.468B-1(e)(1), approval by a new governmental authority, after a fund lost its status as a QSF due to the termination of the initial governmental authority's continuing jurisdiction, cannot have a retroactive effect. Additionally, if fraud, bad faith, or false pretenses were the basis for the termination, the disqualification may apply retroactively back to the QSF's inception.

224.    Although Iberlin leveraged her experience and connections as a town attorney to promote Justice Escrow and broker relationships with the JE Conspirators, her efforts to sell municipalities on the opportunity to serve as a Justice Escrow governmental authority fell far outside the practice of law.

225.    Motivated by a desire for personal enrichment as a key JE Conspirator, Iberlin was aggressive in pushing municipalities to serve as Justice Escrow's governmental authority, telling the City of Casper that it's "a no brainer in terms of getting $ with no risk to you or the City!"

226.    Iberlin also made clear that, for each QSF approved by the municipalities she signed up to assist Justice Escrow, Flatirons would pay her and WPDN. This amounted to receipt of a "finder's fee" or sales commission.

227.    In Iberlin's communications with these municipalities, she also disclosed Eastern Point's trade secrets and confidential information, including but not limited to files titled "EPTC Banking Network," "List of Banks," and "QSF Memorandum in Support – EPTC."

228.    Coccimiglio obtained those documents from Eastern Point under false pretenses, and only after Eastern Point conspicuously marked them as "Confidential. For Client Use Only."

229.    On information and belief, as a WPDN shareholder at Scott Muarry's law firm, Iberlin knew or had reason to know that this information had been obtained in violation of Eastern Point's contractual and trade secret rights, and that her disclosure and use of that information to benefit the Justice Escrow platform further violated Eastern Point's rights.

230.    Indeed, if there existed any doubt that Iberlin understood the unlawful nature and purpose of the JE Conspiracy and her role within it, she laid it all to waste when she personally, and without legal justification, obstructed Glenrock from responding to Wyoming Freedom of Information Act requests related to Justice Escrow—improperly withholding entire swaths of

documents on an erroneous assertion of privilege to avoid disclosure of the Town's incriminating communications with the Settlement Conspirators and Flatirons.

231.    Although Iberlin and WPDN subsequently admitted Iberlin acted improperly, and produced a portion of the responsive documents, Iberlin had exposed herself as an unapologetic operative of the JE Conspiracy who actively communicated with the Settlement Conspirators and Flatirons for instructions.

232.    On information and belief, the Settlement Conspirators, Flatirons, and Iberlin used Eastern Point's trade secret and confidential information extensively in their efforts to recruit municipalities like Glenrock as governmental authorities.

233.    On information and belief, the trade secret and confidential information they used in this process included detailed information about Eastern Point's business processes, Eastern Point's network of third-party banking relationships, bank oversight and vetting process, internal interest calculators, a description of how Eastern Point's QSFs ensure same-day liquidity, and template documents used to generate approvals of QSFs among other materials.

234.    That information was disclosed to Glenrock and Mayor Roumell under circumstances in which they knew or should have known that it was misappropriated from Eastern Point and, in using it for the specific purpose of competing with Eastern Point, would inevitably cause harm to Eastern Point.

235.    Additionally, communications in the possession of Eastern Point indicate that an agreement exists between Iberlin, WPDN, Glenrock, and Flatirons, as Flatirons has and continues to pay for all costs and expenses associated with Glenrock blocking access to government records related to the matter.

236.    Moreover, the entire arrangement between Glenrock and Flatirons is suspect because it does not appear from any records reviewed by Eastern Point that Mayor Roumell obtained approval from the town's Board of Directors, as required under Wyoming law, prior to engaging Glenrock in a contractual relationship with Flatirons.

237.    Considering the totality of the circumstances, the arrangement with Glenrock proves the essence of a widespread conspiracy and that it has reached the halls of government.

**C. The Settlement Conspirators seek to unfairly win business away from Eastern Point to Justice Escrow**

238.    After misappropriating Eastern Point's trade secrets and confidential information to set up a competing platform, the Settlement Conspirators began to divert business from Eastern Point to Justice Escrow.

239.    At the same time, hiding said facts from Eastern Point, Bunnell, Coccimiglio, and the other Settlement Conspirators took great pains to cover their tracks and mislead Eastern Point.

240.    In July 2024, Bunnell convened a call between Eastern Point and certain Delta Settlements clients in which Bunnell sought to incorrectly blame Eastern Point for delays in processing QSFs. On information and belief, this was an attempt to tortiously interfere with Eastern Point's business by amplifying a misrepresentation to divert prospective clients from Eastern Point to Justice Escrow.

241.    Then, on November 7, 2024, a settlement planner sent a message to a popular listserv used by settlement administrators asking for QSF administrator options in the marketplace. To which Upchurch, the CEO of Delta and Bunnell's superior, replied, "Flatirons Bank is getting into the Litigation lending game and is developing a suite of products for attorneys. They are introducing a full technology suite tailored to attorneys and their banking needs. One area that they

have focused on are QSFs.  As you will see in the attached website, they have a QSF service that is new to the market."

242.    Upchurch also encouraged others to "brush up on the QSF options" and "engage with Justice Escrow." On information and belief, these messages were prepared by or in coordination with other JE Conspirators to steer business away from Eastern Point.

## III.    The JE Conspiracy has harmed and continues to harm Eastern Point

243.    On information and belief, the Justice Escrow platform has facilitated the establishment of nearly 200 QSFs.

244.    Defendants' misappropriation and infringement, in violation of Eastern Point's contractual rights and the law, have inflicted significant harm on Eastern Point, including lost revenue, diminished market share, lost long-term client relationships and goodwill, and reputational damage, while unjustly enriching Defendants through their continued and unauthorized use of Eastern Point's trade secrets and confidential information.

245.    Additionally, on information and belief, Settlement Conspirators and Flatirons have sought to hinder Eastern Point's ability to seek proper recourse by destroying and/or withholding potential evidence. In one instance, the town of Lovell requested documentation evidencing tax returns, payment of tax obligations, and compliance with the operational aspects of 26 C.F.R. §1.468B-1 et seq. Flatirons, despite its prior representations and Lovell's then-role as the purported "governmental authority" refused to provide either the requested documentation or access to such, thereby depriving the town of Lovell of necessary information, and preventing the public, including Eastern Point, from seeking the same pursuant to valid requests under the applicable Freedom of Information Act.

246.    Further, on information and belief, Settlement Conspirators have operated, and continue to operate, under a methodology designed to avoid any record of documentation, such as the apparently unlocatable agreement between Flatirons and the Town of Glenrock.

247.    Settlement Conspirators and Flatirons have also engaged in an extensive campaign to malign and disparage Eastern Point in the QSF market generally and with Eastern Point clients specifically. On information and belief, Settlement Conspirators and Flatirons have maliciously asserted that Eastern Point's QSF 360™ Platform is outdated and lacking transparency.

248.    With respect to the assertion that the QSF 360™ Platform lacks transparency, the Platform is fully compliant with both the trust code and the principal and income act. This is a fact Settlement Conspirators are well aware of, as Bunnell previously objected to Eastern Point providing the detailed reporting available on the QSF 360™ Platform, as such reporting allegedly provided too much information.

249.    Additionally, this false characterization conveniently omits the fact that not only does the QSF 360™ Platform provide fully compliant reporting, but said reporting may be filtered into a more easily digestible data set and can be exported, convenient features Eastern Point is unaware of any other provider offering—including Justice Escrow.

250.    Eastern Point recently introduced a new QSF product, known as the Confidential QSF, designed to safeguard sensitive and personal information and enhance privacy and confidentiality. This product offers a one-of-a-kind solution in the realm of confidential and private settlements, and is but one of many examples of Eastern Point innovating new solutions to bring consistent value to its clients; hardly the result of stale technology or outdated approaches.

251.    Furthering these efforts to malign Eastern Point, on information and belief, Settlement Conspirators have made statements to Eastern Point clients falsely asserting that Eastern Point is facing financial hardship and is on the verge of bankruptcy.

## COUNT I
## BREACH OF CONTRACT

### (Against Jakob Z. Norman)

252.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

253.    On or about September 5, 2019, Norman or his agent created an account on the QSF 360™ Platform using his "jakob@TL4J.com" email address.

254.    Norman or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

255.    In exchange for Eastern Point providing Norman an account to access and use the QSF 360™ Platform, Norman or his agent agreed to the Terms of Use at least two times during the account creation process.

256.    Beginning from the date he created the account through around May 28, 2025, Norman or his agent logged into his account with access to the QSF 360™ Platform on at least 120 occasions.

257.    In exchange for Eastern Point allowing Norman to continue accessing and using the QSF 360™ Platform, Norman or his agent agreed to the Terms of Use each time he or his agent logged into his account.

258.    Norman's account is associated with 104 QSFs requested via Eastern Point's QSF 360™ Platform between 2019 and 2024.

259.    Eastern Point executed each such request either at Norman's direction or at the direction of an agent acting on Norman's behalf.

260.    Upon submitting each such request, Norman, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

261.    By accepting the Terms of Use and QSF Agreements, Norman assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

262.    Norman breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

263.    Norman breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

264.    Norman breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

265.    As a direct and proximate result of Norman's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

266.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Norman's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Norman and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT II
## BREACH OF CONTRACT

### (Against Nicholas J. Coccimiglio)

267.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

268.    On or about November 18, 2018, Coccimiglio or his agent created an account on the QSF 360™ Platform using his "nick@justiceforlife.com" email address.

269.    Coccimiglio or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

270.    In exchange for Eastern Point providing Coccimiglio an account to access and use the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use at least two times during the account creation process.

271.    Beginning from the date he or his agent created the account through around May 28, 2025, Coccimiglio or his agent logged into his account with access to the QSF 360™ Platform on at least 4,900 occasions.

272.    In exchange for Eastern Point allowing Coccimiglio to continue accessing and using the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use each time he or his agent logged into his account.

273.    Coccimiglio's account is associated with at least 622 QSFs requested via Eastern Point's QSF 360™ Platform between 2018 and 2024.

274.    Eastern Point executed each such request either at Coccimiglio's direction or at the direction of an agent acting on Coccimiglio's behalf.

275.    Upon submitting each such request, Coccimiglio, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

276.    By accepting the Terms of Use and QSF Agreements, Coccimiglio assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

277.    Coccimiglio breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

278.    Coccimiglio breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

279.     Coccimiglio breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

280.     As a direct and proximate result of Coccimiglio's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

281.     Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Coccimiglio's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Coccimiglio and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT III
## BREACH OF CONTRACT

### (Against William Bunnell)

282.     Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

283.     On or about May 29, 2019, Bunnell or his agent created an account on the QSF 360™ Platform using his "support@justiceforlife.com" email address.

284.     Bunnell or his agent created the account using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

285.     In exchange for Eastern Point providing Bunnell an account to access and use the QSF 360™ Platform, Bunnell or his agent agreed to the Terms of Use at least two times during the account creation process.

286.    Beginning from the date he created the account through around May 28, 2025, Bunnell or his agent logged into his account with access to the QSF 360™ Platform on at least 576 occasions.

287.    In exchange for Eastern Point allowing Bunnell to continue accessing and using the QSF 360™ Platform, Bunnell or his agent agreed to the Terms of Use each time he or his agent logged into his account.

288.    Bunnell's account is associated with at least 625 QSFs requested via Eastern Point's QSF 360™ Platform between 2018 and 2024.

289.    Eastern Point executed each such request either at Bunnell's direction or at the direction of an agent acting on Bunnell's behalf.

290.    Upon submitting each such request, Bunnell, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

291.    By accepting the Terms of Use and QSF Agreements, Bunnell assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

292.    Bunnell breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

293.    Bunnell breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating

Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

294.    Bunnell breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

295.    As a direct and proximate result of Bunnell's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

296.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Bunnell's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Bunnell and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT IV
## BREACH OF CONTRACT

### (Against Michael Upchurch)

297.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

298.    In exchange for access to the QSF 360™ Platform, Upchurch or his agent accepted the terms and conditions imposed under the Terms of Use and the QSF Agreements on numerous occasions and over a course of years.

299.    On or about February 10, 2022, Upchurch or his agent created an account on the QSF 360™ Platform using his "team@deltasettlements.com" email address.

300.    Upchurch or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

301.    In exchange for Eastern Point providing Upchurch an account to access and use the QSF 360™ Platform, Upchurch or his agent agreed to the Terms of Use at least two times during the account creation process.

302.    Beginning from the date he or his agent created the account through around May 28, 2025, Upchurch or his agent logged into his account with access to the QSF 360™ Platform on at least 576 occasions.

303.    In exchange for Eastern Point allowing Upchurch or his agent to continue accessing and using the QSF 360™ Platform, Upchurch or his agent agreed to the Terms of Use each time he logged into his account.

304.    Upchurch's account is associated with at least 31 QSFs established by Eastern Point between 2017 and 2024.

305.    Eastern Point established each QSF associated with Upchurch's account either at Upchurch's direction or at the direction of an agent acting on Upchurch's behalf.

306.    Upon the establishment of each QSF associated with Upchurch's account, Upchurch or his agent electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

307.    By accepting the Terms of Use and QSF Agreements, Upchurch assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

308.    Upchurch breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

309.    Upchurch breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

310.    Upchurch breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

311.    As a direct and proximate result of Upchurch's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

312.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Upchurch's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Upchurch and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT V
## BREACH OF CONTRACT

**(Against Trial Lawyers for Justice)**

313.     Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

314.     On or about March 1, 2019, Trial Lawyers for Justice, through agents authorized to act on its behalf, created an account on the QSF 360™ Platform using a "nick@tl4j.com" email address.

315.     Trial Lawyers for Justice created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

316.     In exchange for Eastern Point providing Trial Lawyers for Justice an account to access and use the QSF 360™ Platform, Trial Lawyers for Justice agreed to the Terms of Use at least two times during the account creation process.

317.     Beginning from the date Trial Lawyers for Justice created the account through around May 28, 2025, agents authorized to act on behalf of Trial Lawyers for Justice logged into its account with access to the QSF 360™ Platform on at least 454 occasions.

318.     In exchange for Eastern Point allowing Trial Lawyers for Justice to continue accessing and using the QSF 360™ Platform, Trial Lawyers for Justice agreed to the Terms of Use each time its authorized agents logged into its account.

319.     Trial Lawyers for Justice's account is associated with at least 150 QSFs established by Eastern Point between March 1, 2019, and May 28, 2025.

320.     Eastern Point established each QSF associated with Trial Lawyers for Justice's account at the direction of an agent authorized to act on behalf of Trial Lawyers for Justice.

321.    Upon the establishment of each QSF associated with Trial Lawyers for Justice's account, agents authorized to act on behalf of Trial Lawyers for Justice electronically executed the Attestation and reaffirmed Trial Lawyers for Justice's assent to the Terms of Use.

322.    By accepting the Terms of Use and QSF Agreements, Trial Lawyers for Justice assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

323.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

324.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted it, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

325.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

326. As a direct and proximate result of Trial Lawyers for Justice's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

327. Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Trial Lawyers for Justice's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Trial Lawyers for Justice and its co-conspirators, in addition to any and all other relief available under the law.

### COUNT VI
### BREACH OF CONTRACT

### (Against Justice for Life)

328. Eastern Point reasserts the prior allegations in Paragraphs 1 through 251 of this Complaint as if fully set forth herein.

329. On or about April 16, 2019, Justice for Life, through agents authorized to act on its behalf, created an account on the QSF 360™ Platform using a "nick@justiceforlife.com" email address.

330. Justice for Life created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

331. In exchange for Eastern Point providing Justice for Life an account to access and use the QSF 360™ Platform, Justice for Life agreed to the Terms of Use at least two times during the account creation process.

332. Beginning from the date Justice for Life created the account through around May 28, 2025, agents authorized to act on behalf of Justice for Life logged into its account with access to the QSF 360™ Platform on at least 4,934 occasions.

333.    In exchange for Eastern Point allowing Justice for Life to continue accessing and using the QSF 360™ Platform, Justice for Life agreed to the Terms of Use each time its authorized agents logged into its account.

334.    Justice for Life's account is associated with at least 625 QSFs established by Eastern Point between March 2, 2018, and October 29, 2024.

335.    Eastern Point established each QSF associated with Justice for Life's account at the direction of an agent authorized to act on behalf of Justice for Life.

336.    Upon the establishment of each QSF associated with Justice for Life's account, agents authorized to act on behalf of Justice for Life electronically executed the Attestation and reaffirmed Trial Lawyers for Justice's assent to the Terms of Use.

337.    By accepting the Terms of Use and QSF Agreements, Justice for Life assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

338.    Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

339.    Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted it, by accessing the QSF

360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

340.    Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

341.    As a direct and proximate result of Justice for Life's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

342.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Justice for Life's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Trial Lawyers for Justice and its co-conspirators, in addition to any and all other relief available under the law.

## COUNT VII
## VIOLATIONS OF THE DEFEND TRADE SECRETS ACT ("DTSA")
## 18 U.S.C. § 1836 ET SEQ.

**(Against Flatirons Bank, Nicholas J. Coccimiglio, Will Bunnell, Timothy Krochuk, Trellis Software, Inc., and Amy Iberlin (collectively, the "Trade Secret Defendants"))**

343.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 342 of this Complaint as if fully set forth herein.

344.    Eastern Point owns and/or lawfully possesses trade secrets related to its business including, but not limited to, the QSF 360™ Platform and its related proprietary methods, processes, documents, and systems, and other trade secret described herein (the "Eastern Point Trade Secrets").

345. The Trade Secret Defendants have acquired and have used or are planning to use the Eastern Point Trade Secrets under circumstances in which they knew or had reason to know the Eastern Point Trade Secrets were obtained without authorization.

346. The Settlement Conspirators were given access to Eastern Point's Trade Secrets while they were clients of Eastern Point, under circumstances that the Settlement Conspirators knew or had reason to know gave rise to a duty to maintain the secrecy and limit their use.

347. The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

348. The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent, having used improper means to acquire knowledge of the trade secrets in violation of their obligations.

349. Flatirons, Krochuk, and Trellis knew or had reason to know that the Settlement Conspirators misappropriated the Eastern Point Trade Secrets, and Flatirons, Krochuk, and Trellis used the trade secrets to set up a competing product to the QSF 360™ Platform.

350. Iberlin knew or had reason to know that she was in possession of and was using Eastern Point's trade secrets in an effort to recruit municipalities to join Justice Escrow, and that the Eastern Point Trade Secrets had been acquired by the Settlement Conspirators through improper means.

351. The Trade Secret Defendants have used and are now using the Eastern Point Trade Secrets to unfairly compete with Eastern Point.

352. The Eastern Point Trade Secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

353.    Eastern Point has taken reasonable measures to maintain the confidential nature of the Eastern Point Trade Secrets, including but not limited to the Eastern Point Trade Secrets that the Trade Secret Defendants misappropriated.

354.    Reasonable efforts that Eastern Point has taken to maintain the secrecy of the Eastern Point Trade Secrets include but are not limited to requiring its website and QSF 360™ Platform users (including the Settlement Conspirators) to comply with non-disclosure and confidentiality obligations protecting the Eastern Point Trade Secrets.

355.    The Eastern Point Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

356.    The Eastern Point Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

357.    The Trade Secrets Defendants possessed and used, and continue to possess and use, the Eastern Point Trade Secrets without Eastern Point's express or implied consent.

358.    On information and belief, the Settlement Conspirators' actions in misappropriating the Eastern Point Trade Secrets were done willfully and maliciously. The Settlement Conspirators acted with actual malice or a wanton and willful disregard to Eastern Point, which foreseeably could have been, and was, harmed by their acts.

359.    The Trade Secrets Defendants' actions violate the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq.

360.    The Trade Secret Defendants' misappropriation of the Eastern Point Trade Secrets has caused and will cause Eastern Point damages in an amount to be determined at trial.

361.    In addition, Eastern Point will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent the Trade Secret Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Eastern Point Trade Secretes from continuing to inure unfairly to the Trade Secret Defendants' benefit.

## COUNT VIII
## VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT ("VUTSA")
## VA. CODE § 59.1-336 ET SEQ.

### (Against the Trade Secret Defendants)

362.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 361 of this Complaint as if fully set forth herein.

363.    Eastern Point owns and/or lawfully possesses confidential information and trade secrets related to its business including, but not limited to, the Eastern Point Trade Secrets.

364.    The Trade Secret Defendants have acquired and have used or are planning to use the Eastern Point Trade Secrets under circumstances in which they knew or had reason to know the Eastern Point Trade Secrets were obtained without authorization.

365.    The Settlement Conspirators were given access to the Eastern Point Trade Secrets while they were clients of Eastern Point, under circumstances that the Settlement Conspirators knew or had reason to know gave rise to a duty to maintain their secrecy and limit their use.

366.    The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

367.    The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

368.    The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent, having used improper means to acquire knowledge of the trade secrets in violation of their obligations.

369.    Flatirons, Krochuk, and Trellis knew or had reason to know that the Settlement Conspirators misappropriated the Eastern Point Trade Secrets, and Flatirons, Krochuk, and Trellis used the Eastern Point Trade Secrets to set up a competing product to the QSF 360™ Platform.

370.    Iberlin knew or had reason to know that she was in possession of and was using Eastern Point's trade secrets in an effort to recruit municipalities to join Justice Escrow, and that the Eastern Point Trade Secrets had been acquired by the Contract Defendants through improper means.

371.    The Trade Secret Defendants have used and are now using the Eastern Point Trade Secrets to unfairly compete with Eastern Point.

372.    Eastern Point has taken reasonable measures to maintain the confidential nature of the Eastern Point Trade Secrets, including but not limited to the Eastern Point Trade Secrets that the Trade Secret Defendants misappropriated.

373.    Reasonable efforts that Eastern Point has taken to maintain the secrecy of the Eastern Point Trade Secrets include but are not limited to requiring its website and QSF 360™ Platform users (including the Settlement Conspirators) to comply with non-disclosure and confidentiality obligations protecting the Eastern Point Trade Secrets.

374.    The Eastern Point Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

375.     The Eastern Point Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

376.     The Trade Secrets Defendants possessed and used, and continue to possess and use, the Eastern Point Trade Secrets without Eastern Point's express or implied consent.

377.     On information and belief, the Settlement Conspirators' actions in misappropriating the Eastern Point Trade Secrets were done willfully and maliciously. The Settlement Conspirators acted with actual malice or a wanton and willful disregard to Eastern Point, which foreseeably could have been, and was, harmed by their acts.

378.     The Trade Secrets Defendants actions violate the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336 et seq.

379.     The Trade Secret Defendants' misappropriation of the Eastern Point Trade Secrets has caused and will cause Eastern Point damages in an amount to be determined at trial.

380.     In addition, Eastern Point will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent the Trade Secret Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Eastern Point Trade Secretes from continuing to inure unfairly to the Trade Secret Defendants' benefit.

**COUNT IX**
**VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT**
**VA. CODE § 18.2-152.12**

**(Against the Settlement Conspirators)**

381.     Eastern Point reasserts the prior allegations in Paragraphs 1 through 380 of this Complaint as if fully set forth herein.

382.     The Settlement Conspirators, both individually and collectively, committed multiple violations of the Virginia Computer Crimes Act, causing injury to Eastern Point.

383.     First, the Settlement Conspirators, both individually and collectively, engaged in a persistent course of conduct involving multiple acts of Computer Fraud, in violation of Va. Code § 18.2-152.3, by repeatedly using Eastern Point's computer network, without authority, and obtaining Eastern Point's property and services by false pretenses and converting Eastern Point's trade secrets and confidential information.

384.     Second, the Settlement Conspirators, both individually and collectively, engaged in a persistent course of conduct involving multiple acts of Computer Trespass, in violation of Va. Code § 18.2-152.4, by, without authority, using Eastern Point's computer network to make or cause to be made unauthorized copies of the computer data residing in, communicated by, or produced by Eastern Point's computer network.

385.     As a direct and proximate result of the Settlement Conspirators' violations of the Virginia Computer Crimes Act, Eastern Point has sustained and will continue to sustain damages.

**COUNT X**
**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030(g)**

**(Against the Settlement Conspirators, Flatirons, Krochuk, and Trellis)**

386.     Eastern Point reasserts the prior allegations in Paragraphs 1 through 385 of this Complaint as if fully set forth herein.

387.     Eastern Point houses and maintains the QSF 360™ Platform on a secured computer network and server located in the Commonwealth of Virginia.

388.     Eastern Point's secured computer network and server consist of high-speed data processing devices that perform logical, arithmetic, or storage functions related to the operation of the QSF 360™ Platform.

389.     All client interactions with the QSF 360™ Platform occur on Eastern Point's secured computer network and server located in Virginia.

390.    Eastern Point's secured computer network and server are used in and affect interstate and foreign commerce or communication because they facilitate economic transactions and communications between Eastern Point and clients utilizing the QSF 360™ Platform via internet connected devices located outside the Commonwealth of Virginia.

391.    While the JE Conspiracy was already underway, to mask their true intentions and maintain access to the QSF 360™ Platform, each of the Settlement Conspirators assented to the Terms of Use and the QSF Agreements on multiple occasions, thereby intentionally representing to Eastern Point that the Settlement Conspirators intended to use the QSF 360™ Platform solely for non-competitive purposes and abide by the obligations imposed under the Terms of Use.

392.    The Settlement Conspirators knew those representations were false when they made them, and that they had no intention of honoring their obligations under the Terms of Use, because the Settlement Conspirators had already decided to steal Eastern Point's trade secrets and confidential information from the QSF 360™ Platform and create a competing platform through the derivative use of Eastern Point's trade secrets and confidential information.

393.    The Settlement Conspirators' representations were material because Eastern Point would not have allowed the Settlement Conspirators to continue accessing the QSF 360™ Platform if it knew the representations were false when the Settlement Conspirators made them.

394.    In fact, had the Settlement Conspirators not clicked the "CONTINUE" button when prompted during the account creation and login processes, access to the QSF 360™ Platform would have been impossible because, until each user acknowledges their assent to the Terms of Use and Privacy Policy, the QSF 360™ Platform remains inaccessible to them.

395.    Because the Settlement Conspirators were longtime clients with no known or observable interest in entering the QSF market, it was reasonable for Eastern Point to rely upon

the Settlement Conspirators' misrepresentations and Eastern Point did, in fact, rely upon the Settlement Conspirators' misrepresentations to its detriment.

396.    The Settlement Conspirators, both individually and collectively, committed multiple violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA"), causing damage and loss to Eastern Point.

397.    First, the Settlement Conspirators, both individually and collectively, and through a persistent course of conduct, committed multiple violations of 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing Eastern Point's computer network and server on multiple occasions, without authority or in excess of authorized access, to obtain information from the QSF 360™ Platform.

398.    Second, the Settlement Conspirators, both individually and collectively, and through a persistent course of conduct, committed multiple violations of 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud, accessing Eastern Point's computer network and server on multiple occasions, without authority or in excess of authorized access, to further their intended fraud and misappropriate Eastern Point's trade secrets and confidential information from the QSF 360™ Platform.

399.    The Settlement Conspirators, Flatirons, Krochuk, and Trellis violated 18 U.S.C. § 1030(b) by conspiring to commit the above-described offenses under 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(4).

400.    The Settlement Conspirators' violations of the CFAA have caused and continue to cause Eastern Point to incur significant costs in responding to the offenses, resulting in loss aggregating at least $5,000 in value within any applicable 1-year period.

401.    As a direct and proximate result of the Settlement Conspirators' violations of the CFAA, Eastern Point has sustained and will continue to sustain damages.

<div align="center">

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)**

**(Against Flatirons, Krochuk, and Trellis)**

</div>

402.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 401 of this Complaint as if fully set forth herein.

403.    Under 18 U.S.C. § 1962(b), it is "unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in … any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

404.    Flatirons, Krochuk, and Trellis (collectively, the "1962(b) Defendants") each violated 18 U.S.C. § 1962(b) by acquiring and maintaining a membership interest in FBHC, either directly or indirectly, through a pattern of racketeering activity.

405.    Each of the 1962(b) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Krochuk) or an entity (Flatirons and Trellis) capable of holding a legal or beneficial interest in property.

406.    FBHC is an "enterprise," as defined by 18 U.S.C. § 1961(4), engaged in interstate commerce, or whose activities affect interstate or foreign commerce, because it is a legal entity— here, a limited liability company—with a proprietary interest in the commercial marks used by Flatirons as the trade name and image of Flatirons's Justice Escrow QSF service, which service Flatirons markets and makes available to clients across the country, and which use by Flatirons is, on information and belief, permitted by FBHC under the terms of a licensing or other agreement entitling FBHC to some form of compensation from Flatirons.

<div align="center">65</div>

407.    Each of the 1962(b) Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two of the predicate acts listed under 18 U.S.C. § 1961(1).

408.    The QSF 360™ Platform is a product or service used in or intended for use in interstate commerce.

409.    Flatirons, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

    d.      Fourth, in violation of 18 U.S.C. § 1832(a)(5), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

    e.      Fifth, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), Flatirons conducted or attempted to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.

        i.      For purposes of this Paragraph 398(e), "financial transaction" means movement of funds, by wire or other means affecting interstate or foreign commerce, to effectuate the transfer, delivery, or disposition of those funds from Flatirons to anyone one of FBHC, Norman, Coccimiglio, Bunnell, Upchurch, the Town of Glenrock, the Town of Evansville, or the Town of Lovell, Wyoming.

        ii.      For purposes of this Paragraph 398(e), "specified unlawful activity" means acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

        iii.      For purposes of this Paragraph 398(e), "proceeds of specified unlawful activity" means funds or other gross receipts derived from, obtained, or retained, directly or indirectly, through acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

410.    Krochuk, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Krochuk knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Krochuk knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Krochuk knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Krochuk knowingly conspired with one or more other persons to commit violations of 18. U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

411.    Trellis, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Trellis knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Trellis knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Trellis knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Trellis conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

412.    As a direct and proximate result of the violations of the 18 U.S.C. § 1962(b) committed by Flatirons, Krochuk, and Trellis, Eastern Point has sustained and will continue to sustain injury and damages.

### COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(c) OF THE "RICO" ACT
### 18 U.S.C. § 1964(c)

**(Against the Settlement Conspirators, Flatirons, Krochuk, and Trellis)**

413.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 413 of this Complaint as if fully set forth herein.

414.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

415.    The Settlement Conspirators, Flatirons, Krochuk, and Trellis (collectively, the "1962(c) Defendants") each violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the JE Conspiracy's affairs through a pattern of racketeering activity.

416.    Each of the 1962(c) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Norman, Coccimiglio, Bunnell, Upchurch, and Krochuk) or an entity (Flatirons and Trellis) capable of holding a legal or beneficial interest in property.

417.    The JE Conspiracy is an "enterprise," as defined by 18 U.S.C. § 1961(4), engaged in interstate commerce, or whose activities affect interstate or foreign commerce, because it is a union or group of individuals associated in fact, although not a legal entity, which individuals reside in various states across the country, crossed state lines to meet or otherwise communicate with each other, and worked collectively to organize, launch, operate, and otherwise advance the interests of the Justice Escrow platform—a product or service marketed by Flatirons and made available to clients across the country—by first using an interstate internet connection to misappropriate Eastern Point's trade secrets and confidential information located in Virginia, then transmitting Eastern Point's trade secrets and confidential information through emails travelling over interstate wires, then participating in the creation of a Delaware limited liability company with a principal office located in Colorado—FBHC Software LLC—to hold assets related to the Justice Escrow platform, including three applied-for trademarks, which Flatirons uses to market Justice Escrow nationally.

418.    Each of the 1962(c) Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two of the predicate acts listed under 18 U.S.C. § 1961(1).

419.    The QSF 360™ Platform is a product or service used in or intended for use in interstate commerce.

420.    Norman committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, a product or service used in or intended for use in interstate commerce, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would

injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.    Fifth, in violation of 18 U.S.C. § 1343, Norman, having devised or intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

421.    Coccimiglio committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Coccimiglio, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Coccimiglio, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Coccimiglio, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit

of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.      Fourth, in violation of 18 U.S.C. § 1832(a)(5), Coccimiglio, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.      Fifth, in violation of 18 U.S.C. § 1343, Coccimiglio, having devised or intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

422.    Bunnell committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.      First, in violation of 18 U.S.C. § 1832(a)(1), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.      Second, in violation of 18 U.S.C. § 1832(a)(2), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.      Third, in violation of 18 U.S.C. § 1832(a)(3), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.      Fourth, in violation of 18 U.S.C. § 1832(a)(5), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.      Fifth, in violation of 18 U.S.C. § 1343, Bunnell, having devised or intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

423.    Upchurch committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Upchurch, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Upchurch, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Upchurch, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Upchurch, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18. U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.    Fifth, in violation of 18 U.S.C. § 1343, Upchurch, having devised or intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade

secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

424.    Flatirons committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit

of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.    Fifth, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), Flatirons conducted or attempted to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.

i.    For purposes of this Paragraph 398(e), "financial transaction" means movement of funds, by wire or other means affecting interstate or foreign commerce, to effectuate the transfer, delivery, or disposition of those funds from Flatirons to anyone one of FBHC, Norman, Coccimiglio, Bunnell, Upchurch, WPDN, the Town of Glenrock, the Town of Evansville, or the Town of Lovell, Wyoming.

ii.    For purposes of this Paragraph 398(e), "specified unlawful activity" means acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

iii.    For purposes of this Paragraph 398(e), "proceeds of specified unlawful activity" means funds or other gross receipts derived from, obtained, or retained, directly or indirectly, through acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

425.    Krochuk, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts

indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

        a.    First, in violation of 18 U.S.C. § 1832(a)(1), Krochuk knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

        b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Krochuk knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

        c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Krochuk knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

        d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Krochuk knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

426.    Trellis, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

        a.    First, in violation of 18 U.S.C. § 1832(a)(1), Trellis knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b. Second, in violation of 18 U.S.C. § 1832(a)(2), Trellis knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c. Third, in violation of 18 U.S.C. § 1832(a)(3), Trellis knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d. Fourth, in violation of 18 U.S.C. § 1832(a)(5), Trellis knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

427. As a direct and proximate result of the violations of the 18 U.S.C. § 1962(c) committed by the Settlement Conspirators, Flatirons, Krochuk, and Trellis, Eastern Point has sustained and will continue to sustain injury and damages.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)**

**(Against the Settlement Conspirators, Flatirons, Krochuk, Trellis, Barber,**
**Trial Lawyers for Justice, and Justice for Life)**

428. Eastern Point reasserts the prior allegations in Paragraphs 1 through 427 of this Complaint as if fully set forth herein.

429. Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section"

430. The Settlement Conspirators, Flatirons, Krochuk, Trellis, Barber, Trial Lawyers for Justice, and Justice for Life (collectively, the "1962(d) Defendants") each violated 18 U.S.C. § 1962(d) by agreeing to act in concert with each other to achieve a common purpose through a course of conduct requiring the violation of sections (b) and (c) of 18 U.S.C. § 1962.

79

431.    Each of the 1962(d) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Norman, Coccimiglio, Bunnell, Upchurch, Krochuk, and Barber) or an entity (Flatirons, Trellis, Trial Lawyers for Justice, and Justice for Life) capable of holding a legal or beneficial interest in property.

432.    The fact that the 1962(d) Defendants took concerted actions in furtherance or in aid of their common purpose that, in fact, involved violations of sections (b) and (c) of 18 U.S.C. § 1962, as alleged under Counts XI and XII, manifests that the 1962(d) Defendants operated in agreement with each other.

433.    As a direct and proximate result of the violations of the 18 U.S.C. § 1962(d) committed by the Settlement Conspirators, Flatirons, Krochuk, Trellis, Barber, Trial Lawyers for Justice, and Justice for Life, Eastern Point has sustained and will continue to sustain injury and damages.

## COUNT XIV
## CONSPIRACY TO INJURE A BUSINESS
## VA. CODE § 18.2-500

### (Against the JE Conspirators)

434.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 433 of this Complaint as if fully set forth herein.

435.    As demonstrated by the actions and conduct alleged herein, the JE Conspirators combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring Eastern Point in its reputation, trade, business, or profession.

436.    For specific reference, Eastern Point incorporates the prior allegations in Paragraphs 118 through 251, which describe the conspiracy and the harm to Eastern Point in detail.

437.    The JE Conspirators then, indeed, undertook the acts and conduct alleged herein as part of a conspiracy to injure Eastern Point's reputation, trade, business and profession.

438.    The JE Conspirators did so intentionally, knowingly, willfully, and maliciously.

439.    As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.

## COUNT XV
## COMMON LAW CONSPIRACY

### (Against the JE Conspirators)

440.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 439 of this Complaint as if fully set forth herein.

441.    As demonstrated by the actions and conduct alleged herein, the JE Conspirators combined for the criminal or unlawful purposes of obtaining an unfair business advantage over Eastern Point and generally inflicting injury and damage upon Eastern Point.

442.    For specific reference, Eastern Point incorporates the prior allegations in Paragraphs 118 through 251, which describe the conspiracy and the harm to Eastern Point in detail.

443.    As described by the actions and conduct alleged herein, the JE Conspirators employed criminal or unlawful means to effectuate the aims of the conspiracy.

444.    As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Eastern Point Trust Company prays for the following relief from Defendants Jakob Z. Norman; Nicholas J. Coccimiglio; William Bunnell; Michael Upchurch; Courtney Barber; Timothy Krochuk; Trial Lawyers for Justice; Justice for Life; FBHC Software LLC; Trellis Software, Inc.; Town of Glenrock, Wyoming; Bruce Roumell; Amy Iberlin; and John Does—an Order:

i.    Awarding Eastern Point damages for the breaches, statutory violations, and tortious conduct described herein in the amount of $3,500,000.00, with damages continuing to accrue at an estimated $500,000 per month, which damages include, but are not limited to, the following:

    a.   One Million U.S. Dollars ($1,000,000) per breach of the Misappropriation of Collective Intellectual Property and Trade Secrets provision in the Terms of Use;

    b.   Five Million U.S. Dollars ($5,000,000) per breach of the Industrial Espionage and Industrial Property provision of the Terms of Use;

    c.   One hundred fifty million U.S. Dollars ($150,000,000) to replace ongoing loss of Eastern Point's unique market position and market segments position as an innovation, thought, and compliance leader;

    d.   Fifty million U.S. Dollars ($50,000,000) to replace future and ongoing loss of competitive advantage and business scale;

    e.   One hundred million U.S. Dollars ($100,000,000) to replace future and ongoing general market penetration diminution, marketplace position erosion;

    f.   Ten million U.S. Dollars ($10,000,000) to replace future and ongoing productivity reductions due to foregone employee income opportunities resulting from loss of current and future customer base, marketplace erosion, and revenue opportunities;

ii.    Granting permanent injunctive relief preventing Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by

or through Defendants, or controlling Defendants or controlled by Defendants, or in active concert or participation with Defendants, from engaging in and continuing to benefit from the wrongful conduct described herein, and eliminating Defendants' inequitable advantages arising from the wrongful conduct;

iii. Requiring the Trade Secret Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Trade Secret Defendants, or controlling the Trade Secret Defendants or controlled by the Trade Secret Defendants, or in active concert or participation with the Trade Secret Defendants, to deliver to Eastern Point all materials embodying, deriving from, or otherwise revealing Eastern Point's trade secrets;

iv. Requiring disgorgement of all direct and indirect financial gain realized by the Settlement Conspirators as a result of the breaches of the Terms of Use and QSF Agreements alleged herein;

v. Awarding Eastern Point damages for any unjust enrichment caused by the Trade Secret Defendants' misappropriation of trade secrets that is not addressed in computing damages for actual losses to Eastern Point;

vi. Awarding Eastern Point exemplary damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3), in an amount two (2) times the amount of the combined actual and unjust enrichment damages;

vii. Awarding Eastern Point punitive damages under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338;

viii. Awarding Eastern Point threefold damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

ix.     Awarding Eastern Point threefold damages under Va. Code § 18.2-500;

x.      Awarding Eastern Point punitive damages in the maximum amount allowed by law for Defendants' tortious conduct;

xi.     Awarding Eastern Point interest, reasonable attorneys' fees, and costs available under the law;

xii.    Awarding Eastern Point reasonable attorney's fees and costs, as provided for under the Terms of Use and QSF Agreements;

xiii.   Awarding Eastern Point reasonable attorney's fees and costs under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338.1;

xiv.    Awarding Eastern Point the costs of suit under the Virginia Computer Crimes Act, Va. Code § 18.2-152.12;

xv.     Awarding Eastern Point reasonable attorney's fees and costs under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

xvi.    Awarding Eastern Point reasonable attorney's fees and costs under Va. Code § 18.2-500; and

xvii.   Awarding Eastern Point such other, further, or different relief as the Court deems just and proper.

<div style="margin-left:40%">

Respectfully Submitted,
EASTERN POINT TRUST COMPANY
By Counsel.

</div>

DYCIO & BIGGS


 /s/ Skyler R. Peacock
Mark R. Dycio, Esq. (VSB No. 32741)
T. Wayne Biggs, Esq. (VSB No. 41281)

Skyler R. Peacock, Esq. (VSB No. 87894)
10533 Main Street
Fairfax, Virginia 22030
T: (703) 383-0100
F: (703) 383-0101
mdycio@dyciolaw.com
twbiggs@dyciolaw.com
speacock@dyciolaw.com