Exhibit

**A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

~~EASTERN POINT TRUST COMPANY,~~                )

~~Plaintiff,~~                )

~~v.~~                )                ~~Case No.: 1:25-cv-1787~~
~~) FLATIRONS BANK,~~                )
~~) JAKOB Z. NORMAN,~~                )
~~) NICHOLAS J. COCCIMIGLIO,~~                )
~~) WILLIAM BUNNELL,~~                )
~~) MICHAEL UPCHURCH,~~                )
~~) COURTNEY BARBER,~~                )
~~) TIMOTHY KROCHUK,~~                )

~~TRIAL LAWYERS FOR JUSTICE,~~                )
~~) JUSTICE FOR LIFE,~~                )
~~) FBHC SOFTWARE LLC,~~                )
~~) TRELLIS SOFTWARE, INC.,~~                )
~~) TOWN OF GLENROCK, WY,~~                )
~~) BRUCE ROUMELL,~~                )
~~) AMY IBERLIN,~~                )
~~) SCOTT C. MURRAY,~~                )
~~) JOHN DOES,~~                )

~~Defendants.~~                )

---

EASTERN POINT TRUST COMPANY,                )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )        Case No.: 1:25-cv-1787
                                            )
FLATIRONS BANK,                             )
                                            )
JAKOB Z. NORMAN,                            )
                                            )
NICHOLAS J. COCCIMIGLIO,                    )
                                            )
WILLIAM BUNNELL,                            )

**Style Definition:** Heading 1: Font: Underline, Font color: Auto, Ligatures: None, Indent: Left: 0", First line: 0", Right: 0", Space After: 12 pt, Line spacing: single, Don't keep lines together

**Style Definition:** footnote description

**Formatted:** Font: Bold

**Formatted:** Font: Bold, No underline

**Formatted:** Normal, Centered, Indent: Left: 0", Right: 0", Space After: 0 pt

|  |  |
|---|---|
| **MICHAEL UPCHURCH,** | ) |
| **COURTNEY BARBER,** | ) |
| **TIMOTHY KROCHUK,** | ) |
| **TRIAL LAWYERS FOR JUSTICE,** | ) |
| **JUSTICE FOR LIFE,** | ) |
| **FBHC SOFTWARE, LLC,** | ) |
| **FBHC HOLDING COMPANY,** | ) |
| **TRELLIS SOFTWARE, INC.,** | ) |
| **TOWN OF GLENROCK, WY,** | ) |
| **BRUCE ROUMELL,** | ) |
| **AMY IBERLIN,** | ) |
| **SCOTT C. MURRAY,** | ) |
| **TAMMY TAYLOR,** | ) |
| **JOHN DOES,** | ) |
| **Defendants.** | ) |

### SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Eastern Point Trust Company, by counsel, and for its Second Amended

Complaint against Defendants Flatirons Bank; Jakob Z. Norman; Nicholas J. Coccimiglio;

William Bunnell; Michael Upchurch; Courtney Barber; Timothy Krochuk; Trial Lawyers for

Justice; Justice for Life; FBHC Software LLC; FBHC Holding Company, Trellis Software, Inc.; Town of Glenrock,

Wyoming; Bruce Roumell; Amy Iberlin; Scott C. Murray; Tammy Taylor; and John Does,

states the following:

ii

iii

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................................... 1

PARTIES .................................................................................................................................. 2

JURISDICTION AND VENUE .................................................................... 4

    A. Subject Matter Jurisdiction .................................................................... 4

    B. Personal Jurisdiction .................................................................... 4

    C. Venue .................................................................................................. 5

FACTS ...................................................................................................................... 5

I. Eastern Point develops the QSF 360™ Platform, a revolutionary new method for establishing Qualified Settlement Funds .................................................... 5

    A. Eastern Point is a proven innovator in the field of trust administration ........................... 5

    B. The QSF 360™ Platform introduces a first of its kind QSF service ................................ 6

    C. Eastern Point invested significant time, effort, and money to develop its trade secrets related to the QSF 360™ Platform, and has taken reasonable steps to protect them .................................................................................................. 8

    D. Eastern Point's trade secrets related to the QSF 360™ Platform are critical to its competitive advantage in the market ......................................................... 8

        1. The QSF 360™ Platform's feature-rich user interface ................................... 8 a. Workflows, intake processes, and questionnaires ............................... 8

iv

b. User interface designs and configurations .......................................................... 9

c. QSF documentation templates .......................................................... 10

d. Other specialized features .......................................................... 10

2. Eastern Point derives independent economic value from the QSF 360™ Platform's behind-the-scenes functionality .......................................................... 11

3. Eastern Point's trade secrets and confidential information are critical to its success .......................................................................................................... 12

E. Eastern Point imposes reasonable restrictions on the access and use of the QSF 360™ Platform to protect its investment and secure its trade secrets and confidential information .......................................................................................................... 13

1. Eastern Point implements reasonable technical and physical security measures to protect its trade secrets related to the QSF 360™ Platform ................. 13

2. Eastern Point implements reasonable contractual measures to protect its trade secrets related to the QSF 360™ Platform .......................................................... 15 a. Eastern Point's Terms of Use .......................................................... 15

i. Access to the QSF 360™ Platform requires assent to the Terms of Use .......................................................................................................... 15

ii. The Terms of Use include reasonable restrictions on the disclosure and use of Eastern Point's trade secrets and confidential information ....... 17

iii. Users have no authority to access, and cannot access, the QSF 360™ Platform unless, at each log-in attempt, they represent to Eastern Point that they agree to the Terms of Use. .......................................................... 21 b. The Eastern Point QSF Agreements .......................................................... 23

i. The Trust Agreement ............................................................................... 23 ii. The Trust Administration Agreement ...................................................... 24 iii. The Petitions for Distribution ............................................................... 24

II. The JE Conspirators attempt to compete with Eastern Point using trade secrets and confidential information misappropriated from the QSF 360™ Platform ............ 25

A. Norman, Coccimiglio, Bunnell, and Upchurch (the "Settlement Conspirators") combine to steal Eastern Point's trade secrets and confidential information, despite having assented to the Terms of Use hundreds of times ................................. 25

1. The Settlement Conspirators each assent to the Terms of Use and QSF Agreements hundreds of times ........................................................ 26 a. Norman Repeatedly Assents to the Terms of Use .............................................. 26

b. Coccimiglio Repeatedly Assents to the Terms of Use ...................................... 27

c. Bunnell Repeatedly Assents to the Terms of Use .......................................... 28

d. Upchurch Repeatedly Assents to the Terms of Use.......................................... 29

2. The Settlement Conspirators decide to defect after Eastern Point uncovers their tax evasion scheme ........................................................ 30

3. Operating under false pretenses, the Settlement Conspirators exploit their good relationship with Eastern Point to conduct industrial espionage ................... 33

B. Using trade secrets and confidential information misappropriated from the QSF 360™ Platform, the Settlement Conspirators combine with Flatirons and others to create "Justice Escrow" ................................................................................. 37

1. Flatirons joins the JE Conspiracy to pivot from being just a fledgling bank to a fledgling bank masquerading as a QSF administrator ........................................ 37

vi

2. Krochuk designs the Justice Escrow platform to mirror the functionality and content of the QSF 360™ Platform ........................................................................... 38

3. The Settlement Conspirators and Flatirons market Justice Escrow as a knock-off of the QSF 360™ Platform in pitches to municipalities ......................... 40

4. Seeing easy money on the table, Iberlin and WPDN solicit their clients — other Wyoming municipalities — to rubberstamp Justice Escrow QSF petitions .............................................................................................................. 43

5. Glenrock — with the assistance of Iberlin — joins the conspiracy as the final piece of the JE Conspiracy, serving as the approving governmental body with full knowledge and active participation. ........................................... 47

C. The Settlement Conspirators seek to unfairly win business away from Eastern Point to Justice Escrow .................................................................... 53

III. The JE Conspiracy has harmed and continues to harm Eastern Point .......................... 54

COUNT I
BREACH OF CONTRACT (NORMAN) ................................................................ 55

COUNT II
BREACH OF CONTRACT (COCCIMIGLIO) ................................................. 57

COUNT III
BREACH OF CONTRACT (BUNNELL) ............................................................ 58

COUNT IV
BREACH OF CONTRACT (UPCHURCH) ....................................................... 60

COUNT V
BREACH OF CONTRACT (TRIAL LAWYERS FOR JUSTICE) ................................... 61

COUNT VI
BREACH OF CONTRACT (JUSTICE FOR LIFE) .................................... 64

COUNT VII
VIOLATIONS OF THE DEFEND TRADE SECRETS ACT ("DTSA")

vii

18 U.S.C. § 1836 ET SEQ. ...................................................................... 66

COUNT VIII
VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT ("VUTSA")
VA. CODE § 59.1-336 ET SEQ. ...................................................................... 69

COUNT IX
VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT
VA. CODE § 18.2-152.12 ...................................................................... 72

COUNT X
VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
18 U.S.C. § 1030(g) ...................................................................... 73

COUNT XI
DEFAMATION (IBERLIN) ...................................................................... 75

COUNT XII
VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT
18 U.S.C. § 1964(c) ...................................................................... 78

COUNT XIII
VIOLATIONS OF 18 U.S.C. § 1962(c) OF THE "RICO" ACT
18 U.S.C. § 1964(c) ...................................................................... 82

COUNT XIV
VIOLATIONS OF 18 U.S.C. § 1962(d) OF THE "RICO" ACT
18 U.S.C. § 1964(c) ...................................................................... 93

COUNT XV
CONSPIRACY TO INJURE A BUSINESS
VA. CODE § 18.2-500 ...................................................................... 94

COUNT XVI

COMMON LAW CONSPIRACY ................................................................................................ 95

PRAYER FOR RELIEF .......................................................................... 96

INTRODUCTION ................................................................................................ 4031

PARTIES ................................................................................................ 4042

JURISDICTION AND VENUE ................................................................................................ 4075

   A.   Subject Matter Jurisdiction ................................................................................................ 4075

   B.   Personal Jurisdiction ................................................................................................ 4075

   C.   Venue ................................................................................................ 4096

FACTS ................................................................................................ 4097

I.   Eastern Point develops the QSF 360™ Platform, a revolutionary new method for establishing Qualified Settlement Funds ................................................................................................ 4097

   A.   Eastern Point is a proven innovator in the field of trust administration ................................................................................................ 4097

   B.   The QSF 360™ Platform introduces a first of its kind QSF service ................................................................................................ 4097

   C.   Eastern Point invested significant time, effort, and money to develop its trade secrets related to the QSF 360™ Platform, and has taken reasonable steps to protect them ................................................................................................ 4119

   D.   Eastern Point's trade secrets related to the QSF 360™ Platform are critical to its competitive advantage in the market ................................................................................................ 41210

ix

1.  The QSF 360™ Platform's feature-rich user interface ................................... 41210

    a.  Workflows, intake processes, and questionnaires ....................................... 41311

    b.  User interface designs and configurations ................................................ 41311

    c.  QSF documentation templates .................................................................. 41412

    d.  Other specialized features ........................................................................ 41513

2.  Eastern Point derives independent economic value from the QSF 360™
    Platform's behind-the-scenes functionality ..................................................... 41613

3.  Eastern Point's trade secrets and confidential information are critical to its
    success ................................................................................................................ 41714

E.  Eastern Point imposes reasonable restrictions on the access and use of the QSF
    360™ Platform to protect its investment and secure its trade secrets and
    confidential information ............................................................................................ 41816

1.  Eastern Point implements reasonable technical and physical security
    measures to protect its trade secrets related to the QSF 360™ Platform ........... 41816

2.  Eastern Point implements reasonable contractual measures to protect its
    trade secrets related to the QSF 360™ Platform ............................................... 42017

    a.  Eastern Point's Terms of Use .................................................................. 42018

        i.  Access to the QSF 360™ Platform requires assent to the Terms of
            Use ......................................................................................................... 42018

        ii. The Terms of Use include reasonable restrictions on the disclosure
            and use of Eastern Point's trade secrets and confidential information. 42320

        iii. Users have no authority to access, and cannot access, the QSF 360™
             Platform unless, at each log-in attempt, they represent to Eastern
             Point that they agree to the Terms of Use. .......................................... 42725

        iv. The Terms of Use specify the location of Eastern Point's servers ....... 42927

    b.  The Eastern Point QSF Agreements ........................................................ 43028

        i.  The Trust Agreement ............................................................................ 43028

        ii. The Trust Administration Agreement .................................................. 43128

        iii. The Petitions for Distribution .............................................................. 43229

x

II.  **The JE Conspirators attempt to compete with Eastern Point using trade secrets
and confidential information misappropriated from the QSF 360™ Platform ...... 43229**

   A.  Norman, Coccimiglio, Bunnell, and Upchurch (the "Settlement Conspirators")
       combine to steal Eastern Point's trade secrets and confidential information,
       despite having assented to the Terms of Use hundreds of times ............................ 43330

       1.  The Settlement Conspirators each assent to the Terms of Use and QSF
           Agreements hundreds of times ........................................................................ 43431

           a.  Norman Repeatedly Assents to the Terms of Use ...................................... 43431

           b.  Coccimiglio Repeatedly Assents to the Terms of Use................................. 43532

           c.  Bunnell Repeatedly Assents to the Terms of Use....................................... 43733

           d.  Upchurch Repeatedly Assents to the Terms of Use.................................... 43936

       2.  The Settlement Conspirators decide to defect after Eastern Point uncovers
           their tax evasion scheme ................................................................................. 44037

       3.  Operating under false pretenses, the Settlement Conspirators exploit their
           good relationship with Eastern Point to conduct industrial espionage .............. 44340

   B.  Using trade secrets and confidential information misappropriated from the QSF
       360™ Platform, the Settlement Conspirators combine with Flatirons and others
       to create "Justice Escrow" ........................................................................... 44744

       1.  Flatirons joins the JE Conspiracy to pivot from being just a fledgling bank to
           a fledgling bank masquerading as a QSF administrator ..................................... 44844

           Krochuk designs the Justice Escrow platform to mirror the............................ 45148

       2.  functionality and content of the QSF 360™ Platform ...................................... 45148

       3.  The Settlement Conspirators and Flatirons market Justice Escrow as a
           knock-off of the QSF 360™ Platform in pitches to municipalities................... 45450

       4.  Seeing easy money on the table, Iberlin and WPDN solicit their clients—
           other Wyoming municipalities—to rubberstamp Justice Escrow QSF
           petitions................................................................................................... 45854

       5.  Glenrock—with the assistance of Iberlin—joins the conspiracy as the final
           piece of the JE Conspiracy, serving as the approving governmental body
           with full knowledge and active participation..................................................... 46459

   C.  The Settlement Conspirators seek to unfairly win business away from Eastern
       Point to Justice Escrow ........................................................................... 47267

xi

**III. The JE Conspiracy has harmed and continues to harm Eastern Point** .................. **473**~~68~~

**COUNT I BREACH OF CONTRACT** ........................................................................... **476**~~71~~

**COUNT II BREACH OF CONTRACT** .......................................................................... **484**~~79~~

**COUNT III BREACH OF CONTRACT** ........................................................................ **488**~~83~~

**COUNT IV BREACH OF CONTRACT** ........................................................................ **493**~~88~~

**COUNT V BREACH OF CONTRACT** .......................................................................... **498**~~93~~

**COUNT VI BREACH OF CONTRACT** ........................................................................ **504**~~98~~

**COUNT VI BREACH OF CONTRACT** ........................................................................ **510**~~104~~

**COUNT VII** ..................................................................................................................... **514**~~109~~

**VIOLATIONS OF THE DEFEND TRADE SECRETS ACT ("DTSA")** ..................... **514**~~109~~

**18 U.S.C. § 1836 ET SEQ.** ........................................................................................... **515**~~109~~

**COUNT VIII** ................................................................................................................... **519**~~113~~

**VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT ("VUTSA") VA. CODE § 59.1-336 ET SEQ.** ................................................................................... **519**~~113~~

**COUNT IX** ...................................................................................................................... **522**~~116~~

**VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT VA. CODE § 18.2-152.12** ........................................................................................................................... **522**~~116~~

**COUNT X** ........................................................................................................................ **525**~~118~~

**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT 18 U.S.C. § 1030(g)** ........................................................................................................................... **525**~~118~~

**COUNT XI VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT 18 U.S.C. § 1964(c)** ........................................................................................................................ **528**~~121~~

**COUNT** ........................................................................................................................... **541**~~131~~

**XII VIOLATIONS OF 18 U.S.C. § 1962(c) OF THE "RICO"** ................................... **541**~~131~~

**ACT 18 U.S.C. § 1964(c)** .............................................................................................. **541**~~131~~

**COUNT** ........................................................................................................................... **560**~~148~~

**XIII VIOLATIONS OF 18 U.S.C. § 1962(d) OF THE "RICO"** .................................. **560**~~148~~

ACT 18 U.S.C. § 1964(c) .................................................................................. 560148

COUNT XIV CONSPIRACY TO INJURE A BUSINESS VA. CODE § 18.2-500 ....... 565153

COUNT XVI COMMON LAW CONSPIRACY ........................................................ 568155

PRAYER FOR RELIEF ...................................................................................... 569156

**INTRODUCTION**

1.      This action arises out of a concerted conspiracy by Defendants to unfairly compete with Eastern Point Trust Company ("Eastern Point" or "EPTC"), a recognized leader in the qualified settlement fund ("QSF") industry, by deliberately and systematically copying, disclosing, and using Eastern Point's trade secrets and confidential information in violation of Defendants' contractual obligations and trade secret laws.

2.      QSFs serve an important public function: they allow individuals and entities to resolve disputes efficiently while affording significant tax advantages. Eastern Point developed its proprietary platform, QSF 360™ (the "QSF 360™ Platform"), the first-of-its-kind comprehensive, online, turnkey solution for the creation and administration of QSFs, through years of sustained investment, research, and innovation. Eastern Point's QSF 360™ Platform empowers claimants to receive faster access to settlement proceeds, ensures tax compliance, and improves overall transparency and efficiency in the settlement process. It revolutionized how QSFs are established, reducing costs and delays and providing significant benefits to litigants, attorneys, and other settlement participants. The QSF 360™ Platform provides Eastern Point with substantial competitive advantages, and Eastern Point treats its QSF 360™ Platform and the underlying proprietary methods, processes, documents, and systems as confidential trade secrets.

3.      Defendants Coccimiglio, Norman, Bunnell, Trial Lawyers for Justice, and Justice for Life were long-standing clients of Eastern Point creating hundreds of QSFs each via the online QSF 360™ Platform.  Each creation of a QSF required a login agreeing to the associated Terms of Use and a secondary confirmation by two factored authentications of the login. As such, they had client access to the QSF 360™ Platform, subject to express contractual obligations prohibiting them from taking Eastern Point's trade secrets and

confidential information or using that information to unfairly compete with Eastern Point.

~~Each of~~

3.      Coccimiglio, <u>Justice for Life,</u> Bunnell, <u>Trial Lawyers for Justice</u> and Norman knowingly abused their client access to the QSF 360™ Platform, in breach of their contractual<u>, statutory, and common law</u> obligations, by misappropriating Eastern Point's trade secrets and confidential information to create a competing platform~~.~~ <u>by and through their joint conspiracy.</u>

4.      Coccimiglio, <u>Justice for Life,</u> Bunnell, <u>Upchurch, Trial Lawyers for Justice</u> and Norman enlisted Flatirons Bank, <u>FHBC Holding Company,</u> Krochuk, <u>Barber</u> and Trellis in this effort. Together, they ~~scrounged up~~<u>created FBHC Software for</u> the ~~pieces of a~~<u>sole and express purpose to misappropriate the</u> QSF ~~platform~~<u>360™ Platform by using the same business methods, process and trade secrets pioneered by EPTC</u> that Flatirons would operate under the trade name "Justice Escrow." Their goal was simple: to replicate and repackage Eastern Point's innovations. Eastern Point brings this action to protect its rights, safeguard its innovations, and remedy the ongoing damage caused by Defendants' unlawful acts.

<u>**PARTIES**</u>

5.      Plaintiff Eastern Point Trust Company ("Eastern Point") is a corporation organized under the laws of the United States Virgin Islands, with its principal office located in the United States Virgin Islands. <u>Eastern Point also maintains affiliate offices in Warrenton, Virginia where its computer network and servers are housed and located.  Further, Eastern Point's employees are located in the Warrenton offices.</u>

6.      Defendant Flatirons Bank ("Flatirons") is a corporation organized under the laws of the State of Colorado, with its principal office located in the State of Colorado, that holds a Colorado state banking license without trust powers.

7.      Defendant Jakob Z. Norman ("Norman") is an individual residing and domiciled in the State of ~~Montana.~~ Wyoming.

8.      Defendant Nicholas J. Coccimiglio ("Coccimiglio") is an individual residing and domiciled in the State of ~~Wyoming.~~ Idaho.

~~9.~~ Defendant Will Bunnell ("Bunnell") is an individual residing and domiciled in the

9.      State of Florida.

10.     Defendant Courtney Barber ("Barber") is an individual residing and domiciled in the State of ~~Montana.~~ Wyoming.

11.     Defendant Michael Upchurch ("Upchurch") is an individual residing and domiciled in the State of Florida.

~~11.~~12.  Defendant Timothy Krochuk ("Krochuk") is an individual residing and domiciled in the State of Florida.

~~in the State of Florida.~~

~~12.~~13.  Defendant Trial Lawyers for Justice is a professional corporation organized under the laws of the State of Iowa, with its principal office located in the State of Iowa.

~~13.~~14.  Defendant Justice for Life is a limited liability company organized under the laws of the State of Wyoming, with its principal office located in the State of Wyoming.

~~14.~~ Defendant FBHC Software LLC ("FBHC - Software") is a three-member limited liability company organized under the laws of the State of Delaware, with its principal office located in the

15.     State of Colorado, and members residing and domiciled in the State of Colorado, the State of Florida, and the Commonwealth of Massachusetts.

16.     Defendant FBHC Holding Company ("FBHC") is a Bank Holding Company organized under the laws of the State of Delaware, with its principal office located in the State of Colorado, and members residing and domiciled in the State of Colorado, the State of Florida, and the Commonwealth of Massachusetts.

15.17.  Defendant Trellis Software, Inc. ("Trellis"), is a corporation organized under the laws of the State of Delaware, with its principal office located in the State of Massachusetts. and a member  of FBHC Software.

16.18.  Defendant Town of Glenrock, Wyoming ("Glenrock") is a municipality in the State of Wyoming.

17.19.  Defendant Bruce Roumell ("Mayor Roumell") is an individual residing and domiciled in the State of Wyoming.

18.  Defendant Amy Iberlin ("Iberlin") is an individual residing and domiciled in the

20.     State of Wyoming.

19.21.  Defendant Scott C. Murray ("Murray") is an individual residing and domiciled in the State of Wyoming.

22.     Defendant Tammy Taylor ("Taylor") is an individual residing and domiciled in the State of Wyoming and is the "Official Custodian" of public records for the Town of Glenrock, Wyoming.

20.23.  Defendants John Does ("Does") are an unknown number of individuals or entities whose true identities and involvement are not fully known to Eastern Point at this time. Defendants Does are believed to be persons or entities in the legal community and settlement profession who associated or combined with the other members of the Justice Escrow Conspiracy ("JE

Conspiracy" as further defined below) to willfully and maliciously injure and obtain an unfair business advantage over Eastern Point.

### JURISDICTION AND VENUE

#### A.        A.    Subject Matter Jurisdiction

21.24. This Court has original jurisdiction of this matter under 28 U.S.C. § 1332(a)(1) because it is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

22. This Court also has original jurisdiction of this matter, in part, under 28 U.S.C. §

1331, insofar as it is a civil action arising under the laws of the United States—*inter alia*, the

25. Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) ("CFAA"), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) ("RICO")—and supplemental jurisdiction of the remaining claims under 28 U.S.C. § 1367(a).

#### B.        B.    Personal Jurisdiction

23.26. Consistent with the permissions and limitations of Virginia's long-arm statute and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, each Defendant in this action is subject to personal jurisdiction in the Commonwealth of Virginia because, either directly or through their participation in the JE Conspiracy (as defined belowinfra at 29, ¶ 154), the Defendants purposefully availed themselves of the privilege of conducting activities in Virginia, Eastern Point's claims arise from Defendants' activities directed at Virginia, and maintenance of this suit in Virginia is constitutionally reasonable.

24. At a minimum, based on the facts alleged below, the contacts with Virginia attributable to Defendants include transacting business in Virginia; causing tortious injury to

27. Eastern Point in Virginia by acts or omissions inside Virginia; and causing tortious injury to Eastern Point by acts or omissions outside Virginia, where Defendants have engaged in a persistent course of conduct. As to Norman, individually and on behalf Trial Lawyers for Justice, several account users at and on behalf of Trial Lawyers for Justice, Coccimiglio, individually and on behalf of Justice for Life, Bunnell, Upchurch, Flatirons, and Iberlin specifically, these Defendants all agreed to Terms of Use, either through individual logins to the QSF 360™ platform or through clickwrap accessing Eastern Point's website, which consented to jurisdiction in Virginia and which identified the computer systems, networks and services at issue in this case to be located in Virginia.[1]

25. 28. In addition, also based on the facts alleged below, Defendants' contacts with this forum may be imputed to other Defendants under the doctrine of coconspirator jurisdiction. Because Defendants acted in concert as part of a common scheme, each knowingly participated in and furthered the conspiracy that caused harm within this jurisdiction. Accordingly, the acts of one conspirator in furtherance of the conspiracy are attributable to all other conspirators for purposes of establishing personal jurisdiction.

---

[1] Pursuant to Va. Code Ann. § 8.01-328.1(B), "Using a computer or computer network located in the Commonwealth shall constitute an act in the Commonwealth." Flatirons has accessed Eastern Point's website after agreeing to terms through clickwrap at least 70 times from June of 2023 through June of 2025. Iberlin or someone under her direction accessed Eastern Point's website after agreeing to terms through clickwrap 9 times between November 4, 2024 through the end of October, 2025.

### C.        C.        Venue

26.29.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because, as alleged below, a substantial part of the events or omissions giving rise to Eastern Point's claims occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

**FACTS**

**I.        I. Eastern Point develops the QSF 360™ Platform, a revolutionary new method for establishing Qualified Settlement Funds**

**A.  Eastern Point is a proven innovator in the field of trust administration**

27.30.  With a legacy spanning thirty years, Eastern Point has long maintained a forwardlookingforward-looking mission to modernize trust services by integrating advanced technology and innovative processes into trust administration.

28.31.  Since then, Eastern Point's innovative efforts have proven so successful that it now stands as a global leader in trust innovation.

29.32.  Eastern Point serves over 20,000 clients internationally, ranging from individuals to multi-national institutions to nation-states, and administers trust assets in excess of 20 billion dollars in transactional flows.

30.33.  Never one to rest on its laurels, Eastern Point again revolutionized the industry with its groundbreaking QSF 360™ Platform. which is singularly distinctive from any other QSF platform in the market.

**B.        The QSF 360™ Platform introduces a first of its kind QSF service**

31.34.  A QSF is a statutory arrangement established pursuant to an order of, or approved by, a "governmental authority," as defined by 26 C.F.R § 1.468B-1(c)(1), that temporarily holds, as tax-deferred, settlement proceeds intended to resolve one or more qualifying claims.

**Formatted:** Heading 3, Space After: 0 pt, Line spacing: single, Tab stops: Not at 0.78" + 1.43"

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

**Formatted:** Underline color: Auto

32.35.  Litigants often deposit settlement proceeds in QSFs because of the appreciable tax advantages afforded to both plaintiffs and defendants.

33.36.  By placing settlement funds in a QSF, defendants can resolve their liability and take immediate tax deductions, while plaintiffs gain temporary tax-deferred tax treatment and time to organize distributions, resolve liens, and structure settlements without rushing decisions.

34.37.  This flexibility protects all parties and streamlines the often-complicated process of disbursing large settlements, but requires compliance with Internal Revenue Service ("IRS") rules.

35.38.  For those reasons, parties frequently establish QSFs to manage settlement proceeds in complex, multi-plaintiff litigation—like, for example, the Volkswagen "Dieselgate" mass action, in which a QSF created through Eastern Point's QSF 360™ Platform facilitated the exchange of settlement funds between Volkswagen and claimants.

36.39.  Parties to litigation of any size can benefit from QSFs, however, including disputes involving multiple plaintiffs, or only a single event with a single plaintiff.

37.40.  Eastern Point recognized the immense opportunity available to the pioneering entrepreneur that could innovate and implement an efficient process for navigating the labyrinthine statutory and regulatory framework governing the establishment of QSFs.

38.41.  In or around 2018, Eastern Point sought to capitalize on that opportunity and began developing an innovative method for the rapid establishment and administration of QSFs.

39.42.  Having affiliate offices, servers and computer networks located in Warrenton, Virginia, and drawing on its decades of experience, Eastern Point dedicated years of research and innovation and substantial financial investment into developing the QSF 360™ Platform and its related proprietary methods, processes, documents, and systems.

40.43.  A first of its kind, the revolutionary QSF 360™ Platform leveraged Eastern Point's proprietary methods and processes to automate many of the steps required to establish a QSF under 26 C.F.R. § 1.468B-1 *et seq.*, thereby pioneering the rapid establishment and management of QSFs.

41.44.  The innovative QSF 360™ Platform is a full-service QSF solution allowing for the electronic establishment of QSFs in as little as one business day, comprehensive online QSF management and administration, and same-day distributions to QSF beneficiaries—all at significantly reduced costs.

42.45.  Specific to QSF management and administration, the QSF 360™ Platform services also uniquely provided the first and only QSF online solution, including account setup, fiduciary oversight, cash management, tax preparation, filing and payments, disbursement adjudication and processing, as well as QSF closing.

43.46.  Consistent with its mission of innovation, Eastern Point revolutionized the QSF industry and once again set itself apart from its peers with the introduction of the QSF 360™ Platform.

44.47.  Since then, Eastern Point has continued to improve the QSF 360™ Platform and the range of innovative services on offer—including introducing the first ever Confidential QSF; Conditional QSF, Contingent QSF, pioneering Sub-Master-Sub accounts; providing same-day distributions, 24-hour platform access, and Principal and Income Act compliant transaction reports; consolidating transactional reporting; and emailing daily transaction summary notices.

C.    **Eastern Point invested significant time, effort, and money to develop its trade secrets related to the QSF 360™ Platform, and has taken reasonable steps to protect them**

48.    45. Eastern Point invested a considerable amount of staff capital, time and effort, and large sums of money, in developing the QSF 360™ Platform. Eastern Point also drew on its decades of experience. The QSF 360™ Platform and its related proprietary methods, processes,

documents, and systems are Eastern Point's trade secrets, and Eastern Point employs reasonable measures to protect them from unauthorized access and use, including confidentiality agreements specified in Paragraphs 116 to 128,

> **Formatted:** Font: Bold

**D.    Eastern Point's trade secrets related to the QSF 360™ Platform are critical to its competitive advantage in the market**

46.    From its customer-facing features to its behind-the-scenes functionality, the QSF 49.    360™ Platform is built on Eastern Point's trade secrets and confidential

> **Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

information. Eastern Point's trade secrets related to the QSF 360™ Platform include, without limitation, the methods, processes, documents, and systems described below.

**1.    1.    The QSF 360™ Platform's feature-rich user interface**

> **Formatted:** Heading 4, Tab stops: Not at 1.27" + 3.61"

47.50.  The QSF 360™ Platform's feature-rich user interface includes a range of features

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

that streamline settlement fund administration on the QSF 360™ Platform while ensuring compliance and client satisfaction. Eastern Point developed the QSF 360™ Platform that includes these features over years and with the benefit of its significant experience in the QSF industry, and protects these features as its valuable trade secrets and confidential information.

**a.    Workflows, intake processes, and questionnaires**

51.    This business information, as described below, provides Eastern Point a competitive advantage over other businesses in the industry. and was identified by EPTC as a "trade secret" as defined in 18 U.S.C. § 1839(3) (including, without limitation, all forms and types of financial, business, scientific, technical, economic, or engineering information, and any compilation, program, device, method, technique, process, procedure, or code) and Eastern Point has taken reasonable measures to keep such information secret and such information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value

from its disclosure or use. The definition of Trade Secrets with the Terms of Use was intended to apply to and support claims for misappropriation and related relief under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and related trade secret and misappropriation claims under applicable law.

### a.    Workflows, intake processes, and questionnaires

48.52.  Dynamic client workflows, online intake processes, and questionnaires are vital to the QSF 360™ Platform because they streamline the intake and QSF creation process, reducing the risk of errors and omissions, as well as administrative burdens.

49.53.  These customized tools enable clients to provide necessary information in a guided, user-friendly format, ensuring that each settlement fund is set up in compliance with legal requirements and tailored to the specific needs of the case.

50.54.  The efficiency and accuracy provided by these dynamic workflows not only minimize administrative burden and ensure compliance with federal tax laws and regulations, but also accelerate the onboarding process for clients, making Eastern Point's platform more attractive to attorneys and settlement administrators seeking reliable, compliant, and timely solutions.

51.55.  EPTC's proprietary workflows and processes include the process that allows EPTC to perform same-day QSF processing, which is sometimes referred to as EPTC's trust flow.

56.        b.        Developing the workflows, intake processes, and questionnaires took significant substantial financial investment and years of back-end research.

### b.    User interface designs and configurations

52.57.  The unique user interface designs and configurations incorporated into the QSF 360™ Platform also set Eastern Point apart from its competitors by offering an intuitive and streamlined user experience.

53.58.  These innovations simplify each step of the QSF creation process, making it accessible to users of varying technical backgrounds.

54.59.  By reducing complexity and enhancing usability, Eastern Point lowers the barriers to entry for clients, increases client satisfaction, and helps ensure that each QSF is established quickly and correctly.

55.60.  Eastern Point's focus on user-centered design is especially important in the settlement fund space, where clients often operate under tight deadlines and require clear, actionable interfaces.

61.    Developing, testing, and refining the user interface designs and configurations required substantial financial investment and years of back-end research and development.

#### c.    QSF documentation templates

56.62.  Another key facet of Eastern Point's success is its proprietary and custom templates for QSF documentation, which include proprietary and custom templates for trust agreements, IRS filings, and other documents essential to the creation and management of QSFs.

57.63.  The product of careful development, Eastern Point's QSF templates are designed to promote operational efficiency and regulatory compliance, while still maintaining the flexibility necessary to accommodate the unique requirements of various settlement types across multiple jurisdictions.

58.64.  By providing clients with turnkey, legal and tax compliant templates and administration processes, the QSF 360™ Platform reduces the risk of costly legal or tax compliance mistakes and expedites the documentation process—thereby conserving each client's time and resources and reinforcing Eastern Point's reputation as a trusted provider of QSF services.

59.65.  Eastern Point only shares the client-facing QSF interface and document templates themselves with clients thatwho have agreed to limited use license terms containing strict

**Formatted:** Heading 5, Space After:  0 pt, Line spacing: single, Tab stops: Not at  1.76" +  3.28"

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

limitations regarding the disclosure and use of Eastern Point's proprietary documentation—, business processes and methods.

66. d. Developing the QSF documents and templates required substantial financial investment and years of back-end research and development.

### d. Other specialized features

60.67. Other specialized features that help the QSF 360™ Platform deliver a superior client experience include real-time information and updates, customizable reports, transaction downloads, and automated reminders.

61.68. These tools empower clients to monitor the status of their settlement funds, receive timely notifications about key deadlines and developments, and generate custom reports for internal or regulatory use.

62.69. By offering these advanced capabilities, Eastern Point ensures transparency, accountability, and proactive communication, which are essential for building trust and satisfaction among attorneys, beneficiaries, and other stakeholders involved in the settlement process.

70. These customer-facing proprietary features streamline settlement fund administration on the QSF 360™ Platform while ensuring compliance and client satisfaction.

63.71. Developing these proprietary features took significant substantial financial investment and years of back-end research.

64.72. Taken together with the QSF 360™ Platform's other features, these integrated elements create a platform that is not only efficient and reliable but also unique to Eastern Point, making them highly valuable.

**2.    Eastern Point derives independent economic value from the QSF 360™ Platform's behind-the-scenes functionality**

65.73. In addition to the customer-facing features discussed above, other behind-thescenesthe-scenes aspects of the QSF 360^TM Platform are highly valuable to its success.

66.74. Eastern Point has spent years assembling a proprietary network of FDIC-backed banks that affords Eastern Point the unique ability to custody assets up to $240 million per beneficiary/claimant and accommodate individual trusts up to $100 billion.

75.    The QSF 360^TM Platform allows for rapid communication with the banking network that revolutionizes the speed of the product in the industry.

67.76. This FDIC-backed banking network is essential to the operation of an online qualified settlement fund platform because it ensures that all funds held in trust on behalf of beneficiaries are secure, insured, and compliant with federal banking regulations.

68.77. In the context of QSFs—where large sums are often placed under court supervision for the benefit of multiple claimants—having a robust, FDIC-insured network allows Eastern Point to guarantee the safety of assets against loss or insolvency, which fosters confidence among beneficiaries, attorneys, and courts.

69.78. Moreover, the network's capacity to custody substantial amounts per claimant and per trust enables Eastern Point to efficiently handle settlements of all sizes, from routine matters to complex, multi-billion-dollar cases.

70.79. This combination of regulatory compliance, financial integrity, and scalability makes Eastern Point's banking network a critical differentiator in the competitive landscape of online QSF administration.

71.80. Eastern Point built its banking network over the course of years of investment in vetting and building relationships with prospective banks, and with the benefit of its significant

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

experience in the QSF industry. Eastern Point protects its proprietary banking network, information about its banking partners, and related information such as its vetting process as its valuable trade secret and confidential information.

> **3.    Eastern Point's trade secrets and confidential information are critical to its success**

~~72.~~81. Eastern Point's QSF 360™ Platform and its underlying proprietary methods, processes, documents, and systems—including, without limitation, the methods, processes, documents, and systems associated with each of the features identified above in subparts 1 and 2 of this section—are Eastern Point's trade secrets and confidential information.

~~73.~~82. Without these features, the QSF 360™ Platform would lack the critical functionality that has made it a leading QSF administration platform trusted by customers worldwide.[2]

~~74.~~83. Eastern Point invested years and substantial resources in innovating, developing, maintaining, and enhancing the QSF 360™ Platform and its underlying proprietary methods, processes, documents, and systems, including those associated with the features described above.

~~75.~~84. Eastern Point's investment in developing its trades secrets and confidential information includes not just the time spent preparing the methods, processes, and documents themselves but also time spent improving and refining the QSF 360™ Platform over time with the benefit of experience.

---

[2] The QSF industry is a robust and highly competitive market that is highly fractionalized, with firms specializing in various elements of QSF processes, and is comprised of large and ~~wellestablished~~well-established providers, including publicly traded firms.

76.85. If a competitor were to obtain Eastern Point's trade secrets and confidential information, it could create a competing platform without investing in the significant research and development costs that Eastern Point incurred to develop its own product, then freeridefree ride off Eastern Point's efforts to unfairly take business away from Eastern Point.

86.    E. In order to develop a similar platform to QSF 360™, a competitor would need decades of experience in the setup and administration of qualified plans under the tax code, spanning a wide breadth of individual circumstances; over a decade of research and development for the platform itself; statutorily necessary fiduciary licenses such as a trust charter; a nationwide legal support system; and innovation skills to develop the business processes supporting the platform. The money, time, and experience involved create a barrier to entry so extensive that this platform would not be developed in the ordinary course of business of a competitor.

E.    **Eastern Point imposes reasonable restrictions on the access and use of the QSF 360™ Platform to protect its investment and secure its trade secrets and confidential information**

> **Formatted:** Heading 3, Left, Indent: Left: 0", First line: 0", Right: 0", Space After: 0 pt, Line spacing: single

77.87. Eastern Point has taken measures that are both commercially reasonable and reasonable under the circumstances to maintain the secrecy of the trade secrets and confidential information associated with the QSF 360™ Platform and to protect those trade secrets and confidential information from unauthorized use and disclosure. These include, without limitation, the technical, physical, and contractual protections discussed below.

1. **Eastern Point implements reasonable technical and physical security measures to protect its trade secrets related to the QSF 360™ Platform**

78.88. Regarding technical protection measures, by way of example, the QSF 360™ Platform is accessible only through an encrypted, online platform housed on a network of computers and servers located in Virginia.

89.     Eastern Point's Terms of Use clearly identify the location of its computer network and servers, and the physical server and network rooms were also identified during site visits by Defendants Norman, Coccimiglio, and Barber.

79.   The QSF 360™ Platform is maintained on Eastern Point's network and servers in

90.     Virginia and is accessible only to authorized users with valid login credentials.

80.91.  All interactions with Eastern Point's computer network and servers are inherently one-sided, as all access occurs solely in Virginia and, via code executed on Virginia servers. As such, as disclosed in EPTC's Terms of Use, the user's browser merely acts as a passive display device to display the output of the server-side code execution occurring in Virginia, regardless of where the user or device may be located. Eastern Point does not offer a downloadable client-side application for the QSF 360™ Platform.

81.92.  Internal documents reflecting Eastern Point's trade secrets and confidential information are stored on Eastern Point's secure servers, which are accessible only to authorized users.

82.93.  The source code for the QSF 360™ Platform is similarly stored in a secured repository accessible only to authorized users.

83.94.  Additionally, Eastern Point maintains a robust physical security, information security policy and continuously monitors cybersecurity controls to prevent unauthorized access to the QSF 360™ Platform.

84.95.  Regarding physical protection measures, by way of example, Eastern Point's offices and workstations are access-controlled.

85.96.  Eastern Point's offices may only be accessed by authorized individuals utilizing key fobs with radio frequency identification technology.

Formatted: List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

86.97. Authorized individuals may only access Eastern Point workstations after completing a two-factor identification process, and thereafter may only access the QSF 360™ Platform after entering a unique identifier and password.

> **2.** **Eastern Point implements reasonable contractual measures to protect its trade secrets related to the QSF 360™ Platform**

87.98. Eastern Point also employs extensive contractual protections for its trade secrets and confidential information.

88.99. Eastern Point's relevant employees and vendors are bound by confidentiality obligations.

89.100.      And access to the QSF 360™ Platform is limited to authorized users bound by various agreements imposing confidentiality obligations and restrictions on use.

> **a.  a. Eastern Point's Terms of Use**

90.  In exchange for the benefits ofassociated with a user account Coccimiglio, Norman, Bunnell, Upchurch, Justice for Life, and Trial Lawyers for Justice, as with any client accessing the system, agreed to the terms of the limited use login license granted by Eastern Point and agreed by accessing the QSF 360$^{TM}$ Platform repeatedly, including the host website wwwwww.easternpointtrust.com and www.my.easternpointtrust.com, all interactions with the QSF 360™ Platform and

101.    Eastern Point's host website are governed by Eastern Point's Platform & Website Terms & Conditions (the "Terms of Use").

> **i.      i. Access to the QSF 360™ Platform requires assent to the Terms of Use**

91.102.      Eastern Point conditions access to the QSF 360™ Platform upon each user agreeing to the Terms of Use with every login to the QSF 360™ Platform.

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

92.103.       In the process of creating a new account on Eastern Point's website, or accessing an existing one, Eastern Point requires every user to affirm their agreement with the Terms of Use (and the Privacy Policy) a minimum of two times.

93.104.       First, upon accessing the Eastern Point website home page, a banner running across the top of the page greets every user and states, in conspicuous language: "By using this site, you agree to our Privacy Policy and Terms of Use." by your Additional Use of this site."

94.105.       The phrases "Privacy Policy" and," "Terms of Use," and "Additional Use" appear in conspicuous bright blue font which indicate it is hyperlinked and are distinct in color from other words on the page, set against a contrasting background, and contain hyperlinks to printable copies of the respective policy agreements.

106.    When one clicks on "Additional Use," users are directed to the Terms of Use, which auto-scrolls to the definition of "Additional Use."

107.    As set forth in the Terms of Use:

**"Additional Use"** means (i) Your access or any use of the Platform or Services, webpage, or related URL or sub-URL beyond the date and time of Your first access session to the Platform or Services or (ii) any additional or continued access (or access session) of the Platform, including any other use, linking, reading, downloading, printing, copying, screen capture, or use of other Platform functions or Services, links, or pages beyond the first accessed page within the Platform, or (iii) any other use (or access session) of the Platform or Services, and You Agree that any of the preceding shall constitute Your acceptance of this Agreement and the associated Document Components as applicable, including additional requirements that We may impose, under the related terms, from time to time. For clarity, You may view the Terms of Use and Privacy Policy during Your initial access session without binding effect, but only if You invoke the Free Use Period provision timely and notify Us of Your exercising the Free Look Period provision election in writing, pursuant to the Notice Provision. Notwithstanding the foregoing, You Agree that (i) any subsequent use, access, or access session, or (ii) any login, or (iii) creating a User log-in, User Account, or any Account shall permanently waive the Free Use Period provision. The failure to properly Notice timely under the Free Look Period provision shall result in (i) Your waiver of all rights, defenses, including affirmative defenses, and claims at law, in equity, or by

other legal theory, and (ii) the binding effect of this Agreement shall then be effective as of your first access or use.

95.108.	Then, from the home page, users can click the "Log In" link to reach the log in page, where existing users can enter their email address and password to access their account and new users are invited to create an account.

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

96.109.	Whenever a new user creates an account, they are directed to an account creation page requiring them to enter their email address and create a password. Since about 2024, this is also the point at which a second means of verification, such as a phone number, is entered into the account for two-factor authentication.

97.110.	Before continuing with the account creation process, new users are confronted with conspicuous language on the account creation page stating: "By clicking the 'CONTINUE' action button below to access the Platform, I reaffirm my agreement to these Terms and Conditions and this Privacy Policy."

98.111.	Again, the phrases "Terms and Conditions" and "Privacy Policy" appear in bold blue font and contain hyperlinks to printable copies of the respective policy agreements.

99.112.	Once the user has created an account, each time they log in thereafter, they are confronted with conspicuous language on the log in page stating: "By clicking the 'LOG IN' action button below to access the Platform, I reaffirm my agreement to these Terms and Conditions and this Privacy Policy."

100.113.	Again, the phrases "Terms and Conditions" and "Privacy Policy" appear in bold blue font and contain hyperlinks to printable copies of the respective policy agreements immediately below the username and password input fields.

114.	Additionally, each time a user creates a QSF on the QSF 360™ Platform, they agree to an Acknowledgement, Agreement, and Attestation (the "Attestation"), which expressly

incorporates the Terms of Use, and they must type their name to signify their affirmative electronic execution of the Attestation and Terms of Use.

115.    ii. The notices are conspicuous and there are no design elements of the website that would hinder a user's reasonable notice to the hyperlinked Attestation and Terms of Use.

### ii.    The Terms of Use include reasonable restrictions on the disclosure and use of Eastern Point's trade secrets and confidential information

101. Assenting to the Terms of Use binds each user to a robust complement of

116.    restrictions intended to preserve Eastern Point's proprietary rights and commercial interests in its trade secret and confidential information, and the economic expectations derived therefrom.

102.117.    In articulating those restrictions, the Terms of Use relies upon certain defined terms and phrases, which are used throughout the agreement, including, in relevant part, the following:

103.118.    "Collective Intellectual Property" means:

without limitation, all of [Eastern Point's] Trade Secrets, all of [Eastern Point's] Intellectual Property, including but not limited to all of [Eastern Point's] Background and Foreground Intellectual Property, collectively.

104.119.    "Industrial Property" means:

in the broadest possible context, [Eastern Point's] Trade Secrets and [Eastern Point's] Collective Intellectual Property, along with any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of Affiliates, Indemnified Parties, and [Eastern Point's] Third Parties, including suppliers, customers, and business partners.

105.120.    "Intellectual Property" means including (collectively and separately):

(a) Trademarks; (b) user interfaces functions and design; (c) process design; (d) lists; (e) pricing information; (f) business strategy; (g) financial information; (h) marketing and advertising strategies; (i) sales techniques; (j) methods of conducting business; (k) technology platforms; (l) software; (m) web sites, publications,

**Formatted:** Heading 6, Left, Indent: Left:  0", First line: 0", Right:  0", Space After:  0 pt, Line spacing:  single

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

databases, and other content; (n) business processes material to the operation of the business; (o) symbols; (p) artwork; (q) copyrights; (r) franchise systems; (s) object code; (t) trading platforms; (u) document design and component elements; (v) patents and patent applications (including any abandoned applications); (w) pending trademark and service mark applications; (x) domain names and domain name registrations; (y) all products and services currently produced, marketed, licensed, sold or distributed by [Eastern Point]; (z) all products and services currently under development that [Eastern Point] intend[s] to make commercially available within 24 months from [users] last use the Platform; (aa) inventions, whether or not patentable, whether or not reduced to practice, or whether or not yet made the subject of a pending patent application or applications; (bb) ideas and conceptions of potentially patentable subject matter, including, without limitation, any patent disclosures, whether or not reduced to practice and whether or not yet made the subject of a pending Patent application or applications; (cc) Trade Secrets and confidential, technical, or business information (including ideas, formulas, compositions, designs, inventions, and conceptions of inventions whether patentable or unpatentable and whether or not reduced to practice); and (dd) technology (including know-how), manufacturing and production processes and techniques, methodologies, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans, and customer and supplier lists and information. "Intellectual Property" further includes as intellectual property owned, commissioned, developed, or created by [Eastern Point]. Certain Intellectual Property may exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in a unique combination, affords a competitive advantage and is a protectable secret.

121.          107.    "Limited Use License" means:

a limited, revocable, non-exclusive, non-transferable, and non-sublicensable license granted by [Eastern Point] to the [user] in order to access and use the Platform and Services solely for the purpose(s) outlined in the applicable Account Documents and these Terms of Use. The [user] may not copy, reproduce, modify, adapt, create derivative works, or otherwise alter any materials accessed and used in accordance with the Limited Use License. The Limited Use License does not grant the [user] any rights to sublicense, distribute, market, or otherwise use [Eastern Point's] Collective Intellectual Property and Trade Secrets outside of the scope expressly outlined in the applicable Account Documents and herein. All other rights are reserved expressly reserved by and to [Eastern Point].

122.    108. "Misappropriation of Our Collective Intellectual Property and Trade Secrets"

means:

(i) the acquisition of [Eastern Point's] Collective Intellectual Property or Trade Secrets by improper means; or (ii) the disclosure or use of [Eastern Point's] Trade

**Formatted:** List Paragraph, Space After: 0 pt, Tab stops: Not at 0.85" + 2.23"

**Formatted:** Block Text, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

Secrets without [Eastern Point's] express, written consent. For purposes of this definition, "improper means" shall be defined as the theft, fraud, bribery, industrial espionage, breaching of a contractual duty to keep something confidential, or inducing others to breach that duty. For purposes of clarity and avoidance of doubt, actual knowledge shall have no bearing on the Misappropriation of [Eastern Point's] Collective Intellectual Property and Trade Secrets; the Parties in Interest Agree that they have a duty to ensure that they prevent the improper acquisition or unauthorized disclosure of [Eastern Point's] Collective Intellectual Property or Trade Secrets.

123.    "Platform and Services" means:

(i) the website (www.easternpointtrust.com); and (ii) any other sub domains, linked or affiliated websites, including any content, functionality, and services delivered, directly or indirectly, by [Eastern Point], whether web-based, on line, or otherwise; and (iii) all related services, including, fiduciary services, ministerial, technology, administration, escrow, or other such types of and related services provided by [Eastern Point] (the preceding collectively the "Platform;" and (iv) all documentation received from [Eastern Point], whether via the Platform, mail, email, scan, fax, or any other transmission method. For purposes of clarity and avoidance of doubt, the word "documentation" as used in this definition shall include Account Documents.

110.124.    "Relevant Business(es)" means:

the business or businesses (including but not limited to any form of commercial activity) from time to time carried on by [Eastern Point], or any other Associated Undertaking, in respect of which [user] bec[omes] aware of Confidential Information and Collective Intellectual Property arising from their use of the Platform and Services.

111.125.    "Trade Secrets" means:

all information, materials, and data, whether in oral, written, electronic, or other forms, that are not generally known to the public and that derive independent economic value, actual or potential, from not being generally known to, or readily ascertainable by proper means by, others who can obtain economic value from its disclosure or use. Trade Secrets include, but are not limited to: technical information, business information, customer and client information, research and development, confidential business communications, compilation(s) of information (meaning the combination or aggregation of information that, in its entirety, is more valuable or significant than any individual component when made public, including business intelligence, strategic insights, and internal reports, that are kept confidential), or otherwise. This definition of Trade Secrets is intended to cover all forms of confidential and proprietary information, whether or not it is in tangible or intangible form, and includes all information, techniques, methods, or processes that are protected by trade secret laws and are used by [Eastern Point] for the

**Formatted:** List Paragraph, Space After: 0 pt, Tab stops: Not at 0.85" + 2.27"

**Formatted:** Block Text, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

purpose of gaining a competitive or economic advantage in the marketplace. For purposes of clarity and the avoidance of doubt, Trade Secrets shall include any and all information that is subject to confidentiality protections under applicable law, such as the Uniform Trade Secrets Act (UTSA), or its applicable s[t]ate variant or any similar trade secrets or misappropriation statute(s).

112.126.       The Terms of Use includes a "Non-Compete and Non-Disclosure"

provision requiring each user to, among other things, acknowledge and agree that:

[Eastern Point] and the Platform and Services operate in a unique and highly specialized business sector, which is international in scope with a limited number of competitors; that [Eastern Point] possess[es] a valuable body of confidential information and Collective Intellectual Property and that the [user]'s access and use of such knowledge of confidential information and Collective Intellectual Property directly benefits them by enabling them to use and garner advantageous financial outcomes from said same; and that the protection of our confidential information, Collective Intellectual Property, suppliers, goodwill, the stability of the Platform and Services, and/or any other Associated Undertaking(s) are business interests requiring and deserving protection from misuse or disclosure.

…

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

127.    The Terms of Use also includes a "Trade Secrets and Confidential Information"

provision clarifying, in relevant part, that Eastern Point premisesconditions each user's access

upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

113.128.    Similarly, the "Industrial Espionage and Industrial Property Protection" provision explicitly prohibits the competitive use, unauthorized disclosure, and misuse of Eastern Point's proprietary information and all other intellectual property:

> The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

iii.    iii. **Users have no authority to access, and cannot access, the QSF 360™ Platform unless, at each log-in attempt, they represent to Eastern Point that they agree to the Terms of Use.**

129.   Importantly, again, access to the QSF 360™ Platform is limited to authorized users.

116.

114.    And no user has free-standing authorization to access and use the QSF 360™

130.    Platform at will.

117.131.    Although users must assent to the Terms of Use as a condition to accessing the QSF 360™ Platform, users are not *authorized* to access and use the QSF 360™ Platform merely because they once assented to and are already bound by the Terms of Use.

118.132.    Additionally, although users must possess valid login credentials to access the QSF 360™ Platform, users are not *authorized* to access and use the QSF 360™ Platform merely because they have valid login credentials.

119.133.    As described above, access to the QSF 360™ Platform is blocked by a gatekeeping log-in page that dictates which users are authorized to proceed and which users are barred from access.

120.134.    Without exception, users are directed to this log-in page before each attempt to access the QSF 360™ Platform.

121.135.    After inputting their login credentials, users must click the "LOG IN" action button to proceed further.

122.136.    Consistent with the conspicuous statement included on the log-in page, by clicking the "LOG IN" action button to gain access to the QSF 360™ Platform, the user represents to Eastern Point that they are reaffirming their agreement to the Terms of Use.

123.137.    By reaffirming their agreement to the Terms of Use, the user necessarily acknowledges their assent to all of the use limitations and adopts all of the user representations stated in the Terms of Use, including those described above and the following:

> By using the Platform, [user] agree[s] to follow and be bound by these Terms of Use....

> If [user] disagree[s] with any part of the current Terms of Use, then [user] do[es] not have permission to access the Platform, must immediately suspend [their] use thereof....

**Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

[User] may use the Platform only for lawful purposes and in accordance with these Terms of Use. [User] agree[s] not to use the Platform: … [t]o impersonate or attempt to impersonate EPTC, an EPTC employee, another user, or any other person or entity (including, without limitation, by using email addresses associated with any of the foregoing)….

[User] agree[s] not to … [u]se any manual process to monitor or copy any of the material on the Platform, or for any other purpose not expressly authorized in these Terms of Use, without our prior written consent….

BY ACCESSING OR USING THE PLATFORM, [USER] AND ALL PARTIES IN INTEREST ACKNOWLEDGE AND AGREE THAT ALL PROVISIONS OF THIS AGREEMENT … ARE MATERIAL TERMS AND THAT ABSENT SAID PROVISIONS EPTC WOULD NOT AUTHORIZE ANY ACCESS TO, OR USE OF, THE PLATFORM OR ANY SERVICES ASSOCIATED THEREWITH.

~~124.~~138.    Because users must click the "LOG IN" action button to proceed past the log-in page and access the QSF 360™ Platform, and because clicking the "LOG IN" action button constitutes a knowing and voluntary representation that the user will abide by the Terms of Use while using the QSF 360™ Platform, and because the user knows that representation is material to Eastern Point's decision to allow them access to the QSF 360™ Platform, authorization to access and use the QSF 360™ Platform is strictly limited to users who agree to abide by the Terms of Use each time the user accesses the QSF 360™ Platform.

~~125.~~139.    Any user that clicks the "LOG IN" action button with the present intent to breach the Terms of Use is not an authorized user and any subsequent access to the QSF 360™ Platform would be the result of a fraud.

~~b.~~

iv.    **The Terms of Use specify the location of Eastern Point's servers.**

140.    Additionally, the Terms of Use also contain several provisions that explicitly tell users the location of the Eastern Point's servers.

141.    The Terms of Use explicitly provide that:

The Platform function as a server-side application where the associated code is executed on the hosting server and computer network located in Virginia. Accordingly, all access occurs solely in Virginia, and Your browser merely acts as a passive display device to display the output of the server-side code execution. Therefore, the hosting server and computer network executes the associated server-side machine application code, not Your web browser. Moreover, the server-side application and computer network limit and control all instances of all User access, functionality, and sessions, not Your web browser.

142.    In addition, users waive jurisdictional defense in the following provision:

Pursuant to the preceding, You Agree that, by accessing and using servers and computer networks located in Virginia, You have purposefully availed Yourself of Virginia law jurisdiction; You further Agree that Your access and use of servers and computer networks to access the Platform occurred solely in Virginia and not in the jurisdiction in which or Your browser were operating at the time of Your access to or use of the Platform.

143.    To avoid any doubt, the Terms of Use are also governed by Virginia explicitly because "each User's point of Use is on said servers and networks within the Commonwealth of Virginia."

144.    Thus, users of Eastern Point's website are charged with actual and constructive knowledge of the location of Eastern Point's servers.

### b.    The Eastern Point QSF Agreements

~~126.~~The documents associated with each QSF—specifically, the Trust Agreement, the Trust Administration Agreement, and the Petitions for Distribution (collectively, the "QSF

145.    Agreements")—include agreements that incorporate the Terms of Use by reference, and bind the Interested Parties, which include a QSF claimant's attorney and settlement planner, to the Terms of Use with the establishment of each QSF.

#### i.        i.    The Trust Agreement

146.    ~~127.~~Each Trust Agreement includes an "Incorporation of Terms and Conditions" provision that expressly incorporates the Terms of Use:

All terms, provisions, and agreements, and as may be amended from time to time, set forth in the Terms and Conditions, and Privacy Statement of the associated websites, including but not limited to www.EasternPointTrust.com, are incorporated by reference into the Trust Agreement and the Trust Administration Agreement with the same force and effect as though fully set forth therein. Any capitalized term not defined in this Trust Agreement or the Trust Administration Agreement incorporated by reference hereto shall have the meaning ascribed to it in the Terms and Conditions and Privacy Statement."

ii.        ii.    **The Trust Administration Agreement**

128.  The Trust Administration Agreement also includes an "Incorporation of Terms and

147.   Conditions" provision":.:

All terms, provisions, and agreements, and as may be amended from time to time, set forth in the Terms and Conditions, and Privacy Statement of the associated websites, including but not limited to www.EasternPointTrust.com, are incorporated by reference into this Trust Administration Agreement and the Trust Agreement with the same force and effect as though fully set forth therein. Any capitalized term not defined in this Trust Administration Agreement shall have the meaning ascribed to it in the Terms and Conditions and Privacy Statement."

129.148.    Additionally, the Trust Administration Agreement includes an "Intellectual Property" provision expressly stating that "[t]he business, operational processes, and documents of the Trustee constitute Intellectual Property, proprietary information, and copyright works of [Eastern Point]."

149.        iii.    Trust Administration Agreements are created upon governmental approval of each trust after a petitioner has agreed to be bound by the terms of the QSF trust.

150.   Justice for Life, through Coccimiglio, Bunnell, and its other agents, has petitioned for 634 trusts through QSF 360$^{TM}$.

151.   Trial Lawyers for Justice and Justice for Life have connected users on hundreds of trusts created through QSF 360$^{TM}$.

152. The trust documents include documents that allow for a three-day cancellation period if users do not agree to the trust terms. It further provides that use of a trust is assent to its terms.

### iii. The Petitions for Distribution

153. 130. All requests for distribution from a QSF must be made using the Eastern Point approved Petition for Distribution, which includes the following language incorporating the Terms of Use and QSF Agreements into each distribution request: "All terms, provisions, and agreements set forth in the referenced QSF Trust are incorporated by reference into this Instrument with the same force and effect as though fully set forth herein. Any capitalized term not defined herein shall have the meaning ascribed to it in the QSF Trust."

**II.    The JE Conspirators attempt to compete with Eastern Point using trade secrets and confidential information misappropriated from the QSF 360™ Platform**

131. As explained more fully below, "Justice Escrow" is the trade name given to an online QSF platform claimed to be "Powered by Flatirons Bank" that, in reality, is a redressed derivative of the QSF 360™ Platform, powered by the confidential, trade secret innovations misappropriated from Eastern Point for misuse and exploitation by the combination of Norman,

154. Coccimiglio, Bunnell, Upchurch, Barber, Flatirons, Krochuk, Trellis, FBHC, FBHC Software the Town of Glenrock, Mayor Roumell, Iberlin, Murray, Taylor, and John Does (collectively, the "JE Conspirators"), acting in concert to knowingly and intentionally deprive Eastern Point of its valuable contract and property rights and usurp Eastern Point's share of the QSF market, under the guise of legitimate competition (the "JE Conspiracy").

Formatted: Heading 6, Tab stops: Not at 2.29" + 3.76"

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 0", Right: 0", Space After: 0 pt, Line spacing: single

Formatted: List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

**A. ~~A.~~ Norman, Coccimiglio, Bunnell, and Upchurch (the "Settlement Conspirators") combine to steal Eastern Point's trade secrets and confidential information, despite having assented to the Terms of Use hundreds of times**

~~132.~~ Norman is a personal injury attorney and Chief Operating Officer of the law firm

155.    Trial Lawyers for Justice.

~~133.~~156.    Norman and Trial Lawyers for Justice regularly advocate for the use of

QSFs when negotiating settlements on behalf of their clients.

~~134.~~157.    Coccimiglio is a settlement planner and the owner of Justice for Life, who

regularly advocates for the use of QSFs to sell commissioned financial products.

~~135.~~158.    Bunnell, a settlement professional operating under the banners of both Delta

Settlement and Justice for Life, who regularly assists Coccimiglio with various tasks, such as

requesting the establishment of a QSF to receive settlement proceeds for Norman's and Justice for

Life's clients and then participating in the sale of commissioned financial products.

~~136.~~159.    Upchurch, once the CEO of Delta Settlements, regularly assists

Coccimiglio with various tasks, such as requesting the establishment of a QSF to receive settlement

proceeds for Norman's and Justice for Life's clients, and the promoting and assisting the sale of

commissioned financial products in support of Coccimiglio.

160.    Barber is the wife of Norman and worked with Upchurch to broker and sell

commissioned financial products via Coccimiglio and Justice for Life in support of Coccimiglio,

Upchurch's and Barber's own financial interests.

~~137.~~161.    Throughout the remainder of this Complaint, where appropriate, Norman,

Coccimiglio, Justice for Life, Trial Lawyers for Justice, Bunnell, and Upchurch may be referred

to collectively as the "Settlement Conspirators."

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

**1. The Settlement Conspirators each assent to the Terms of Use and QSF Agreements hundreds of times**

~~138.~~162.    Each of the Settlement Conspirators is a registered user of the QSF 360™ Platform and has utilized the QSF 360™ Platform to request or monitor QSFs.

~~139.~~163.    The Settlement Conspirators each created an account ~~for~~with Eastern Point TrustWare, part of the technology of the QSF 360™ Platform, from a location outside the Commonwealth of Virginia by using a computer connected via a terminal instance to the internet to interact with Eastern Point's servers and computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

~~140.~~164.    In exchange for access to the QSF 360™ Platform, the Settlement Conspirators accepted the terms and conditions imposed under the Terms of Use and the QSF Agreements on numerous occasions and over a course of years.

~~141.~~Cumulatively, the Settlement Conspirators and their agents logged into the QSF 165.    360™ Platform more than 6,600 times—each time reaffirming their assent to the Terms of Use~~.~~ at least twice with each login process.

**a.  ~~a.~~ Norman Repeatedly Assents to the Terms of Use**

~~142.~~On or about September 5, 2019, Norman or his agent created an account on the 166.    QSF 360™ Platform using his "jakob@TL4J.com" email address.

~~143.~~167.    Norman or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

~~144.~~168.    In exchange for Eastern Point providing Norman an account to access and use the QSF 360™ Platform, Norman or his agent agreed to the Terms of Use at least two times during the account creation process.

> **Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

> **Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

145.169.    Beginning from the date he created the account through around May 28, 2025, Norman or his agent logged into his account with access to the QSF 360™ Platform on at least 120 occasions.

146.170.    In exchange for Eastern Point allowing Norman to continue accessing and using the QSF 360™ Platform, Norman or his agent agreed to the Terms of Use each time he or his agent logged into his account.

147.Norman's account is associated with 104 QSFs requested via Eastern Point's QSF

171.    360™ Platform between 2019 and 2024.

148.172.    Eastern Point executed each such request either at Norman's direction or at the direction of an agent acting on Norman's behalf.

149.173.    Upon submitting each such request, Norman, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

174.    b.    Norman, or agents acting at his direction, including Coccimiglio and Bunnell, additionally executed hundreds of petitions for distributions, and each executed petition reaffirmed the Terms of Use.

175.

### b.    Coccimiglio Repeatedly Assents to the Terms of Use

150.176.    On or about November 18, 2018, Coccimiglio or his agent created an account on the QSF 360™ Platform using his "nick@justiceforlife.com" email address.

151.177.    Coccimiglio or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

178.  In exchange for Eastern Point providing Coccimiglio an account to access and use the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use at least two times during the account creation process.

179.  Beginning from the date he or his agent created the account through around May 28, 2025, Coccimiglio or his agent logged into his account with access to the QSF 360™ Platform on at least 4,900 occasions.

180.  In exchange for Eastern Point allowing Coccimiglio to continue accessing and using the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use each time he or his agent logged into his account.

152. Beginning from the date he or his agent created the account through around May 28, 2025, Coccimiglio or his agent logged into his account with access to the QSF 360™ Platform on at least 4,900 occasions.

153. In exchange for Eastern Point allowing Coccimiglio to continue accessing and using the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use each time he or his agent logged into his account.

154.181.  Coccimiglio's account and the accounts of agents under his control, which at times have included Bunnell, are associated with at least 622 QSFs requested via Eastern Point's QSF 360™ Platform between 2018 and 2024.

155.182.  Eastern Point executed each such request either at Coccimiglio's direction or at the direction of an agent acting on Coccimiglio's behalf.

156.183.  Upon submitting each such request, Coccimiglio, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

Formatted: List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

##### c.        c.        Bunnell Repeatedly Assents to the Terms of Use

157. On or about May 29, 2019, Bunnell or his agent created an account on the QSF

184.    360™ Platform using his "support@justiceforlife.com" email address.

158.185.        Bunnell or his agent created the account using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

159.186.        In exchange for Eastern Point providing Bunnell an account to access and use the QSF 360™ Platform, Bunnell or his agent agreed to the Terms of Use at least two times during the account creation process.

160.187.        Beginning from the date he created the account through around May 28, 2025, Bunnell or his agent logged into his account with access to the QSF 360™ Platform on at least 576 occasions.

161.188.        In exchange for Eastern Point allowing Bunnell to continue accessing and using the QSF 360™ Platform, Bunnell or his agent agreed to the Terms of Use each time he or his agent logged into his account.

162. Bunnell's account is associated with at least 625 QSFs requested via Eastern Point's

189.    QSF 360™ Platform between 2018 and 2024.

163.190.        Eastern Point executed each such request either at Bunnell's direction or at the direction of an agent acting on Bunnell's behalf.

164.191.        Upon submitting each such request, Bunnell, or his agent, electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

192.    **d.**    In addition, upon information and belief, Bunnell accessed a user account using someone else's email address—without permission from the email account's user—on 392 occasions.

193.    Upon information and belief, Bunnell, in violation of the Terms of Use prohibition against sharing login credentials or using another person's login credentials to hide one's identity, used an email associated with one of Delta Settlements' former employees to access Eastern Point's computer network located in Virginia.

194.    Attached as **EXHIBIT 1** is the affidavit of Christopher Bua, a former employee of Delta Settlements. On or about October 15, 2017, Bua left his employment with Delta Settlements.

195.    Upon Bua's departure, Bunnell requested access to Bua's user account, using the email address chrisb@deltasettlements.com, as part of the transition of duties associated with Bua's departure from Delta Settlements.

196.    From on or about November 3, 2017, through on or about January 26, 2023, an account associated with chrisb@deltasettlements.com logged into Eastern Point's website 392 times.

197.    According to Bua's sworn affidavit, he did not have access to chrisb@deltasettlements.com email account after his departure from Delta Settlements.

198.    Further, Bua never attempted to log into Eastern Point's website using the chrisb@deltasettlements.com account after his departure from Delta Settlements.

199.    Bua also did not give anyone permission to log into Eastern Point's website using the chrisb@deltasettlements.com account after his departure from Delta Settlements.

200.    Upon information and belief, Bunnell used the chrisb@deltasettlements.com account to log into Eastern Point's website.

201.    Bunnell's phone number was used during this time period for two-factor authentication in QSF 360™ to access Bua's user account.

202.    Thus, Bunnell has further assented an additional 392 times to Eastern Point's Terms of Use.

### d.    Upchurch Repeatedly Assents to the Terms of Use

165.203.    In exchange for access to the QSF 360™ Platform, Upchurch or his agent accepted the terms and conditions imposed under the Terms of Use and the QSF Agreements on numerous occasions and over a course of years.

166.On or about February 10, 2022, Upchurch or his agent created an account on the 204.    QSF 360™ Platform using his "teammichael@deltasettlements.com" email address.

167.205.    Upchurch or his agent created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

168.206.    In exchange for Eastern Point providing Upchurch an account to access and use the QSF 360™ Platform, Upchurch or his agent agreed to the Terms of Use at least two times during the account creation process.

169.207.    Beginning from the date he or his agent created the account through around May 28, 2025, Upchurch or his agent logged into his own account and the account registered to team@deltasettlments.com, account with accessing to the QSF 360™ Platform on at least 576 occasions.

170.208.    In exchange for Eastern Point allowing Upchurch or his agent to continue accessing and using the QSF 360™ Platform, Upchurch or his agent agreed to the Terms of Use each time he logged into his account.

171.209.    Upchurch's account is associated with at least 31 QSFs established by Eastern Point between 2017 and 2024.

172. Eastern Point established each QSF associated with Upchurch's account either at

210.    Upchurch's direction or at the direction of an agent acting on Upchurch's behalf.

173.211.    Upon the establishment of each QSF associated with Upchurch's account, Upchurch or his agent electronically executed the Attestation and reaffirmed his assent to the Terms of Use.

**2.    The Settlement Conspirators decide to defect after Eastern Point uncovers their tax evasion scheme**

174.212.    For years, the Settlement Conspirators and Eastern Point enjoyed a mutually beneficial business relationship. Founded on the simple principle that Eastern Point's QSF 360 platform was the leading and most innovative platform in existence, which provided the Settlement Conspirators with a beneficial advantage in the marketplace over other settlement industry participants who did not utilize Eastern Point's QSF 360 platform.

213.    In that same time, the Settlement Conspirators approved hundreds of QSFs through Eastern Point's computer network in Virginia, and such QSFs were approved by governmental entities in the Commonwealth of Virginia.

175. Unbeknownst to Eastern Point, however, the Settlement Planners harbored secret

214.    (and unlawful) ambitions.

176.215.    Consisting of three settlement professionals and a personal injury attorney, and their associated entities, Justice for Life and Trial Lawyers for Justice, the Settlement Conspirators all were, and still are, all incentivized to maximize the monetary stake they can claim in a plaintiff's judgment or settlement proceeds.

177.216.      For the settlement professionals, that could mean attempting to increase the revenue generated from commissions and fees by upselling plaintiffs on unnecessarily complex products that carry commissions at least 33% higher than the industry average.[3]

178.217.      Upon information and belief, reported complaints have accused Coccimiglio of doing just that—aggressively over-structuring and misrepresenting products, failing to disclose the details of commissions and fees, and potentially employing misleading sales tactics.

179.218.      For Norman, who receives a pre-fixed percentage of the plaintiff's recovery as attorney fees, the only way to maximize his post-award return is to limit his share's exposure to tax liability.

180.219.      To that end, upon information and belief, Norman engaged Coccimiglio in a yearslongyears-long tax avoidance scheme involving layers of sham entities and promissory notes with client QSF accounts.[4]

181.220.      Specifically, upon information and belief, Coccimiglio would assist Norman in establishing a shell company to serve as the "borrower" of funds held in a client QSF, in an amount approximating Norman's attorney fee percentage, which Norman and Coccimiglio would memorialize in a fraudulent promissory note, knowing the loan would never be fully repaid.

---

[3] Flatirons CEO, Kent Jones, in a press interview said "Since launching Justice Escrow in December 2023, Flatirons has seen its overall deposits jump by 36%. They totaled $358.6 million as of June 30." Yahoo Finance. Jones further noted in the same interview large increases in non-interest revenue that Flatirons Bank and the co-conspirators have benefited from related to QSFs.

[4] Funds held in a QSF, in satisfaction of the defendant's obligation to the plaintiffs, are for the benefit of the plaintiff(s) (a.k.a. claimants). Pursuant to Banks v. Comm'r, 543 U.S. 426, 436 (2005), the attorney has no vested right to said funds under any state attorney fee lien laws. Therefore, any loan to an attorney from a QSF would be a loan of plaintiff funds.

Formatted: Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

182.221.	For example, upon information and belief, in or around 2018, Coccimiglio helped Norman and other attorneys establish a limited liability company called Justice Consulting, LLC ("Justice Consulting").

183. Further upon information and belief, at no point in its existence did Justice

222.	Consulting engage in any continuous, legitimate business activity.

**Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

184.223.	Indeed, Justice Consulting was not even continuously active during its brief, threeyearthree-year existence—having been temporarily administratively dissolved for tax-related delinquencies from August 2019 through April 2020, and finally administratively dissolved for tax-related delinquencies in August 2021.

185.224.	Yet, despite being administratively dissolved, Justice Consulting somehow entered into a promissory agreement to borrow nearly $2.4 million from a Norman-associated QSF in or around October 2021.

186.225.	To facilitate the transaction, Norman served as Justice Consulting's authorized representative and Nicholas Rowley, Norman's law partner, served as the authorized agent for the QSF.

187.226.	On information and belief, Coccimiglio knowingly facilitated the transaction and prepared or altered the promissory note to incorporate a 2% interest rate, which was well below the then-current Applicable Federal Rate, and to obscure the repayment terms.

188.227.	Although the QSF received a partial repayment in January 2022, it received no additional payments toward the principal or interest, despite repeated demands to Justice Consulting and Norman. which they ignored or responded to with insults.

189.228.	The Justice Consulting scheme finally came to light when, during a routine audit of outstanding promissory arrangements, Eastern Point learned that Justice Consulting had

been administratively dissolved before entering the agreement—a fact that Norman intentionally concealed from Eastern Point and misrepresented in the promissory agreement.

190.229.    Upon learning that Justice Consulting was a non-existent company, Eastern Point called the note and demanded repayment from Norman—requests Norman belligerently refused, even going so far as to falsely claim that the promissory note was not due because it contained no payment date, which would have been inconsistent with applicable tax law. despite being a demand note.

191.Curiously, in an apparent effort to cover his tracks, Norman established a new

230.    Wyoming limited liability company called Justice Consulting in January 2025.

192.231.    The Justice Consulting promissory agreement remains unpaid and in default to this day. Eastern Point has made all required associated reporting to the IRS.

193.232.    In this particular instance, on information and belief, Norman's actions were apparently intended to delay or avoid paying taxes on over $1 million.

194.233.    On further information and belief, having orchestrated other fraudulent promissory agreements with client QSFs over a period of years, Norman and Coccimiglio developed a lucrative habit of tax avoidance they could not sustain under Eastern Point's watch.

> 3.    **Operating under false pretenses, the Settlement Conspirators exploit their good relationship with Eastern Point to conduct industrial espionage**

195.234.    Unbeknownst to Eastern Point, the Settlement Conspirators had been secretly plotting against Eastern Point for years.

196.235.    Little by little, through clandestine efforts or seemingly innocuous interactions, the Settlement Conspirators exploited their close relationship with Eastern Point to extract as much information about the QSF 360™ Platform as possible.

**Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

197.236.    On information and belief, the first acts in furtherance of the JE Conspiracy occurred on or about ~~March 20, 2020~~February 10, 2022, when a team of JE Conspirators comprised of Norman, Coccimiglio, Barber, and Bunnell diverted their private flight to New York to accommodate a stop at Manassas Regional Airport in Virginia and an hours-long visit to Eastern Point's offices.

198.237.    With no discernible purpose or agenda, the meeting served primarily as an opportunity for the JE Conspiracy contingent to get a lay of the land and ask unusually detailed questions about Eastern Point's business practices and procedures.

238.    For example, Coccimiglio asked for a list of all the banks partnering with Eastern Point and other internal business methodologies—such as internal processing, tax reporting, tax processing, controls, and document production—employed by Eastern Point

199.239.    Eastern Point respectfully avoided offering any substantive answers.

200.240.    Efforts in furtherance of the JE Conspiracy continued after that~~.~~, as explained below.

201.241.    For example, having carefully reviewed and assented to the Terms of Use, the Settlement Conspirators understood that their continued use of the QSF 360™ Platform was subject to specific contractual obligations and limitations.

202. The Settlement Conspirators mistakenly believed they could avoid those

242.    obligations and limitations by, at times, utilizing a rotating variety of fabricated login credentials they shared amongst themselves to conceal their true identities— additionally breaching the Terms of Use each time.

203.243.    For example, on information and belief, in furtherance of the Settlement Conspirators' industrial espionage efforts, Bunnell attempted to conceal his identity when pilfering

the QSF 360™ Platform by using login credentials associated with a former Delta Settlements employee, Christopher Bua. See **EXHIBIT 1**.

244.    As another example, at one point, Coccimiglio made multiple direct inquiries to Eastern Point employees, seeking sensitive process information regarding Eastern Point's network of third-party banking relationships, its bank oversight and vetting process, and internal interest calculators.

245.    On information and belief, to avoid creating a written record, Coccimiglio pursued this line of inquiry using only phone calls and refused or avoided email communications.

246.    Also, on information and belief, Coccimiglio's requests to access this information were made under false pretenses. Specifically, Coccimiglio represented that he needed this information to advise a prospective client regarding their potential use of the QSF 360™ Platform for a very large transaction that would be lucrative to Eastern Point.

247.    When asked for the details of the case (case citation, amounts, and the prospective client's identity), however, Coccimiglio refused to provide them.

In reliance on Coccimiglio's contractual obligations and representations, Eastern Point provided Coccimiglio with a partial response to the request for banking relationships used by Eastern Point on March 23, 2023, with the express, written caveat that the material provided was "not for public distribution and is limited to client use only as the foregoing contains intellectual property, trade secrets and proprietary information, including but not limited to Foreground Intellectual Property." Foreground

248.    Intellectual Property is defined in Eastern Point's Terms of Use and includes, among other items, Eastern Point's trade secrets.

209.249.    Indeed, this information is highly valuable to Eastern Point because it could allow a competitor to learn about the operational methods behind the QSF 360™ Platform, which could be used to shortcut the extensive investment and development time that Eastern Point put into its business.

210.250.    Similarly, access to internal financial tools such as interest calculators and check documentation would give a competitor a ready-made operational backbone.

211.251.    In short, the information Coccimiglio obtained from Eastern Point under false pretenses could enable a rival to replicate Eastern Point's infrastructure and service quality far more quickly and cheaply than developing them independently, thereby significantly eroding Eastern Point's competitive advantage.

212.252.    Beyond the information regarding Eastern Point's network of third-party banking relationships, in the fall of 2023, Coccimiglio and Bunnell also made direct phone inquiries with Eastern Point regarding its process for acquiring an Employer Identification Number (EIN).more than one Employer Identification Number (EIN) for the IRS per day. Specifically, Bunnell in his role in the conspiracy did not called Eastern Point executive staff (knowing his inquiry would raise question) but rather he, in a pre-meditated maneuver contacted, with no notice, a non-executive staff person and harangued her in an attempt to have her disclose the information. She did not disclose the information.

213.253.    This information is critical to the creation of QSFs because each QSF must have its own IRS-issued EIN.

214.254.    Therefore, on information and belief, Coccimiglio and Bunnell sought to learn Eastern Point's unique method for obtaining multiple EINs for QSFs per day, which would be necessary for Justice Escrow to operate as a viable competitor to the QSF 360™ Platform.

215.255.     Additionally, Bunnell made similar numerous requests to Eastern Point personnel forto extract information about advance notice of tax, regulatory, and legal changes, as well as QSF funding information, both of which would be valuable to a competing entity.

256.    Such information requested by Bunnell was not necessary for the ordinary course of business activities of a settlement planner. It is not information that has been requested by Eastern Point from any other settlement planner.

216.257.     Shortly after these inquiries, on or about November 7, 2023, Justice Escrow sent its first QSF to the Town of Lovell, Wyoming, for approval in a further act of the conspiracy.[5]

217.258.     On information and belief, Justice Escrow would not have been able to send its first QSF to the Town of Lovell[6] for approval without its reliance on Eastern Point's trade secrets and confidential information.

**B.    Using trade secrets and confidential information misappropriated from the QSF 360™ Platform, the Settlement Conspirators combine with Flatirons and others to create "Justice Escrow"**

218.259.     After realizing Eastern Point would not play a passivesupportive role in their tax evasion scheme, the Settlement Conspirators combined with Flatirons and others to create

---

[5] As a demonstration of the Settlement Conspirators' spurious intention, they hid the JusticeEscrow.com website from search engines to avoid detection by Eastern Point. By doing so, they garnered additional time to interfere with and solicit Eastern Point clients in violation of the non-competition provisions of the assailed agreements to which the Settlement Conspirators had agreed.

[6] The Town of LovellGlenrock by its staff or agents did, in fact, access Eastern Point's website on multiple occasions to conduct industrial espionage and evaluate Eastern Point'sPoint's QSF process and better understand their role in the JE Conspiracy. LovellBased on access logs Glenrock and its agents accessed the system at least sixapproximately nine sperate times, with total sessions lasting up to around 21appropriately 30 minutes.

36

a competing QSF platform, now known as "Justice Escrow," using trade secrets and confidential information misappropriated from the QSF 360™ Platform.

### 1.    1. Flatirons joins the JE Conspiracy to pivot from being just a fledgling bank to a fledgling bank masquerading as a QSF administrator

219.260.    Flatirons is a two-branch Colorado bank with one location in Boulder and another in Longmont.

220.261.    In or around 2021, before joining ranks with the Settlement Conspirators, Flatirons had a material capital erosion from approximately $28 million in capital to roughly only $19 million in capital. Subsequently, in 2023, Weiss Ratings, an independent, widely-used, bank rating agency, downgraded Flatirons to a C-rated institution (on a scale where an "A" rating is the best).[7]

221.262.    Flatirons maintains a C rating on the Weiss scale to this day, with reported capital of less than $25 million and a "weak" liquidity rating.[8]

222.263.    Because Flatirons is a privately held bank, it has fewer options for raising capital than a publicly traded bank.

223.264.    A regulated financial institution nonetheless, Flatirons served a specific need in the conspiracy: the appearance of legitimacy.

224.265.    Further, Flatirons provides the necessary financial backing for the JE Conspiracy and the ability to accept funds of third parties thereby allowing the JE Conspirators, jointly and severally, to profit from the conspiracy.

---

[7] Based on public reports from Weiss Ratings, available as of September 23, 2025.

[8] https://weissratings.com/en/bank/57280 (last accessed Oct. 3, 2025).

266.    For its part, Flatirons was incentivized to consider any alternative sources of additional capitaldeposits, fee income and revenue, Flatirons had nothing. Based on information contained in Flatirons FDIC Call Reports, Flatirons saw the opportunity to losegarner deposit siphon business from Eastern Point, which would produce deposits and fee revenue to offset Flatirons' compromised financial conditions.

225.267.    Thus, when the Settlement Conspirators pitched the plan to steal business from Eastern Point by employing the same methods and processes powering the QSF 360™ Platform, only repackaging it as a Flatirons was lured into creating the product called Justice Escrow.

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

226.268.    Flatirons had every reason to know that the Settlement Conspirators intended to peddle stolen goods because, upon information and belief, the Settlement Conspirators made no secret regarding the source of the methods and processes that would power Justice Escrow.

227.269.    Indeed, on information and belief, the Settlement Conspirators even pitched Flatirons using stolen Eastern Point intellectual property, which Eastern Point had clearly designated confidential., as explained in the ensuing paragraphs.

270.    ThusIn or around August 2022, on information and belief and user logs, a user logged onto Eastern Point's website under "support@justiceforlife.com" and 70+ separate times began a QSF creation session without completing such. The sessions are unusual and out of the ordinary in that no name was input or the name was John Doe QSF. The pattern of not entering a name and abandoning the session is indicative of someone demoing Eastern Point's QSF 360™ Platform, including its confidential workflows, intake processes, and questionnaires; its user interface designs and configurations; and other confidential and proprietary information.

271.    Just as in the Petition and Approval documents employed in Eastern Point's operations, Justice Escrow utilized large tracts of the same or similar language, (some documents components being 100% the same), the same document formats, design and arrangement, clearly demonstrating that the source of the design and content of those documents came from Eastern Point's unique documents. The settlement conspirators had access to those materials through such demos and related access.

272.    For example, on or about August 16, 2022, the support@justiceforlife.com user started the process of petitioning for fourteen (14) QSFs without completing or actually petitioning for any. This amount is far greater than any other day a Justice for Life user has attempted to create a QSF.

273.    Again, on or about November 16, 2023, the support@justiceforlife.com user attempted to create eight (8) QSFs—without completing any.

274.    Upon information and belief, the Settlement Conspirators, together or in isolation, were pitching to Flatirons, or other JE-conspirators, how to replicate Eastern Point's Eastern Point's QSF 360™ Platform; its confidential workflows, intake processes, and questionnaires; its user interface designs and configurations; and other confidential and proprietary information.

228.275.    Because of the use of Eastern Point's website used in its recruitment, Flatirons agreed to join the JE Conspiracy fully informed of its unlawful purpose.

229.276.    Today, after entering the QSF industry in 2024, the once-fledgling Flatirons has seen its assets and profits grow by millions-.

277.    2.    In a press interview[9], CEO Kent Jones confirmed that since launching Justice Escrow in December 2023, Flatirons has seen its overall deposits jump by 36%,

___

[9] Source: American Banker, September 25, 2025

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

**Formatted:** Left, Indent: Left:  0", Right:  0", Space After: 0 pt, Line spacing:  single

totaling $358.6 million as of June 30, 2025, and noninterest income rose 63% from the same period in 2023. This growth occurred in roughly 18 months. Average community bank deposit growth runs 3–4% annually. A 36% surge in 18 months — entirely attributed to a single third-party facilitated product demonstrates that Flatirons benefits for poaching Eastern points product and client relationships with aid of the Settlement Conspirators.

Krochuk designs the Justice Escrow platform to mirror the

### 2. functionality and content of the QSF 360™ Platform

230.278. Although adding Flatirons to the conspiracy solved one piece of the puzzle, the conspiracy required more participants, also equipped with special skills, to fully realize its unlawful objectives.

231.279. Neither Flatirons nor the Settlement Conspirators possessed the technical expertise necessary to build the electronic platform needed to facilitate the various technical processes and user interactions required of an automated QSF service.

232. To meet that need, Flatirons and the Settlement Conspirators recruited Krochuk and

280. Trellis and the parties, FBHC Holding Company and Trellis, along with Krochuk, created FBHC Software LLC on August 19, 2024, specifically to formalize for cloning Eastern Point's QSF 360™ software functionality as well as business processes.

---

Article title: "Bank alleges rival tried to bar it from lucrative business" URL: https://www.americanbanker.com/news/bank-alleges-rival-tried-to-bar-it-from-lucrative-business

The article states: "For Flatirons, the qualified settlement fund niche has emerged as a source of both fee income and deposits, CEO Kent Jones told American Banker." — This is the attribution for Kent Jones as the speaker and American Banker as the interview venue.

"Since launching Justice Escrow in December 2023, Flatirons has seen its overall deposits jump by 36%. They totaled $358.6 million as of June 30." Yahoo Finance

233.281.    Krochuk and Trellis participated in the conspiracy by knowingly using the trade secrets and confidential information stolen from Eastern Point as a template to develop and implement the Justice Escrow platform—which, in appearance and functionality, is a nearlyidenticalnearly-identical clone of the QSF 360™ Platform's processes, documents, forms, and methods.

282.    Krochuk's approval of the collaboration between FBHC Software and Trellis was instrumental in the execution of the JE Conspiracy.

234.283.    For example, certain Justice Escrow documents substantially match their counterpart QSF 360™ Platform document in content, language, wording, form, style, and design. On information and belief, these documents are copied from the QSF 360™ Platform documents.

284.    Between August of 2022 and November of 2023, Justice for Life provided demonstrations of Eastern Point's QSF 360™ platform to potential partners, including Krochuk, FBHC Software, FBHC and Flatirons. See *supra* ¶¶ 270 - 273.

285.    Upon information and belief, the Settlement Conspirators, together or in isolation, were pitching to Krochuk and Trellis how to replicate Eastern Point's QSF 360™ Platform; its confidential workflows, intake processes, and questionnaires; its user interface designs and configurations; and other confidential and proprietary information.

~~On information and belief, these documents are copied from the QSF 360™ Platform documents.~~

235. The similarity of content, verbiage (words and phrases), form, style, and design, as well as website and platform functionality and business processes, evidences both the JE

286.    Conspirators' intent to systematically copy the QSF 360™ Platform, and their intentional use of Eastern Point's trade secrets and confidential information to create Justice Escrow.

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

> **Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

236.287.    The substantial similarity between Justice Escrow and the QSF 360™ Platform, including their highly similar user interfaces, functionality, structures, design elements, and content, further evidences the JE Conspirators' pervasive use of Eastern Point's trade secrets and confidential information to create Justice Escrow.

237.288.    In other words, Justice Escrow is a knockoff of the QSF 360™ Platform.

289.    By developing Justice Escrow through the unauthorized use of the trade secrets and confidential information the Settlement Conspirators stole from Eastern Point, the JE Conspirators bypassed the years of research, development, experience, and capital investment that would otherwise have been required to independently create a similar product.

290.    In particular, Justice Escrow uses the same or similar features, its user interface designs and configurations as Eastern Point's QSF 360™ Platform and the same or similar workflows, intake processes, questionnaires as Eastern Point.

291.    Notwithstanding the contractual provisions safe-guarding Eastern Point against the JE Conspirators' reverse-engineering or replicating, these proprietary features would have taken years to the develop the same without Eastern Point's proprietary and confidential information.

238.292.    On information and belief, Flatirons, Krochuk, and Trellis each maintain an ownership interest in the Justice Escrow platform through their relationship with FBHC Software LLC.

293.    Additionally, Krochuk has served as a current board member on FBHC Holding Company and Flatirons Bank for over 10 years establishing his active knowledge and financial interest in promoting the conspiracy.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

239.294.    On information and belief, FBHC stands for "Flatirons Bank Holding Company." Formed on or around August 19, 2024, on information and belief, FBHC serves as a holding company for certain assets related to Justice Escrow.

240.295.    For example, a Trademark/Service Mark Application for use of the mark "Justice Escrow," filed on or about December 18, 2024, identifies FBHC as the "Owner of Mark" and Krochuk as a "Principal" of FBHC.

Krochuk as a "Principal" of FBHC.

241.296.    In fact, Krochuk is one of three members of FBHC., is a member of FBHC Software and a board member of FBHC Holding Company and FBHC Software.

242. The other two members of FBHC are FBHC Holding Company, a subsidiary of

297.    Flatirons, and Identity Management LLC, a wholly owned subsidiary of Trellis.

243.298.    Upon information and belief, Flatirons, Krochuk, and Trellis agreed to funnel certain Justice Escrow assets through FBHC to legitimize their roles in the JE Conspiracy and divide the return on their efforts.

**3.    3. The Settlement Conspirators and Flatirons market Justice Escrow as a knock-off of the QSF 360™ Platform in pitches to municipalities**

244.299.    To complete their launch of Justice Escrow as a competing platform, the Settlement Conspirators and Flatirons also needed to enlist a willing and readily accessible "governmental authority" to approve Justice Escrow QSFs, as required under IRC §1.468B-1(c).

245.300.    To that end, the Settlement Conspirators and Flatirons began reaching out to contacts in Wyoming.

246.301.    Specifically, the Settlement Conspirators and Flatirons originally sought to make inroads with the Town of Evansville by exploiting Norman's connection with Scott C.

Murray ("Murray"), a shareholder with Williams, Porter, Day & Neville, P.C. ("WPDN") and an Evansville town attorney.

247.302.    On February 8, 2023, at Norman's written direction, sent by email on which Murray was copied, Bunnell emailed Murray a link to download and review various QSF-related documents from a zip folder titled "EPTC QSF Docs."[10] A true and accurate copy of this email is attached in as **EXHIBIT** 2.

248.303.    Indeed, given that the documents disclosed to Murray all related to a specific QSF administered through the QSF 360™ Platform, the Settlement Conspirators and Flatirons clearly misappropriated them from Eastern Point.[11]

249.Among other Eastern Point trade secrets and confidential information, the document folder included "a breakdown of how EPTC put together their bank system"; "QSF

304.    Creation Docs" generated by Eastern Point's platform., including trust agreements, petitions for QSF approvals, certificates of trust, funding and wiring instructions, and QSF summary documentation; financial reporting generated by Eastern Point's platform; and detailed examples of Eastern Point's proprietary workflows and processes, including the EPTC "trust flow."

250.305.    The trust flow describes the process that allows EPTC to perform same-day processing, including by revealing specific agreements, documents, policies, procedures, and proprietary techniques that EPTC uses to create a QSF, generate the associated documents, obtain

---

[10] "EPTC" is an acronym for Eastern Point Trust Company.

[11] These also contained the underlying client's personally identifiable information, violating the applicable Privacy Policy to which Bunell and Norman had agreed.

approval from the governmental authority, generate the certificate of trust, generate wire transfer instructions, and apply for an EIN.

306.    This zip file also contained a petition submitted in Virginia to the Fauquier County Commissioner of Revenue, the then-current governmental authority.

307.    The petition was requested by Justice for Life, Bunnell, and Coccimiglio, who availed themselves to Virginia by requesting that their Petition be approved by the Virginia governmental agency to approve the QSF

251.308.    On information and belief, knowing that the materials stored in the "EPTC QSF Docs" file were misappropriated Eastern Point trade secrets and confidential information, Murray and Bunnell then used and/or disclosed those materials to the Town of Evansville at the direction of Norman.

252.On information and belief Murray approached Evansville and proposed Evansville serve as the governmental authority for Justice Escrow.  In another email to Murray on March 4, 2023, Norman explained that the Justice

309.    Escrow platform was intended to replicate the QSF 360™ Platform. Murray, as an experienced lawyer, and with the stated intent of Norman, knew or should have known that the documents, plainly labeled with Eastern Point's logo and names, were the intellectual property of Eastern Point, and he should have refused receipt and avoided any use. Rather, Murray, in his role in the conspiracy, chose to use the documents and the information contained therein to assist the JE conspirators.

253.310.    He Norman referred to documents attached to the email as describing the QSF 360™ Platform's workflow and explained: "we would want to do the same."

254.311.    Norman added: "Right now EPTC has a deal with the Town where they prepare the documents for them so it can be processed the same day. In this case, I still think that

Formatted: List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

Formatted: List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt

would be best, but we just have a system that tracks/forwards/etc. the escrow accounts as they are set up. The work is 100% automated." The statement is most damning and illustrative of the Settlement Conspirators' intentions. They did not intend to create their own platform. Rather, the intent was to duplicate—i.e. steal—the workflow functionality of QSF 360TM .

255.312. Norman—along with the other Settlement Conspirators and Flatirons—sought to create a knockoff of Eastern Point's QSF 360™ Platform.

256.313. In the same email, Norman also included a "sample trust flow" for the Justice Escrow platform, which was based entirely on documents misappropriated from the QSF 360™ Platform yet had confoundingly been designated "proprietary" to Justice Escrow.

257.314. The "sample trust flow" included many pages of screenshots of Eastern Point instructions, filings, and other materials, including multiple documents bearing Eastern Point's name or logo.

258.315. Notably, Norman copied Barber on most of his emails to Murray because, on information and belief, Barber was assisting the Settlement Conspirators and Flatirons in their efforts to steal Eastern Point's trade secrets and confidential information and market a competing QSF platform.

316. In fact, Norman indicated he was potentially unable to attend a meeting with Murray and stated that "Courtney and I are in Wyoming now, but because of this will not be able to make it to Casper. Courtney can still commit to a phone call."

317. Barber, Norman's wife, had an active and continuing role promoting and selling the Justice Escrow platform, and she and her family have benefited financially.

318. Barber thus was actively involved in providing support to the JE Conspirators as well as actively participating in meetings and other efforts to promote Justice Escrow and the

interests related to such by the JE Conspirators, as well as her own financial interest stemming from the insurance product sales from her primary job resulting from Justice Escrow QSFs.

319.    It does not appear that the proposed arrangement with Evansville came to fruition, so the Settlement Conspirators began to engage other Wyoming towns.

259.320.    In or about July 2023, Norman contacted the town administrator for the Town of Lovell, Wyoming, to solicit the town administrator's support in getting the Town of Lovell to act as a governmental authority for Justice Escrow.

260.321.    During discussions with the Town of Lovell in July and August 2023, Norman indicated that Justice Escrow could compete with another QSF platform to deliver a better product to the market and also shared the same "sample trust flow" as he shared with the Town of Evansville, which he represented was "proprietary" to Justice Escrow.

Evansville, which he represented was "proprietary" to Justice Escrow.

322.    In or about August 2023, Norman, Coccimiglio, and Flatirons communicated via email with the Lovell's Town Attorney to set up meetings to discuss QSFs.

261.323.    The Town of Lovell briefly acted as Justice Escrow's governmental authority.

4.    **Seeing easy money on the table, Iberlin and WPDN solicit their clients—other Wyoming municipalities—to rubberstamp Justice Escrow QSF petitions**

262.324.    On information and belief, Justice Escrow's relationship with Lovell began crumbling after an outside tax opinion raisedaffirmed concerns, also shared by Lovell's counsel, that the Justice Escrow model violated federal tax law and Wyoming law because Flatirons is a mere bank with no Trust Charter or discretionary powers.

263.325.    The fact that Flatirons lacked valid discretionary powers concerned Lovell's counsel because, if Flatirons cannot exercise fiduciary-based discretion with respect to QSF assets,

Formatted: List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

Formatted: List Paragraph, Left, Right: 0", Space After: 0 pt, No bullets or numbering

it cannot legally possess any settlement funds paid into a QSF. Under such circumstances, control over the QSF passes automatically to the claimants, which triggers the constructive receipt and economic benefit doctrine, making the funds within the QSF immediately taxable and not eligible for assignment, —thereby defeating the entire purpose of the QSF.

264.326.    On information and belief, Lovell also became concerned when Flatirons refused Lovell's repeated requests, made in accordance with its continuing jurisdictional powers, for specific information necessary for the town to fulfill its legal obligations. Attached as **EXHIBIT** 3 is the affidavit of Lovell's Town Mayor, Thomas Newman.

327.    Specifically, Lovell recognized that it was required by federal regulation to exercise "continuing jurisdiction" to oversee the QSFs it authorized and to have access to all operational and tax data necessary to fulfill its continuing jurisdiction.

328.    Acting as Justice Escrow's then-governmental-approving jurisdiction, Lovell directed its legal counsel to request specific information from Flatirons on multiple occasions over the course of approximately three weeks concerning the QSFs over which Lovell had continuing jurisdiction.

265.329.    The information sought was basic and included, among other things, proof of tax returns, payment of tax obligations, and compliance with the operational aspects of 26 C.F.R. § 1.468B-1 *et seq.*—information necessary for Lovell to fulfill its legal obligation to ensure compliance with IRS regulations and Wyoming law.

266.330.    Despite previously representing to Lovell that such information would be available to the town on demand, Flatirons refused to comply with Lovell's requests.[12]

---

[12] If the administrator of a QSF refuses to comply with demands from the governmental authority for access to information and/or documents, or otherwise hinders continuing jurisdiction, leading the governmental authority to revoke or terminate its continuing jurisdiction of the QSF, the fund

267.331.     In response to the deteriorating relationship with Lovell, the Settlement Conspirators and Flatirons sought to enlist other municipalities in Wyoming, including the Town of Glenrock, to act as qualified governmental authorities to retroactively approve disqualified QSFs (that were invalid as of Lovell's termination of continuing jurisdiction), as well as approve new QSFs.[13]

268.332.     To aid in that effort, the Settlement Conspirators enlistedthe Settlement Conspirators recruited –Amy Iberlin, a shareholder at WPDN, which counts several Wyoming municipalities as clients. into the conspiracy.

269.333.     Although Iberlin leveraged her experience and connections as a town attorney to promote Justice Escrow and broker relationships with the JE Conspirators, her efforts to sell municipalities on the opportunity to serve as a Justice Escrow governmental authority fell far outside the practice of law.

270.334.     In fact, Iberlin has since admitted under oath that she lacked the requisite knowledge of QSFs or the Flatirons Justice Escrow platform to advise municipalities on the legality of QSFs or the Flatirons Justice Escrow arrangement and, therefore, could not provide legal advice of any kind as to the same. —This directly conflicts with Mayor Roumell's testimony,

---

fails the requirement of 26 C.F.R. § 1.468B-1(c)(1) and thus loses qualification as a QSF under 26 C.F.R. § 1.468B-1(a), thereby exposing the transferors and claimants to adverse tax outcomes.

[13] Under 26 C.F.R. § 1.468B-1(e)(1), approval by a new governmental authority, after a fund lost its status as a QSF due to the termination of the initial governmental authority's continuing jurisdiction, cannot have a retroactive effect. Additionally, if fraud, bad faith, or false pretenses were the basis for the termination, the disqualification may apply retroactively back to the QSF's inception.

44

as he testified in deposition that Iberlin was the only person who advised him and the Town of Glenrock on the legality of the arrangement.

271.335.    Iberlin also made clear that, for each QSF approved by the municipalities she signed up to assist Justice Escrow, Flatirons would pay her and WPDN.

272.336.    On or about March 2, 2025, Norman sent Iberlin a recruitment email detailing QSF law and stating, "I would propose we pay the attorney $50/QSF processing, and a Court fee of $100/per QSF approval"—here, Norman intended Iberlin and/or WPDN to be "the attorney" receiving the proposed QSF processing and approval fee payments.

337.    Beginning on or about March 12, 2025, Iberlin or someone acting under her direction repeatedly visited Eastern Point's website at least nine (9) times, accessing multiple pages in some visits, thereby assenting to the Terms of Use. Upon information and belief, Iberlin visited Eastern Point's website multiple times thereafter, with the most recent visit occurring on December 11, 2025.

338.    On or about March 13, 2025, Iberlin began to copy Coccimiglio on emails with her client, Glenrock.

339.    Upon information and belief, Iberlin visited Eastern Point's website because Norman and/or other JE Conspirators informed her about the JE Conspiracy and the theft of Eastern Point's intellectual property.

273.340.    On or about April 7, 2025, Ashtyn Knight of Flatirons likewise emailed Glenrock's Town Clerk, Tammy Taylor, and Ibelin offering "$100 to the Town and $50 to WPD&N for each approved QSF."

274.341.    Neither Iberlin nor WPDN ever refused or declined such offers.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

275. Motivated by a desire for personal enrichment as a key JE Conspirator, Iberlin was aggressive in pushing municipalities to serve as Justice Escrow's governmental authority, telling the City of Casper, Wyoming that it's "a no brainer in terms of getting $ with no risk to you or the

342.   City!" Such a solicitation is irregular because Iberlin was not the city attorney for the City of Casper at that time.

343.   On information and belief, Iberlin is compensated for her role in the conspiracy—either alternatively or in conjunction to the offers by Norman and Flatirons—by being added as *pro hac* counsel in Trial Lawyers for Justice's cases outside of Wyoming, the only jurisdiction she is admitted. Such an arrangement is irregular, as Trial Lawyers for Justice primarily practices plaintiff personal injury cases and Iberlin practices insurance defense in addition to her role as Town Attorney for Glenrock.

276. On information and belief, Iberlin did not previously serve as co-counsel with Trial

344.   Lawyers for Justice's lawyers prior to her recruitment of Glenrock.

345.   Since entering into the conspiracy, Iberlin has appeared in cases as an attorney for Trial Lawyers for Justice, while remaining a shareholder of WPDN.[14]

277. Such compensation amounts to receipt of a "finder's fee" or kickback referral for

346.   Glenrock's approval of QSFs.

---

[14] https://www.pacermonitor.com/public/case/59245551/Treasure_Valley_Fence_Panels_LLC_et_al_v_Federated_Mutual_Insurance_Company.

278.347.    In Iberlin's communications with these municipalities, she also disclosed Eastern Point's trade secrets and confidential information, including but not limited to files titled "EPTC Banking Network," "List of Banks," and "QSF Memorandum in Support – EPTC."

279.348.    Coccimiglio obtained thosethese repackaged documents from Eastern Point under false pretenses, and only after Eastern Point conspicuously marked them as "Confidential. For Client Use Only."

280.349.    On information and belief, as Scott C. Murry's shareholder colleague at WPDN, Iberlin knew or had reason to know that this information had been obtained in violation of Eastern Point's contractual and trade secret rights, and that her disclosure and use of that information to benefit the Justice Escrow platform further violated Eastern Point's rights.

281.350.    On information and belief, the Settlement Conspirators, Flatirons, and Iberlin used Eastern Point's trade secret and confidential information extensively in their efforts to recruit municipalities like Glenrock as governmental authorities.

282.351.    On information and belief, the trade secret and confidential information they used in this process included detailed information about Eastern Point's business processes, Eastern Point's network of third-party banking relationships, bank oversight and vetting process, internal interest calculators, a description of how Eastern Point's QSFs ensure same-day liquidity, and template documents used to generate approvals of QSFs among other materials.

283. That information was disclosed to Glenrock and Mayor Roumell under

352.    circumstances in which they knew or should have known that it was misappropriated from Eastern Point and, in using it for the specific purpose of competing with Eastern Point, would inevitably cause harm to Eastern Point.

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

**5.    Glenrock—with the assistance of Iberlin—joins the conspiracy as the final piece of the JE Conspiracy, serving as the approving governmental body with full knowledge and active participation.**

284.353.    Initially, the Settlement Conspirators and Flatirons planned to use both Glenrock's municipal court judge and Mayor Roumell to approve QSFs.[15]

285.354.    However, it appears the Glenrock's municipal court judge backed out as reflected by an email dated March 18, 2025, sent from Ashtyn Knight of Flatirons to Tammy Tayor of Glenrock stating, "I sent two petitions/approvals over to [Glenrock's municipal court judge] yesterday via DocuSign. It looked like he was able to view them, but he hasn't signed them yet."

286.355.    Around this time, Lovell's town attorney sent an email dated April 4, 2025, to Glenrock's municipal court judge with Eastern Point's cease-and-desist letters sent to Lovell and its agents attached therein.[16]

287.356.    In turn, on or about April 4, 2025, that Glenrock and its agents, including Iberlin and Mayor Roumell, obtained full knowledge of the JE Conspiracy, as a Glenrock agent obtained full knowledge of documents sent by Eastern Point detailing the JE Conspiracy.

---

[15] Norman Norman, in his email communications to Iberlin and WPDN, assured the parties that the Wyoming court had jurisdiction to approve QSFs, yet Wyoming municipal courts are courts of limited jurisdiction established in incorporated cities and towns primarily to handle violations of local municipal ordinances (e.g., traffic tickets, minor public nuisance issues, zoning violations, petty offenses specific to the city or town). This limitation is set out in Wyoming Statutes Title 5, Chapter 6 (specifically W.S. 5-6-201 and related sections). The jurisdiction is thus limited and no civil matters or matters exceeding $750 are within the court's jurisdiction.

[16] At this point, local media outlets had published articles about Lovell terminating its relationship with Flatirons. David Peck, *Town of Lovell Cancels QSF Agreement After Legal Demand*, LOVELL CHRONICLELOVELL CHRONICLE (Jan. 30, 2025), https://www.lovellchronicle.com/content/town-lovell-cancels-qsfagreementqsf-agreement-after-legal-demand.

288.357.    On or about April 8, 2025, a Flatirons representative directly emailed Glenrock's municipal court judge to set up a meeting and explain the Justice Escrow process. Upon information and belief, Glenrock's municipal court judge never responded to this email.

289.358.    On or about April 14, 2025, a Flatirons representative emailed Mayor Roumell and other Glenrock agents—with Iberlin and Glenrock's municipal judge copied thereon—seeking to set up a virtual meeting. The communication sought Iberlin's and Glenrock's municipal judge's participation because their "insights would be valuable in this conversation."

290.359.    The Flatirons, Iberlin, and Glenrock's movements behind closed doors concerned Glenrock's municipal judge. On or about April 15, 2025, Glenrock's municipal judge declined the invite by responding, "I appreciate the invite, but I won't be attending the meeting in large part due to the code of judicial conduct. I would prefer that any communication with me about QSFs occur on the record or through a court pleading."

291.360.    When this plan fell through, Flatirons and Iberlin decided that Mayor Roumell would individually and unilaterally approve the QSFs instead.

361.    On or about March 18, 2025, Mayor Roumell approved his first QSF for Justice Escrow. Since then, Mayor Roumell has approved hundreds of QSFs, with the number growing by the day.

362.    Taylor assisted Flatirons in ensuring Mayor Roumell signed the QSF approvals, as reflected in email communications, and notified Flatirons' representatives when Mayor Roumell signed the QSF approvals.

363.    On or about April 9, 2025, Taylor also facilitated communications with the Town Treasurer, Kelly Lewis, and Flatirons concerning Glenrock's compensation for its QSF approvals, including providing instructions on check payees and providing Glenrock's W-2.

364.    On or about April 16, 2025, Taylor, Mayor Roumell, Iberlin, and Treasurer Lewis met with representatives of Flatirons via Zoom.

365.    In all respects, Taylor serves as Mayor Roumell's primary email communicator with Flatirons, providing updates to Flatirons on his signing of QSF petitions. In addition, Taylor would communicate with news outlets regarding the matter.

366.    On or about April 30, 2026, Glenrock deposited its first check from Flatirons.

292.367.    Indeed, if there existed any doubt that Iberlin, Mayor Roumell, Taylor, and Glenrock understood the unlawful nature and purpose of the JE Conspiracy and their role within it, she Iberlin laid it all to waste when they, and without legal justification, obstructed Glenrock from responding to Wyoming Public Records Act (Wyoming's version of the Freedom of Information Act) requests related to Justice Escrow—improperly withholding entire swaths of documents on an erroneous assertion of privilege to avoid disclosure of the Town's incriminating communications with the Settlement Conspirators and Flatirons.

293.368.    On or about May 5, 2025, at about 4:04 PM MST, a private investigator for Eastern Point sent a public records request to Glenrock, seeking documents regarding QSFs and communications between Glenrock and other JE Conspirators (the "Miller Request").

294.On or about May 5, 2025, at about 4:07 PM MST, Glenrock's Town Clerk, Tammy

369.    Taylor, forwarded the Miller Request to Iberlin.

295.On or about May 5, 2025, at about 4:23 PM MST, Iberlin then forwarded the Miller

370.    Request to Chris White, a Flatirons representative, and Norman.

296.371.    Days later, after receiving the Miller Request, on or about May 8, 2025, Mayor Roumell texted a Flatirons representative stating, "Question, why are we getting records

requests from a law firm [retained to assist with the public records case] over intellectual property rights? Bruce.”

297.372.    In isolation, it would have seemed like an odd question, considering that the requestMiller Request itself did not mention intellectual property rights. In the context of Mayor Roumell's and Glenrock's relationship with Flatirons, however, it demonstrates that Mayor Roumell, Glenrock, and Iberlin knew or had reason to know of their participation in the JE Conspiracy and its illicit activities.

298. The same was true when Iberlin immediately contacted Flatirons and other JE

373.    Conspirators on or about May 5, 2025 before she even notified her actual client, the Town of Glenrock to warn of the Miller Request and to seek instructions on mitigating theseek instructions for mitigating exposure faced by all involved conspirators.

> **Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

374.    On or about May 30, 2025, Iberlin prepared a response to the Miller Request on behalf of Glenrock, producing only a handful of heavily and improperly redacted emails and blatantly omitting numerous responsive public records. Iberlin intentionally redacted and withheld publicundertook the wrongful redaction and withholding of records to give the misleading impression that Glenrock had no business relationship with Flatirons.

299.375.    Although Iberlin admitted at deposition, and WPDN subsequently admitted Iberlin acted improperly, and produced a portion of the responsive documents, Iberlin had exposed herself as an unapologetic operative of the JE Conspiracy who actively communicated with the Settlement Conspirators and Flatirons for instructions.

376.    On or about July 3, 2025, counsel for Eastern Point sent a cease-and-desist letter to Glenrock, through Taylor. See **EXHIBIT 4**, Cease and Desist letter dated July 3, 2025.

377. The letter advised Glenrock to cease and desist participation in Justice Escrow's unlawful operation because Justice Escrow illegally derived its platform from Eastern Point's intellectual property, trade secrets, and other protected information misappropriated from Eastern Point's nearly identical QSF 360™ platform.

378. The letter advised Glenrock to take affirmative steps to preserve all documents and communications related to Flatirons, Trial Lawyers for Justice, Justice for Life, Trellis, Norman, Coccimiglio, Upchurch, Bunnell, Barber, WPDN, Justice Escrow, Eastern Point, Krochuk, and platform known as QSF 360™.

~~300.~~379. After efforts to resolve ~~that matter~~the production of the Miller Request without judicial intervention failed, the private investigator was forced to file suit in Wyoming state court to compel production of such records on or about July 18, 2025.

~~301.~~380. On or about August 19, 2025; on or about August 27, 2025; and again on or about September 3, 2025, Glenrock produced sets of unredacted copies of the public records, but such production clearly indicated that additional~~, on or about August 27, 2025, and then again on or about September 3, 2025, Glenrock produced sets of the unredacted copies of the public records, but such production clearly indicated more~~ documents were being withheld.

~~302.~~381. Around this time, on or about August 25, 2025, Glenrock's town council held an Executive Session to discuss "legal issues" with Mayor Roumell, Iberlin, and other Glenrock agents—with town outsiders Norman, Barber, Coccimiglio, and Flatirons representatives also in attendance.

~~303.~~382. On or about September 17, 2025, the private investigator supplemented his initial filing to reflect that Glenrock continued to withhold documents despite its eventual production.

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

383.    In light of the discrepancies and inherently inconsistent positions taken by Glenrock in the public records case, on or about October 28, 2025, the state court judge allowed discovery "to ascertain whether the requested communications and/or documents are within Glenrock's control" and "to ascertain the existence of the requested communications an appropriate remedy under the present circumstances." Order on Plaintiff's Motion for Prelimiary [sic] Discovery, *Miller v. Town of Glenrock*, No. 2025-CV-0019182 (Wyo. Dist. Oct. 28, 2025). See **EXHIBIT 5**.

304.384.    In offering reasons for allowing a novel tool to be used in a FOIA-related case, the state court judge cited the following reasons for doing so: "the unique circumstances of the present controversy, the existence of a dispute concerning whether the requested communications exist or are retrievable, the likelihood of the applicability of the Act as it pertains to the contested communications, the previous disclosure of documents, the lack of any claim to an exemption, Glenrock's steadfast position that it cannot access documents – i.e., contracts – that appear to be subject to the Act, and [the private investigator's] demonstration that such documents may be retrievable." *Id.*

305.385.    The discovery process revealed that Glenrock played a much more active role with the JE Conspirators than previously disclosed.[17]

306.386.    Specifically, in what would be a reportable conflict, Glenrock admitted that Flatirons is funding their suit to and withholding public records from the private investigator. Thus,

---

[17] *See* the deposition testimony of Mayor Roumell, attached as ~~Exhibit~~ **EXHIBITA 6**; deposition testimony of Glenrock Town Clerk Tammy Taylor, attached as ~~Exhibit B~~**EXHIBIT 7**; and deposition testimony of Amy Iberlin, attached as ~~Exhibit C~~**EXHIBIT 8**—in which the deponents cumulatively represented approximately 300 times that they had no recollection of matters about which they had previously been vociferously outspoken, like Eastern Point's QSF business.

51 Eastern Point expressly does not adopt the deposition testimonies.

in violation of Wyoming law, Glenrock, as a Wyoming municipality, and Taylor, as the custodian of records, delegated to Flatirons itstheir constitutional and statutory authority to disclose public records. See **EXHIBIT 6** (Tr. of Depo. of Mayor Roumell) at 34:13 – 35:5 and 42:14 – 45:15; see also **EXHIBIT 8** (Tr. of Depo. of Iberlin) at 71:20 – 72:19.

307.387.    In this respect, documents reflect that, on or about August 25, 2025, Flatirons, Mayor Roumell, Taylor, Iberlin, and other Glenrock agents entered into a Joint Defense and Indemnity Agreement. Glenrock admitted that it entered into this arrangement without first receiving authorization from the town councilTown Council in a public meeting. **EXHIBIT 6** at 30:19 – 35:5.

308.388.    In addition, Glenrock admitted that Mayor Roumell has approved many QSFs without prior authorization from town council in a public meeting. Without such authorization, Mayor Roumell's acts of approving such QSFs were unauthorized. See **EXHIBIT 6** at 13:5 – 14:6, 23:18 – 23:23; see also 26 CFR § 1.468B-1(c)(1), stating that a QSF must be "approved by. . . a state. . . or any political subdivision thereof…"; see also Wy. Stat. § 15-1-103(a)(v) (2025), which provides that the governing body (such as the town council) may "[p]erform all acts in relation to the. . . concerns of the. . . town necessary to the exercise of its corporate powers," *compare with* Wy. Stat. § 15-1-108(a)(v) (2025), which only gives the signing authority, not approval authority, to the mayor.

309.Further, Glenrock, through Mayor Roumell and Taylor, and Iberlin have made several

389.   materially false, misleading, or irreconcilable statements in their sworn depositions. This deception demonstrates the knowledge of the conspiracy and their respective participation therein. [18]

310.390.   Considering the totality of the circumstances, the arrangement with Glenrock proves the essence of a widespread conspiracy and that it has reached the halls of government.

311.391.   Without limitation, Glenrock, Mayor Roumell, Taylor, and Iberlin contributed to the JE Conspiracy by obstructing public records requests, concealing incriminating communications, entering into business with Flatirons and the Settlement Conspirators approving QSFs without council authorization in a public meeting, entering into an unauthorized joint defense agreement without council authorization in a public meeting, and making false statements under oath in furtherance of the conspiracy. Such actions demonstrate active participation in an unlawful scheme to injure Eastern Point.

312.392.   Upon information and belief, Glenrock has profited from the JE conspiracy at a rate of $100 or $150 per QSF approval. Through on or about October 23, 2025, Glenrock profited $21,400 from its illegal participation in the JE Conspiracy. Upon information and belief, Glenrock continues to profit from QSF approvals. [19]

313.393.   Upon information and belief, by operation of Mayor Roumell's unilateral and *ultra vires* actions, Glenrock has approved hundreds of QSFs—a number which grows by the day.

---

[18] For example, Iberlin claimed that she knew nothing, or could not recall anything, about Justice Escrow, Flatirons, or Eastern Point. See Exh 6, *passim*.

[19] The 2025-2026 budget for the Town of Glenrock shows an expected revenue of $100,000 related to "QSR" [sic].

394.   Taylor, in her role as Town Clerk, is the official custodian of public records and, in sworn testimony, admitted that she has willfully and knowingly failed to take any action to preserve the documents required under Wyoming law. Nor has Taylor preserved the documents identified in the records preservation notice served upon the Town by Eastern Point.

314.395.   The Wyoming state court public records dispute remains ongoing with discovery revealing that Glenrock is withholding more public records.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

315.396.   Upon information and belief, Glenrock continues to approve QSFs on a routine basis and is still serving in its role as the government-approving body for the JE Conspiracy. , and Taylor continues in her role to support the conspiracy by failing to preserve records and documents.

**C.    The Settlement Conspirators seek to unfairly win business away from Eastern Point to Justice Escrow**

316.397.   After misappropriating Eastern Point's trade secrets and confidential information to set up a competing platform, the Settlement Conspirators began to divert business from Eastern Point to Justice Escrow.

317.398.   At the same time, hiding said facts from Eastern Point, Bunnell, Coccimiglio, and the other Settlement Conspirators took great pains to cover their tracks and mislead Eastern Point.

318.In July 2024, Bunnell convened a call between Eastern Point and certain Delta Settlements clients in which Bunnell sought to incorrectly and falsely blame Eastern Point for delays in processing QSFs. On information and belief, this was an attempt to tortiously interfere with

399.   Eastern Point's business by amplifying a misrepresentation to divert prospective clients from Eastern Point to Justice Escrow.

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

319.400.    Then, on November 7, 2024, a settlement planner sent a message to a popular listserv used by settlement administrators asking for QSF administrator options in the marketplace. To which Upchurch, the CEO of Delta and Bunnell's superior, replied, "*Flatirons Bank is getting into the Litigation lending game and is developing a suite of products for attorneys. They are introducing a full technology suite tailored to attorneys and their banking needs. One area that they have focused on are QSFs.  As you will see in the attached website, they have a QSF service that is new to the market.*"

320.401.    Upchurch also encouraged others to "brush up on the QSF options" and "engage with Justice Escrow." On information and belief, these messages were prepared by or in coordination with other JE Conspirators to steer business away from Eastern Point.

402.    The post also alludes to the use of loans by Coccimiglo, Norman, Justice for Life, and Trial Lawyers for Justice as Flatirons offered a companion lending platform, "Justice Banking."

403.    Based on information and belief, Justice Banking allows attorneys to take loans guaranteed by client claimant funds held in the QSF.

## III.    The JE Conspiracy has harmed and continues to harm Eastern Point

321.404.    On information and belief, the Justice Escrow platform has facilitated the establishment of nearly 200400 QSFs.

322.405.    Defendants' misappropriation and infringement, in violation of Eastern Point's contractual rights and the law, have inflicted significant harm on Eastern Point, including lost revenue, diminished market share, lost long-term client relationships and goodwill, and reputational damage, while unjustly enriching Defendants through their continued and unauthorized use of Eastern Point's trade secrets and confidential information.

323. Additionally, on information and belief, Settlement Conspirators and Flatirons have sought to hinder Eastern Point's ability to seek proper recourse by destroying and/or withholding potential evidence. In one instance, the town of Lovell requested documentation evidencing tax returns, payment of tax obligations, and compliance with the operational aspects of 26 C.F.R.

406. §1.468B-1 *et seq.* Flatirons, despite its prior representations and Lovell's then-role as the purported "governmental authority," refused to provide either the requested documentation or access to such, thereby depriving the town of Lovell of necessary information, and preventing the public, including Eastern Point, from seeking the same pursuant to valid requests under the applicable Freedom of Information Act.

324. 407. Further, on information and belief, Settlement Conspirators have operated, and continue to operate, under a methodology enabled by Taylor's willful failure to collect and preserve documents, purposely designed to avoid any record of documentation, such as the apparently unlocatable agreement between Flatirons and the Town of Glenrock.

325. 408. Settlement Conspirators and Flatirons have also engaged in an extensive campaign to malign and disparage Eastern Point in the QSF market generally and with Eastern Point clients specifically. On information and belief, Settlement Conspirators and Flatirons have maliciously asserted that Eastern Point's QSF 360™ Platform is outdated and lacking transparency.

326. 409. With respect to the assertion that the QSF 360™ Platform lacks transparency, the Platform is fully compliant with both the trust code and the principal and income act. This is a fact Settlement Conspirators are well aware of, as Bunnell previously objected to

Eastern Point providing the detailed reporting available on the QSF 360™ Platform, as such reporting allegedly provided too much information.[20]

327.410.    Additionally, this false characterization conveniently omits the fact that not only does the QSF 360™ Platform provide fully compliant reporting, but said reporting may be filtered into a more easily digestible data set and can be exported, convenient features Eastern Point is unaware of any other provider offering—, including Justice Escrow.

328.411.    Eastern Point recently introduced a new QSF product, known as the Confidential QSF, designed to safeguard sensitive and personal information and enhance privacy and confidentiality. This product offers a one-of-a-kind solution in the realm of confidential and private settlements, and is but one of many examples of Eastern Point innovating new solutions to bring consistent value to its clients; hardly the result of stale technology or outdated approaches.

412.    Eastern Point has also innovated three unique new QSF products: Contingent QSFs, Confidential QSFs, and Conditional QSFs. Once again, EPTC has provided QSF solutions which do not otherwise exist in the industry.

413.    Because the Settlement Conspirators lack access to these products to create new QSF funds and thus misappropriate these QSF solutions, they have not launched comparable products. This demonstrates the lack of ability to innovate and the reliance that the JE conspirators had on misappropriating Eastern Point's intellectual property.

329.414.    Furthering these efforts to malign Eastern Point, on information and belief, Settlement Conspirators have made statements to Eastern Point clients falsely asserting that Eastern Point is facing financial hardship and is on the verge of bankruptcy.

---

[20] Eastern Point utilizes full principal and income, accounting as well as full tax lot accounting and reporting as required under the law.

Eastern Point is facing financial hardship and is on the verge of bankruptcy.

## COUNT I
## BREACH OF CONTRACT

BREACH OF CONTRACT

**(Against Jakob Z. Norman)**

335. Eastern Point reasserts the prior allegations in Paragraphs 1 through 334414 of this

415. Amended Complaint as if fully set forth herein.

416. On or about September 5, 2019, Norman or his agent created an account on the QSF 360™ Platform using his "jakob@TL4J.com" email address.

417. In exchange for Eastern Point providing Norman an account to access and use the QSF 360™ Platform, Norman or his agent in each access agreed to the Terms of Use at least two times during the account creation process.

336.418. Norman logged in to his Eastern Point account and assented to the Terms of Conditions at least 120 times.

337.419. In exchange for Eastern Point allowing Norman to continue accessing and using the QSF 360™ Platform, Norman or his agent represented to Eastern Point that he agreed to abide by the Terms of Use each time he or his agent logged into his account.

338.420. By accepting the Terms of Use and QSF Agreements, Norman assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision., and the "Public Statements and Non-Disparagement" provision.

421. The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

339.422.    Norman breached his obligations under the Non-Compete and Non-Disclosure provisionprovisions by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

423.    Specifically, Norman breached subsection (a) by engaging, and conspiring to engage, and enlisting the other Settlement Conspirators to form a new competitive activity, Justice Escrow.

424.    Norman breached subsection (b) disclosed Eastern Point's confidential information or Collective Intellectual Property, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

information. Such information was disclosed to the other Settlement Conspirators, Flatirons, Murray, Iberlin, and others.

425.    Norman breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

426.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

340.427.    Norman breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point's trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

428.    Specifically, Norman's emails and other communication to Murray, WPDN and other demonstrates that he used Eastern Point's business information, including Eastern Point's banking information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use to aid the remaining Settlement

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

Conspirators and Flatirons in establishing Justice Escrow.  Alternatively, Norman used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

429.    The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

> The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

341. Norman breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's

430.    Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

431.    Specifically, Norman, along with the other Settlement Conspirators, used Eastern Point's website for the benefit himself, the remaining Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with the intent to claim ownership, launch a derivative

service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Norman used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

432.    As a result of the breach of "Industrial Espionage and Industrial Property Protection" provision, Norman, the other Settlement Conspirators, and Flatirons formed Justice Escrow to directly compete with Eastern Point. Justice Escrow continues to benefit all of the JE Conspirators.

433.    The Terms of Use further provide the following "Public Statements and Non-Disparagement" provision:

> Without Our prior written permission, You shall not, directly or indirectly, issue any press release, make public statements, publications, or announcements directly or indirectly related to Us, the Platform or any of Our services. …
>
> You Agree that You will not make, or induce or cause another party to make any statement or communication, public or private, that (i) is intended to, or reasonably could be expected to, defame, disparage, or harm Our reputation or the reputation of the Platform and Services; (ii) is false; or (iii) that would reasonably be expected to lead to unwanted or unfavorable publicity or public perception.
>
> Specifically, You Agree that You will not defame or disparage Us, the Platform, or the Services. You further Agree not to relay, communicate, or repeat defamatory or disparaging comments from others or cause, encourage, conspire, or sponsor, directly or indirectly, such statements to be made by a third party or through an anonymous Person or Entity. Defamation and disparagement include: public writings, remarks, comments, or statements (with or without malice or intent) that

are false in nature, fact, or substance and which impugn the character, honesty, integrity, morality, or business acumen, or abilities in connection with any aspect of the operation of Our business. This includes the torts of defamation, product disparagement, insulting words, injurious falsehood, and trade libel. Any violation of this Section shall require You to immediately remove or retract any such defaming or disparaging statements. In recognition of the willful and reckless nature of, and intent to harm associated with, defaming and disparaging statements, and recognizing the difficulty in ascertaining damages caused by defamatory statements, You Agree that You shall be liable for stipulated damages of five million dollars ($5,000,000) per Defamation Instance, plus any other award an adjudicator of proper jurisdiction deems appropriate including, but not limited to, punitive and exemplary damages. You Agree that said liability shall begin from the moment the statement is published without regard to the method of publication. All damages associated with said defaming and disparaging statements shall additionally include Our attorneys' fees and all internal and external costs.

By Your use of and access to the Platform, You Agree that any effort or coordination of action by more than one Person to cause, conspire, or coordinate to make or cause to be made defamatory or disparaging statements against Us or the Platform, is stipulated as an injury of reputation, trade, business, or profession by reason of conspiracy, and We are thus entitled to recover all damages to the fullest extent allowed under applicable statutes, including when applicable treble damages, plus any associated stipulated damages, plus the costs of the suit, including attorneys' fees and all internal and external costs. Without limiting the generality of the term, "damages" shall include loss of profits, reputational harm, and all future expectancy of lost profits or business opportunities.

For purposes of this Agreement, the Parties in Interest Agree that limitation period for Us bringing defamation or disparagement claims forth is five (5) years from the date in which We (i) have direct sufficient knowledge of an incident, and (ii) the contents of the statements or publications, and (iii) the identity of all parties speaking or receiving the statements or publications. Further, Parties in Interest waive all defenses or objections at law, in equity or based on estoppel and accordingly, the Parties in Interest waive all Claims and are barred from any resulting Claim against Us or related to the Platform or any Account.

434.    Norman breached the "Public Statements and Non-Disparagement" provision by inducing Iberlin to make disparaging and defamatory statements in several articles.[21]

---

[21] Greg Hirst, *Town of Glenrock, Casper Attorney Iberlin Accused of 'Industrial Espionage' by Trust Company*, OIL CITY NEWS (Oct. 25, 2025), https://oilcity.news/news/2025/10/25/town-of-glenrock-casper-attorney-iberlin-accused-of-industrial-espionage-by-trust-company/; Jackson Walker, *$350M Lawsuit Over Banking Trade Secrets Names Town of Glenrock and Mayor*, COWBOY ST. DAILY (Oct. 27, 2025), https://cowboystatedaily.com/2025/10/27/350m-trade-

435. Iberlin described Eastern Point as "a bully who threatened us with a frivolous lawsuit if we didn't acquiesce to their settlement demands — and because we didn't fold, we are being sued." This characterization is false.

436. An article further states: "Iberlin's statement also characterizes Justice Escrow as the superior product to Eastern Point's QSF 360 Platform."

437. Iberlin further stated: "Eastern Point Trust Company is a Virginia company coming into Wyoming, bullying people, threatening people, saying they're going to threaten all these people and basically ruin their lives and take their firstborn children if they don't stop these qualified settlement agreements."

438. Iberlin further stated: "Eastern Point Trust Company is just mad because they made a better product, Flatirons made a better product."[22] This statement is false.

439. Iberlin further stated that Flatirons "developed a new, more efficient and user-friendly QSF platform. Seeing a legitimate and promising business opportunity that would benefit our community, the Town of Glenrock partnered with Flatirons Bank." This statement is false.

440. Norman further induced Iberlin to direct Glenrock to make disparaging and defamatory public statements.

441. In addition, Iberlin induced Glenrock to state: "This lawsuit is an affront not only to the Town of Glenrock and its representatives but to the principles of fair competition and

---

secrets-lawsuit-names-glenrock-city-mayor/; Clair MacFarland, *Glenrock Wants Judge to Dismiss Town, Mayor From $350M Lawsuit Over Bank Secrets*, COWBOY ST. DAILY (Dec. 22, 2025), https://cowboystatedaily.com/2025/12/22/glenrock-wants-judge-to-dismiss-town-mayor-from-350m-lawsuit-over-bank-secrets/; Cinthia Stimson, *Glenrock Vows to Fight $320 Million Lawsuit*, WYO. TRIB. EAGLE (Oct. 30, 2025), https://www.wyomingnews.com/news/local_news/glenrock-vows-to-fight-320-million-lawsuit/article_0cf2c644-0045-4c7d-820d-4c9955119e55.html.

[22] The falsity of this statement is also demonstrated by the fact that Eastern Point offers a Confidential QSFs solution, a Contingent QSFs solution, and a Conditional QSFs solution, which Flatirons Bank lacks.

innovation that drive our economy … EPTC may believe its corporate power and Virginia-based lawyers can bully a small Wyoming town into submission, but they are sorely mistaken." This statement is false.

442.    Iberlin further induced Glenrock to state: "We intend to fight these allegations vigorously and expose this lawsuit for what it is: a desperate attempt by a market incumbent to crush a competitor who dared to create a new product."

443.    Iberlin further induced Glenrock to state that "they are proud of their decision to partner with an innovator that 'brought a better product to the market.'"

444.    These statements constitute press releases, public statements, publications, or announcements directly or indirectly related to Eastern Point and Eastern Point's platform and services.

445.    Because Iberlin testified under oath that she did not have knowledge of the merits of Flatirons' and Eastern Point's products, Norman, as her personal friend, and her employer as co-counsel, directed her to make such statements.

446.    Norman breached the contract by inducing Iberlin to make such statements.

447.    Norman knew of the falsity or reckless disregard for the truth or, alternatively, made such statements with malice, ill will, or intent to interfere unprivileged with business interests when he directed Iberlin to make such statements.

342.448.    As a direct and proximate result of Norman's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

343.449.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Norman's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

disgorgement of the profits and benefits realized by Norman and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT II
## BREACH OF CONTRACT

BREACH OF CONTRACT

### (Against Nicholas J. Coccimiglio)

344. Eastern Point reasserts the prior allegations in Paragraphs 1 through 343449 of this

450.    Amended Complaint as if fully set forth herein.

345. In exchange for Eastern Point providing Coccimiglio an account to access and use the QSF 360™ Platform, Coccimiglio or his agent agreed to the Terms of Use at least two times during the account creation process.

451.    On or about November 18, 2018, Coccimiglio or his agent created an account on the QSF 360™ Platform using his "nick@justiceforlife.com" email address.

452.    In exchange for Eastern Point providing Coccimiglio an account to access and use the QSF 360™ Platform, Coccimiglio or his agent, with each access, agreed to the Terms of Use at least two times during the account creation process.

453.    Beginning from the date he or his agent created the account through around May 28, 2025, Coccimiglio or his agent logged into his account with access to the QSF 360™ Platform on at least 4,900 occasions.

346.454.    In exchange for Eastern Point allowing Coccimiglio to continue accessing and using the QSF 360™ Platform, Coccimiglio or his agent represented to Eastern Point that he agreed to abide by the Terms of Use each time he or his agent logged into his account.

347.455.    By accepting the Terms of Use and QSF Agreements, Coccimiglio assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-

Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

456.    The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

348.457.      Coccimiglio breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

458.    Specifically, Coccimiglio breached subsection (a) by engaging, and conspiring to engage, and enlisting the other Settlement Conspirators to form a new competitive with Eastern Point, andactivity, Justice Escrow.

459.    Coccimiglio breached subsection (b) by disclosing Eastern Point's confidential information or Collective Intellectual Property to persons, including Eastern Point's business

Formatted: List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Such information was disclosed to the other Settlement Conspirators, Flatirons, and others.

460.    Coccimiglio breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

461.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or entities engaged in competition with Eastern Point. indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

349.462.    Coccimiglio breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

463.    Specifically, Coccimiglio used Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right:  0", Space After:  0 pt, Line spacing:  single

violation of the Terms of Use to aid the remaining Settlement Conspirators and Flatirons in establishing Justice Escrow.  Alternatively, Coccimiglio used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

464.   The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

350.465.     Coccimiglio breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

466.   Specifically, Coccimiglio used Eastern Point's website for the benefit himself, the remaining Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Coccimiglio used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

467.    As a result of the breach of the "Industrial Espionage and Industrial Property Protection" provision, Coccimiglio, the other Settlement Conspirators, and Flatirons formed Justice Escrow to directly compete with Eastern Point. Justice Escrow continues to benefit all the JE Conspirators.

351.468.    As a direct and proximate result of Coccimiglio's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

352.469.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Coccimiglio's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Coccimiglio and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT III
### BREACH OF CONTRACT
### BREACH OF CONTRACT

**(Against William Bunnell)**

353. Eastern Point reasserts the prior allegations in Paragraphs 1 through 352469 of this

470.    Amended Complaint as if fully set forth herein.

471.    On or about May 29, 2019, Bunnell or his agent created an account on the QSF 360™ Platform using his "support@justiceforlife.com" email address.

354.472.    In exchange for Eastern Point providing Bunnell an account to access and use the QSF 360™ Platform, Bunnell or his agent, with each access, agreed to the Terms of Use at least two times during the account creation process.

355.473.    In exchange for Eastern Point allowing Bunnell to continue accessing and using the QSF 360™ Platform, Bunnell or his agent represented to Eastern Point that he agreed to abide by the Terms of Use each time he or his agent logged into his account.

474.    Beginning from the date he created the account through around May 28, 2025, Bunnell or his agent logged into his account with access to the QSF 360™ Platform on at least 576 occasions.

356.475.    By accepting the Terms of Use and QSF Agreements, Bunnell assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

476.    The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the

associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

357.477.    Bunnell breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

478.    Specifically, Bunnell breached subsection (a) by engaging, and conspiring to engage, and enlisting the other Settlement Conspirators to form a new competitive activity, Justice Escrow.

479.    Bunnell breached subsection (b) by disclosing Eastern Point's confidential information or Collective Intellectual Property, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Such information was disclosed to the other Settlement Conspirators, Flatirons, Murray, and others.

480.    Bunnell breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

481.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

358.482.    Bunnell breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

483.    Specifically, Bunnell used Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use to aid the remaining Settlement Conspirators and Flatirons in establishing Justice Escrow.  Alternatively, Bunnell used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

484.    The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

359.485.    Bunnell breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

486.    Specifically, Bunnell used Eastern Point's website for the benefit himself, the remaining Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Bunnell used

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

487.    As a result of the breach of the "Industrial Espionage and Industrial Property Protection" provision, Bunnell, the other Settlement Conspirators, and Flatirons formed Justice Escrow to directly compete with Eastern Point. Justice Escrow continues to benefit all the JE Conspirators.

488.    Bunnell breached his obligations under the T&Cs by using login IDs assigned to former Delta Settlement employees (BUA) to conceal his identity and gain "gates down" unauthorized access to the system.

360.489.    As a direct and proximate result of Bunnell's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

361.490.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Bunnell's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Bunnell and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT IV
### BREACH OF CONTRACT
### BREACH OF CONTRACT

**(Against Michael Upchurch)**

362. Eastern Point reasserts the prior allegations in Paragraphs 1 through 361490 of this

491.    Amended Complaint as if fully set forth herein.

492.    On or about February 10, 2022, Upchurch or his agent created an account on the QSF 360™ Platform using his "michael@deltasettlements.com" email address. He and his agents also had and utilized QSF 360™ Platform account access via "team@deltasettlments.com."

363.493.    In exchange for Eastern Point providing Upchurch with an account to access and use the QSF 360™ Platform, Upchurch or his agent, with each access, agreed to the Terms of Use at least two times during the account creation process.

494.    Beginning from the date he or his agents created the account through around May 28, 2025, Upchurch or his agents at Delta Settlements logged into his QSF 360™ account 31 times and logged in using other Delta Settlement accounts (including but not limited to "team@deltasettlements.com") on at least 576 occasions.

364.495.    In exchange for Eastern Point allowing Upchurch or his agent to continue accessing and using the QSF 360™ Platform, Upchurch or his agent represented to Eastern Point that he agreed to abide by the Terms of Use each time he logged into his account.

365.496.    By accepting the Terms of Use and QSF Agreements, Upchurch assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

497.    The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

[User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the

associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

366.498.    Upchurch breached his obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

499.    Specifically, Coccimiglio breached subsection (a) by engaging, and conspiring to engage, and enlisting the other Settlement Conspirators to form a new competitive with Eastern Point, andactivity, Justice Escrow.

500.    Upchurch breached subsection (b) by disclosing Eastern Point's confidential information or Collective Intellectual Property to persons, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Such information was disclosed to the other Settlement Conspirators, Flatirons, and others.

501.    Upchurch breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

502.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or entities engaged in competition with Eastern Point. indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

367.503.    Upchurch breached his obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted him, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

504.    Specifically, Upchurch used Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use to aid the remaining Settlement Conspirators and Flatirons in establishing Justice Escrow. Alternatively, Upchurch used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

**Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

505. The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

> The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

368.506. Upchurch breached his obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

507. Specifically, Upchurch used Eastern Point's website for the benefit himself, the remaining Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Upchurch used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective

Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

508.    As a result of the breach of "Industrial Espionage and Industrial Property Protection" provision, Upchurch, the other Settlement Conspirators, and Flatirons formed Justice Escrow to directly compete with Eastern Point. Justice Escrow continues to benefit all of the JE Conspirators.

369.509.    As a direct and proximate result of Upchurch's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

370.510.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Upchurch's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Upchurch and his co-conspirators, in addition to any and all other relief available under the law.

## COUNT V
### BREACH OF CONTRACT
### BREACH OF CONTRACT

**(Against Trial Lawyers for Justice)**

371. Eastern Point reasserts the prior allegations in Paragraphs 1 through 370510 of this

511.    Amended Complaint as if fully set forth herein.

372.512.    On or about March 1, 2019, Trial Lawyers for Justice, through agents authorized to act on its behalf, created an account on the QSF 360™ Platform using a "nick@tl4j.com" email address.

373.513.    Trial Lawyers for Justice created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

374.514.    In exchange for Eastern Point providing Trial Lawyers for Justice an account to access and use the QSF 360™ Platform, Trial Lawyers for Justice agreed to the Terms of Use with each access at least two times during the account creation process.

375.515.    Beginning from the date Trial Lawyers for Justice created the account through around May 28, 2025, agents authorized to act on behalf of Trial Lawyers for Justice logged into its account with access to the QSF 360™ Platform on at least 454 occasions.

376.516.    In exchange for Eastern Point allowing Trial Lawyers for Justice to continue accessing and using the QSF 360™ Platform, Trial Lawyers for Justice agreed to the Terms of Use each time its authorized agents logged into its account.

377.517.    Trial Lawyers for Justice's account is associated with at least 150 QSFs established by Eastern Point between March 1, 2019, and May 28, 2025.

378.518.    Eastern Point established each QSF associated with Trial Lawyers for Justice's account at the direction of an agent authorized to act on behalf of Trial Lawyers for Justice.

379.519.    Upon the establishment of each QSF associated with Trial Lawyers for Justice's account, agents authorized to act on behalf of Trial Lawyers for Justice electronically executed the Attestation and reaffirmed Trial Lawyers for Justice's assent to the Terms of Use.

380.520.    By accepting the Terms of Use and QSF Agreements, Trial Lawyers for Justice assumed legally enforceable obligations to Eastern Point, including the obligations

articulated in the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

521.    The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

> [User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

381.522.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

523.    Specifically, Trial Lawyers for Justice, through agents authorized to act on its behalf, including Norman, breached subsection (a) by conspiring to engage with the Settlement Conspirators and Flatirons to form a new competitive activity, Justice Escrow.

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

524.    Trial Lawyers for Justice, through agents authorized to act on its behalf, including Norman, breached subsection (b) by disclosing Eastern Point's confidential information or Collective Intellectual Property, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Such information was disclosed to the Settlement Conspirators, Flatirons, and others.

525.    Trial Lawyers for Justice, through agents authorized to act on its behalf, breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

526.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

382.527.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted it, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

528.    Specifically, by accessing the Eastern Point QSF 360 platform via user logins, Trial Lawyers for Justice, through agents authorized to act on its behalf, used Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use to aid the remaining Settlement Conspirators and Flatirons in establishing Justice Escrow.  Alternatively, Trial Lawyers for Justice, through agents authorized to act on its behalf,used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

529.    The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

> The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

383.530.    Through the conduct of agents authorized to act on its behalf, Trial Lawyers for Justice breached its obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

531.    Specifically, Trial Lawyers for Justice, through agents authorized to act on its behalf, used Eastern Point's website for the benefit himself, the Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Trial Lawyers for Justice, through agents authorized to act on its behalf, used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

532.    As a result of the breach of "Industrial Espionage and Industrial Property Protection" provision, Trial Lawyers for Justice aided the Settlement Conspirators—as one example, through Norman conspiring with Iberlin to improperly use the Glen Rock Municipal Court. Flatirons thereafter formed Justice Escrow to directly compete with Eastern Point through

the improperly gained Trade Secrets and with said aid of Trial Lawyers for Justice. Justice Escrow continues to benefit all the JE Conspirators.

384.533.    As a direct and proximate result of Trial Lawyers for Justice's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

385.534.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Trial Lawyers for Justice's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Trial Lawyers for Justice and its coconspiratorsco-conspirators, in addition to any and all other relief available under the law.

## COUNT VI
**BREACH OF CONTRACT**
~~BREACH OF CONTRACT~~

**(Against Justice for Life)**

386.Eastern Point reasserts the prior allegations in Paragraphs 1 through 385534 of this

535.    Amended Complaint as if fully set forth herein.

387.536.    On or about April 16, 2019, Justice for Life, through agents authorized to act on its behalf, created an account on the QSF 360™ Platform using a "nick@justiceforlife.com" email address.

388.537.    Justice for Life created the account by using a computer connected to the internet to access Eastern Point's computer network in Virginia, where the QSF 360™ Platform is housed and maintained.

389.538.    In exchange for Eastern Point providing Justice for Life an account to access and use the QSF 360™ Platform, Justice for Life agreed to the Terms of Use at least two times during the account creation process.

390.539.    Beginning from the date Justice for Life created the account through around May 28, 2025, agents authorized to act on behalf of Justice for Life logged into its account with access to the QSF 360™ Platform on at least 4,9346,600 occasions.

391.540.    In exchange for Eastern Point allowing Justice for Life to continue accessing and using the QSF 360™ Platform, Justice for Life agreed to the Terms of Use each time its authorized agents logged into its account.

392. Justice for Life's account is associated with at least 625 QSFs established by

541.    Eastern Point between March 2, 2018, and October 29, 2024.

393.542.    Eastern Point established each QSF associated with Justice for Life's account at the direction of an agent authorized to act on behalf of Justice for Life.

394.543.    Upon the establishment of each QSF associated with Justice for Life's account, agents authorized to act on behalf of Justice for Life electronically executed the Attestation and reaffirmed Trial Lawyers for Justice's assent to the Terms of Use.

395.544.    By accepting the Terms of Use and QSF Agreements, Justice for Life assumed legally enforceable obligations to Eastern Point, including the obligations articulated in the NonCompeteNon-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, and the Industrial Espionage and Industrial Property Protection provision.

396.545.    Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Non-Compete and Non-Disclosure provision by engaging in activity competitive with Eastern Point, acquiring an interest in an entity competitive with Eastern Point, and disclosing Eastern Point's confidential information or Collective Intellectual Property to persons or entities engaged in competition with Eastern Point.

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt

546.    The Terms of Use provide the following "Non-Compete and Non-Disclosure" provision:

> [User] therefore acknowledge[s] that the highly competitive nature of [Eastern Point's] Relevant Business and the [user]'s derived benefits and contractual obligations hereunder justify restricting the [user]'s activities. Accordingly, during the term of this Agreement, and for a period of sixty months (60) months following the latter of (i) the date of the last service provided by [Eastern Point]; or (ii) the last access or use of the Platform and Services; or (iii) the termination of the associated User Account(s) from the system (the "Restricted Period"), [user] shall not, in any manner whatsoever, directly or indirectly, (a) engage or conspire in any capacity with or in any existing or new competitive activity with any of [Eastern Point's] Relevant Businesses then engaged in by [Eastern Point], any of [Eastern Point's] subsidiaries or any of Affiliates for [user's] own benefit or for the benefit of any Person or Entity other than [Eastern Point] or any subsidiary or affiliate; (b) disclose in any capacity [Eastern Point's] confidential information or Collective Intellectual Property to any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Business; or (c) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, salesman, promoter, collaborator, or otherwise in any Person, Entity, business or organization directly or indirectly competitive with [Eastern Point's] Relevant Businesses….

547.    Specifically, Justice for Life, through agents authorized to act on its behalf, including but not limited to Norman, breached subsection (a) by conspiring to engage with the Settlement Conspirators and Flatirons to form a new competitive activity, Justice Escrow.

548.    Justice for Life, through agents authorized to act on its behalf, including but not limited to Norman, breached subsection (b) by disclosing Eastern Point's confidential information or Collective Intellectual Property, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Such information was disclosed to the Settlement Conspirators, Flatirons, and others.

549.    Justice for Life, through agents authorized to act on its behalf, including but not limited to Norman, breached subsection (c) by acquiring an interest in Justice Escrow before his last access date and within the 60-month period of his last access date.

550.    The Terms of Use also includes a "Trade Secrets and Confidential Information" provision clarifying, in relevant part, that Eastern Point conditions each user's access upon the grant of "a non-exclusive, revocable, nontransferable Limited Use License to use the Platform and Services solely for [user's] own non-competitive purposes," in exchange for which users "agree that they are prohibited from any direct or indirect, reverse engineering or derivative use or reselling of the Platform and Services" and that "using the Platform and Services for purposes outside the scope and purpose(s) contemplated in the Limited Use License constitutes a *prima facie* Misappropriation of Our Collective Intellectual Property and Trade Secrets and a breach of the Limited Use License."

397.551.        Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Trade Secrets and Confidential Information provision, and exceeded the scope of the Limited Use License Eastern Point granted it, by accessing the QSF 360™ Platform for competitive purposes and by misappropriating Eastern Point trade secrets and confidential information for derivative use by an entity in competition with Eastern Point.

552.    Specifically, Justice for Life, through employees and agents authorized to act on its behalf, including Coccimiglio and Bunnell, used Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use to aid the remaining Settlement Conspirators and Flatirons in establishing Justice Escrow. Alternatively, Trial Lawyers for Justice, through agents authorized

to act on its behalf, including but not limited to Norman, used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

553.    The Terms of Use further provide the following "Industrial Espionage and Industrial Property Protection" provision:

The Parties in Interest shall not, under any circumstances, use or surveil [Eastern Point's] Industrial Property in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, or in breach of the Non-Compete and Non-Disclosure provisions of this Agreement. Likewise, the Parties in Interest agree not to conspire with any other party to use or surveil, in any unauthorized manner, including modification, reverse engineering, or replication in any manner, with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate, clone, plagiarize, or steal Our Trade Secrets and Collective Intellectual Property or any related or derivative rights or other proprietary information, material, designs, web functions, processes, products, intellectual property, or proprietary or confidential information of anyone, including suppliers, customers, or business partners.

554.    Through the conduct of agents authorized to act on its behalf, Justice for Life breached its obligations under the Industrial Espionage and Industrial Property Protection provision by engaging in unauthorized surveillance and use of Eastern Point's Industrial Property and conspiring with other parties to surveil and use Eastern Point's Industrial Property without authorization.

555.    Specifically, Justice for Life, through agents authorized to act on its behalf, including Coccimiglio and Bunnell, used Eastern Point's website for the benefit himself, the Settlement Conspirators, the remaining JE Conspirators, and Flatirons to replicate with the intent to claim ownership, launch a derivative service or product, gain competitive advantage, emulate,

clone, plagiarize, or steal Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Alternatively, Justice for Life, through agents authorized to act on its behalf, including but not limited to Norman, used Eastern Point's website to reverse engineer Eastern Point's Trade Secrets and Collective Intellectual Property, including its Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information in violation of the Terms of Use.

556.    As a result of the breach of "Industrial Espionage and Industrial Property Protection" provision, Justice for Life aided the Settlement Conspirators, and Flatirons in forming Justice Escrow to directly compete with Eastern Point. Justice Escrow continues to benefit all of the JE Conspirators.

398.557.    As a direct and proximate result of Justice for Life's breaches of the Terms of Use and QSF Agreements, which remain ongoing and continuous, Eastern Point has sustained and will continue to sustain damages.

399.558.    Under the Terms of Use and QSF Agreements, as non-exclusive remedies for Justice for Life's breaches, Eastern Point is entitled to injunctive relief, stipulated damages, and disgorgement of the profits and benefits realized by Trial Lawyers for Justice and its coconspiratorsco-conspirators, in addition to any and all other relief available under the law.

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

**COUNT VI**
**BREACH OF CONTRACT**

**(Against Iberlin)**

559.    Eastern Point reasserts the prior allegations in Paragraphs 1 through 558 of this Amended Complaint as if fully set forth herein.

560.    On or about March 12, 2025, upon information and belief, Iberlin visited Eastern Point's website and engaged in at least ten (10) entries, thereby assenting to the Terms of Use. Upon information and belief, Iberlin visited Eastern Point's website multiple times thereafter, with the most recent documented visit occurring on or about December 11, 2025.

561.    Eastern Point's website features a banner on the top of the page which states, in conspicuous language: "By using this site, you agree to our Privacy Policy and Terms of Use by you Additional Use of this site."

562.    "Privacy Policy," "Terms of Use," and "Additional Use" appear in conspicuous bright blue font, which indicate the terms are hyperlinked, and are distinct in color from other words on the page, set against a contrasting background, and contain hyperlinks to printable copies of the respective policy agreements.

563.    There are no design elements of the website that would hinder a user's reasonable notice to the hyperlinked "Privacy Policy," "Terms of Use," and "Additional Use".

564.    When one clicks on "Additional Use," users are directed to the Terms of Use, which auto-scrolls to the definition of "Additional Use."

565.    As set forth in the Terms of Use:

**"Additional Use"** means (i) Your access or any use of the Platform or Services, webpage, or related URL or sub-URL beyond the date and time of Your first access session to the Platform or Services or (ii) any additional or continued access (or access session) of the Platform, including any other use, linking, reading, downloading, printing, copying, screen capture, or use of other Platform functions

or Services, links, or pages beyond the first accessed page within the Platform, or (iii) any other use (or access session) of the Platform or Services, and You Agree that any of the preceding shall constitute Your acceptance of this Agreement and the associated Document Components as applicable, including additional requirements that We may impose, under the related terms, from time to time. For clarity, You may view the Terms of Use and Privacy Policy during Your initial access session without binding effect, but only if You invoke the Free Use Period provision timely and notify Us of Your exercising the Free Look Period provision election in writing, pursuant to the Notice Provision. Notwithstanding the foregoing, You Agree that (i) any subsequent use, access, or access session, or (ii) any login, or (iii) creating a User log-in, User Account, or any Account shall permanently waive the Free Use Period provision. The failure to properly Notice timely under the Free Look Period provision shall result in (i) Your waiver of all rights, defenses, including affirmative defenses, and claims at law, in equity, or by other legal theory, and (ii) the binding effect of this Agreement shall then be effective as of your first access or use.

566.    By engaging in ten (10) entries beyond the first accessed page within the Eastern Point's website, Iberlin assented to Eastern Point's Terms of Use in exchange for her continued use of Eastern Point's website.

567.    Further, Iberlin never submitted a notice under the Free Look Period provision.

568.    Under the Terms of Use, there is a provision titled "Public Statements and Non-Disparagement."

569.    The "Public Statements and Non-Disparagement" provision provides in relevant part:

Without Our prior written permission, You shall not, directly or indirectly, issue any press release, make public statements, publications, or announcements directly or indirectly related to Us, the Platform or any of Our services. …

You Agree that You will not make, or induce or cause another party to make any statement or communication, public or private, that (i) is intended to, or reasonably could be expected to, defame, disparage, or harm Our reputation or the reputation of the Platform and Services; (ii) is false; or (iii) that would reasonably be expected to lead to unwanted or unfavorable publicity or public perception.

Specifically, You Agree that You will not defame or disparage Us, the Platform, or the Services. You further Agree not to relay, communicate, or repeat defamatory or disparaging comments from others or cause, encourage, conspire, or sponsor,

directly or indirectly, such statements to be made by a third party or through an anonymous Person or Entity. Defamation and disparagement include: public writings, remarks, comments, or statements (with or without malice or intent) that are false in nature, fact, or substance and which impugn the character, honesty, integrity, morality, or business acumen, or abilities in connection with any aspect of the operation of Our business. This includes the torts of defamation, product disparagement, insulting words, injurious falsehood, and trade libel. Any violation of this Section shall require You to immediately remove or retract any such defaming or disparaging statements. In recognition of the willful and reckless nature of, and intent to harm associated with, defaming and disparaging statements, and recognizing the difficulty in ascertaining damages caused by defamatory statements, You Agree that You shall be liable for stipulated damages of five million dollars ($5,000,000) per Defamation Instance, plus any other award an adjudicator of proper jurisdiction deems appropriate including, but not limited to, punitive and exemplary damages. You Agree that said liability shall begin from the moment the statement is published without regard to the method of publication. All damages associated with said defaming and disparaging statements shall additionally include Our attorneys' fees and all internal and external costs.

By Your use of and access to the Platform, You Agree that any effort or coordination of action by more than one Person to cause, conspire, or coordinate to make or cause to be made defamatory or disparaging statements against Us or the Platform, is stipulated as an injury of reputation, trade, business, or profession by reason of conspiracy, and We are thus entitled to recover all damages to the fullest extent allowed under applicable statutes, including when applicable treble damages, plus any associated stipulated damages, plus the costs of the suit, including attorneys' fees and all internal and external costs. Without limiting the generality of the term, "damages" shall include loss of profits, reputational harm, and all future expectancy of lost profits or business opportunities.

For purposes of this Agreement, the Parties in Interest Agree that limitation period for Us bringing defamation or disparagement claims forth is five (5) years from the date in which We (i) have direct sufficient knowledge of an incident, and (ii) the contents of the statements or publications, and (iii) the identity of all parties speaking or receiving the statements or publications. Further, Parties in Interest waive all defenses or objections at law, in equity or based on estoppel and accordingly, the Parties in Interest waive all Claims and are barred from any resulting Claim against Us or related to the Platform or any Account.

570.    In several articles,[23] Iberlin, individually and in her role as Glenrock's Town Counsel described Eastern Point as "a bully who threatened us with a frivolous lawsuit if we didn't

---

[23] Greg Hirst, *Town of Glenrock, Casper Attorney Iberlin Accused of 'Industrial Espionage' by Trust Company*, OIL CITY NEWS (Oct. 25, 2025), https://oilcity.news/news/2025/10/25/town-of-

acquiesce to their settlement demands — and because we didn't fold, we are being sued." This characterization is false.

571.    An article further states: "Iberlin's statement also characterizes Justice Escrow as the superior product to Eastern Point's QSF 360 Platform."

572.    Iberlin further stated: "Eastern Point Trust Company is a Virginia company coming into Wyoming, bullying people, threatening people, saying they're going to threaten all these people and basically ruin their lives and take their firstborn children if they don't stop these qualified settlement agreements."

573.    Iberlin further stated: "Eastern Point Trust Company is just mad because they made a better product, Flatirons made a better product." This statement is false.

574.    Iberlin further stated that Flatirons "developed a new, more efficient and user-friendly QSF platform. Seeing a legitimate and promising business opportunity that would benefit our community, the Town of Glenrock partnered with Flatirons Bank." This statement is false.

575.    In addition, Iberlin induced Glenrock to state: "This lawsuit is an affront not only to the Town of Glenrock and its representatives but to the principles of fair competition and innovation that drive our economy … EPTC may believe its corporate power and Virginia-based lawyers can bully a small Wyoming town into submission, but they are sorely mistaken." This statement is false.

---

glenrock-casper-attorney-iberlin-accused-of-industrial-espionage-by-trust-company/; Jackson Walker, *$350M Lawsuit Over Banking Trade Secrets Names Town of Glenrock and Mayor*, COWBOY ST. DAILY (Oct. 27, 2025), https://cowboystatedaily.com/2025/10/27/350m-trade-secrets-lawsuit-names-glenrock-city-mayor/; Clair MacFarland, *Glenrock Wants Judge to Dismiss Town, Mayor From $350M Lawsuit Over Bank Secrets*, COWBOY ST. DAILY (Dec. 22, 2025), https://cowboystatedaily.com/2025/12/22/glenrock-wants-judge-to-dismiss-town-mayor-from-350m-lawsuit-over-bank-secrets/; Cinthia Stimson, *Glenrock Vows to Fight $320 Million Lawsuit*, WYO. TRIB. EAGLE (Oct. 30, 2025), https://www.wyomingnews.com/news/local_news/glenrock-vows-to-fight-320-million-lawsuit/article_0cf2c644-0045-4c7d-820d-4c9955119e55.html.

576. Iberlin further induced Glenrock to state: "We intend to fight these allegations vigorously and expose this lawsuit for what it is: a desperate attempt by a market incumbent to crush a competitor who dared to create a new product."

577. Iberlin further induced Glenrock to state that "they are proud of their decision to partner with an innovator that 'brought a better product to the market.'"[24]

578. These statements constitute press releases, public statements, publications, or announcements directly or indirectly related to Eastern Point and Eastern Point's platform and services.

579. Iberlin breached the contract by making such statements.

580. Iberlin knew of the falsity or reckless disregard for the truth or, alternatively, made such statements with malice, ill will, or intent to interfere unprivileged with business interests.

581. In fact, Iberlin testified under oath that she did not have knowledge of the merits of Flatirons' and Eastern Point's products.

582. Because Iberlin breached the "Public Statements and Non-Disparagement" provision, she is liable for liquidated damages of $5,000,000.00 per instance.

COUNT VII
~~VIOLATIONS OF THE DEFEND TRADE SECRETS ACT~~
VIOLATIONS OF THE DEFEND TRADE SECRETS ACT ("DTSA")

---

[24] as noted previously, Flatirons is no innovator. Norman admitted in his email to Murray that our QSF360 solution was the best. Further, the Justice Escrow platform offers only partial QSF solutions. It does not offer a Contingency QSF, a Confidential QSF, or a Conditional QSFs solution, nor does Flatirons offer QSF solutions to defendants, which Eastern Point does routinely through its QSF 360.

**18 U.S.C. § 1836 ~~ET SEQ.~~ ET SEQ.**

**(Against Flatirons Bank, ~~Nicholas J. Coccimiglio, Will Bunnell~~the Settlement Conspirators, Timothy Krochuk, Trellis Software, Inc., Amy Iberlin, and Scott C. Murray (collectively, the "Trade Secret Defendants"))**

~~401.~~Eastern Point reasserts the prior allegations in Paragraphs 1 through ~~400~~582 of this

583.    Amended Complaint as if fully set forth herein.

584.    Eastern Point owns and/or lawfully possesses trade secrets related to its business including, but not limited to, the QSF 360™ Platform and its related proprietary methods, processes, documents, and systems, and other trade secret described herein (the "Eastern Point Trade Secrets~~").~~." or "Easten Point's Trade Secrets").

~~402.~~585.    "Eastern Point Trade Secrets" includes its business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information. Developing Eastern Point Trade Secrets took significant substantial financial investment and years of back-end research.[25]

~~403.~~586.    The Trade Secret Defendants have acquired and have used or are planning to use the Eastern Point Trade Secrets under circumstances in which they knew or had reason to know the Eastern Point Trade Secrets were obtained without authorization.

~~404.~~587.    The Settlement Conspirators were given access to Eastern Point's Trade Secrets while they were clients of Eastern Point, under circumstances that the Settlement

---

[25] Eastern Point expended over a 10-year period millions of dollars in developing QSF 360, including but not limited to: legal opinions, tax opinions, industry adoption costs, and software development costs

Conspirators knew or had reason to know gave rise to a duty to maintain the secrecy and limit their use.

405.588.        The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

406. The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent, having used improper means to acquire knowledge of the trade secrets in violation of their obligations.

589.    The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent.

590.    Specifically, the Settlement Conspirators used improper means to acquire knowledge of Eastern Point Trade Secrets in violation of their obligations, such as the Non-Compete and Non-Disclosure, Misappropriation of Our Collective Intellectual Property and Trade Secrets, and Industrial Espionage and Industrial Property Protection provisions.

591.    The Settlement Conspirators disclosed Eastern Trade Secrets to Flatirons, Krochuk, and Trellis, Iberlin, Murray, and other third parties.

407.592.        Flatirons, Krochuk, Murray, Iberlin and Trellis as recipients of the information knew or had reason to know that the Settlement Conspirators misappropriated the Eastern Point Trade Secrets, and Flatirons, Krochuk, and Trellis used the trade secrets to set up a competing product to the QSF 360™ Platform. because Easten Point's Trade Secrets included Eastern Point's branding.

> **Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

593.   Upon information and belief, the Settlement Conspirators demoed or shared screen shots (images) of Eastern Point's secured website to Flatirons, Krochuk, Trellis and others in a manner that exceeded the Settlement Conspirators' authorized access under the Terms of Use.

594.   Flatirons, Krochuk, and Trellis used Eastern Point's Trade Secrets to set up a competing product to the QSF 360™ Platform, Justice Escrow.

408.595.   Murray knew or had reason to know that he was in possession of and was using Eastern Point's trade secretsPoint Trade Secrets in an effort to recruit municipalities to join Justice Escrow because Norman directly stated that the Justice Escrow platform was intended to replicate Eastern Point Trade Secrets, and that the Eastern Point Trade Secrets had been acquired by the Settlement Conspirators through improper means.

409.596.   Iberlin knew or had reason to know that she was in possession of and was using Eastern Point's trade secrets in an effort to recruit municipalities to join Justice Escrow, and that the Eastern Point Trade Secrets had been acquired by the Settlement Conspirators through improper means.

410.The Trade Secret Defendants have used and are now using the Eastern Point Trade

597.   Secrets to unfairly compete with Eastern Point.

411.598.   The Eastern Point Trade Secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

412.599.   Eastern Point has taken reasonable measures to maintain the confidential nature of the Eastern Point Trade Secrets, including but not limited to the Eastern Point Trade Secrets that the Trade Secret Defendants misappropriated.

413.600.   Reasonable efforts that Eastern Point has taken to maintain the secrecy of the Eastern Point Trade Secrets include, but are not limited to, requiring its website and QSF 360™

> **Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

> **Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

Platform users (including the Settlement Conspirators) to comply with non-disclosure and confidentiality obligations protecting the Eastern Point Trade Secrets., and requiring authorized access only.

414.601.    The Eastern Point Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

415.602.    The Eastern Point Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

416.603.    The Trade Secrets Defendants possessed and used, and continue to possess and use, the Eastern Point Trade Secrets without Eastern Point's express or implied consent.

417.604.    On information and belief, the Settlement Conspirators' actions in misappropriating the Eastern Point Trade Secrets were done willfully and maliciously. The Settlement Conspirators acted with actual malice or a wanton and willful disregard to Eastern Point, which foreseeably could have been, and was, harmed by their acts.

605.    Eastern Point Trade Secrets implicate interstate commerce because Flatirons uses Eastern Point Trade Secrets for the establishment of QSFs throughout the country.

606.    Upon information and belief, Justice Escrow used Eastern Point Trade Secrets to establish QSFs related to matters arising in many states, such as California, Iowa, Florida, and elsewhere.

418. The Trade Secrets Defendants' actions violate the Defend Trade Secrets Act of

607.    2016, 18 U.S.C. § 1836 *et seq.*

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** List Paragraph, Left, Indent: Left:  0", Right: 0", Space After:  0 pt, Line spacing:  single

608. For example, Bunnell's hundreds of instances of unauthorized access using misappropriated user credentials constitute unauthorized access to the Eastern Point system and violate the VCCA and the Defend Trade Secrets Act.

419.609.    The Trade Secret Defendants' misappropriation of the Eastern Point Trade Secrets has caused and will cause Eastern Point damages in an amount to be determined at trial.

420.610.    In addition, Eastern Point will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent the Trade Secret Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Eastern Point Trade Secretes from continuing to inure unfairly to the Trade Secret Defendants' benefit.

## COUNT VIII
## VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT
## VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT ("VUTSA") VA. CODE
## VA. CODE § 59.1-336 ET SEQ. ET SEQ.

**(Against the Trade Secret Defendants)**

421.Eastern Point reasserts the prior allegations in Paragraphs 1 through 420610 of this

611.    Amended Complaint as if fully set forth herein.

422.612.    Eastern Point owns and/or lawfully possesses confidential information and trade secrets related to its business, including, but not limited to, the Eastern Point Trade Secrets.

423.613.    The Trade Secret Defendants have acquired and have used or are planning to use the Eastern Point Trade Secrets under circumstances in which they knew or had reason to know the Eastern Point Trade Secrets were obtained without authorization.

424.614.    The Settlement Conspirators were given access to the Eastern Point Trade Secrets while they were clients of Eastern Point, under circumstances that the Settlement

Conspirators knew or had reason to know gave rise to a contractual duty to maintain their secrecy and limit their use.

425. The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

426.615.    The Settlement Conspirators breached their duty to maintain the secrecy of the Eastern Point Trade Secrets by misappropriating them and using them in connection with the Justice Escrow platform.

427.616.    The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent, having used improper meansbreached their duty to acquire knowledgemaintain the secrecy of the trade secretsEastern Point Trade Secrets by misappropriating them and using them in violation of their obligations. connection with the Justice Escrow platform.

617.    The Settlement Conspirators misappropriated Eastern Point's trade secrets without Eastern Point's express or implied consent, having used improper means to acquire knowledge of the trade secrets in violation of their obligations.

428.618.    Flatirons, Krochuk, and Trellis knew or had reason to know that the Settlement Conspirators misappropriated the Eastern Point Trade Secrets, and Flatirons, Krochuk, and Trellis used the Eastern Point Trade Secrets to set up a competing product to the QSF 360™ Platform.

Formatted: List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

Formatted: List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

429.619.    MurrayMurray, with his receipt of information and documents clearly labeled with Eastern Point's name and logos, as well as banking information, he knew or had reason to know that he was in possession of and was using Eastern Point's trade secrets in an effort to recruit municipalities to join Justice Escrow, and that the Eastern Point Trade Secrets had been acquired by the Settlement Conspirators through improper means.

430.620.    Iberlin knew or had reason to know that she was in possession of and was using Eastern Point's trade secrets in an effort to recruit municipalities to join Justice Escrow, and that the Eastern Point Trade Secrets had been acquired by the Settlement Conspirators through improper means.

431. The Trade Secret Defendants have used and are now using the Eastern Point Trade

621.    Secrets to unfairly compete with Eastern Point.

432.622.    Eastern Point has taken reasonable measures to maintain the confidential nature of the Eastern Point Trade Secrets, including but not limited to the Eastern Point Trade Secrets that the Trade Secret Defendants misappropriated.

433.623.    Reasonable efforts that Eastern Point has taken to maintain the secrecy of the Eastern Point Trade Secrets include but are not limited to requiring its website and QSF 360™ Platform users (including the Settlement Conspirators) to comply with non-disclosure and confidentiality obligations protecting the Eastern Point Trade Secrets.

434.624.    The Eastern Point Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

**Formatted:** List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt

435.625.      The Eastern Point Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

436.626.      The Trade Secrets Defendants possessed and used, and continue to possess and use, the Eastern Point Trade Secrets without Eastern Point's express or implied consent.

437.627.      On information and belief, the Settlement Conspirators' actions in misappropriating the Eastern Point Trade Secrets were done willfully and maliciously. The Settlement Conspirators acted with actual malice or a wanton and willful disregard to Eastern Point, which foreseeably could have been, and was, harmed by their acts.

438. The Trade Secrets Defendants' actions violate the Virginia Uniform Trade Secrets

628.    Act ("VUTSA"), Va. Code § 59.1-336 et seq.

439.629.      The Trade Secret Defendants' misappropriation of the Eastern Point Trade Secrets has caused and will cause Eastern Point damages in an amount to be determined at trial.

630.    In addition, Eastern Point will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent the Trade Secret Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Eastern Point Trade Secretes from continuing to inure unfairly to the Trade Secret Defendants' benefit.

COUNT IX
**VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT VA. CODE**
**VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT VA. CODE § 18.2-152.12**

**(Against the Settlement Conspirators)**

441. Eastern Point reasserts the prior allegations in Paragraphs 1 through 440630 of this

631.    Amended Complaint as if fully set forth herein.

442.632.        The Settlement Conspirators, both individually and collectively, committed

multiple violations of the Virginia Computer Crimes Act, causing injury to Eastern Point.

633.    First, the Settlement Conspirators, both individually and collectively, engaged in a

persistent course of conduct involving multiple acts of Computer Fraud, in violation of Va. Code

§ 18.2-152.3, by repeatedly using Eastern Point's computer network, without authority, and

obtaining Eastern Point's property and services by false pretenses and converting Eastern Point's

trade secrets and confidential information.

634.    Specifically, the Settlement Conspirators used Eastern Point's computer network

located in Virgina without authority by violating multiple provisions of the Terms of Use.

635.    For example, and without limitation, the Terms of Use explicitly state that:

**Prohibition on Use**
The Infringing Party is hereby prohibited from any further, direct or indirect, use of any Derivative Work Product technologies, business processes, systems, websites, technology, products, or services, Including direct, indirect, derivative, or consequential work product, Including but not limited to systems, source code, websites, processes, materials, procedures, marketing materials, resulting directly or indirectly from the use, or access to, or possession of the Misappropriated Property.

636.    "Derivative Work Product" means:

any (i) derivative technologies, reverse-engineered elements, business processes, systems, websites, technology, products, or services, Including direct, indirect, derivative, or consequential work products, Including but not limited to systems, source code, websites, processes, materials, procedures, marketing materials, resulting directly or indirectly from the use, or access to, receipt of, or possession of the Misappropriated Property by you or as part of a Conspiracy, or (ii) any work product like elements that are directly or indirectly derived from Our Collective Intellectual Property, Trade Secrets, or Industrial Property Including any other Misappropriated Property. The foregoing includes any modifications, adaptations, reverse engineering, or developments based on such Collective Intellectual Property, Trade Secrets, or Industrial Property, Including any other work product arising from or as part of a Conspiracy. This term is intended to be interpreted and

applied in the broadest possible context to ensure the rightful protection of intellectual property and other proprietary rights and deter misappropriation.

637.    At a minimum, the Settlement Conspirators violated the Terms of Use by disclosing "materials, procedures, [and] marketing materials," to each other, Flatirons, Krochuk, Trellis, Murray, Iberlin, and others. For example, the Settlement Conspirators disclosed Derivative Work Product to Murray in July of 2023.

638.    Each Settlement Conspirator logged on to their Eastern Point account after July of 2023.

639.    Upon information and belief, Norman or his agent logged in to Eastern Point's servers at least 110 times after that date, with the latest occurring in May of 2025.

640.    Upon information and belief, Coccimiglio and his agents, including Bunnell, logged in to Eastern Point's servers at least 2114 times after that date, with the latest occurring in February of 2025.

641.    Upon information and belief, Bunnell or his agent logged in to Eastern Point's servers at least 310 times after that date, with the latest occurring in April of 2025.

443.642.    Under the Terms of Use, each access after the date of their disclosure was unauthorized and exceed the scope of permissive use.

643.    Second, the Settlement Conspirators, both individually and collectively, engaged in a persistent course of conduct involving multiple acts of Computer Trespass, in violation of Va. Code § 18.2-152.4, by, without authority, using Eastern Point's computer network to make or cause to be made unauthorized copies of the computer data residing in, communicated by, or produced by Eastern Point's computer network.

644.    For example, and without limitation, the Terms of Use explicitly state that:

**Formatted:** List Paragraph, Left, Right:  0", Space After: 0 pt, Line spacing:  single,  No bullets or numbering

You may not use the Platform and Services or Collective Intellectual Property, including Trade Secrets, for any other commercial purpose, or purpose which results any gross revenue, fees or derived income or in connection with any other website, application, software or content.

444.645.    By using the Platform to download copies of materials for anticompetitive purposes, the Settlement Conspirators made unauthorized copies of Eastern Point's data and confidential information.

445.646.    As a direct and proximate result of the Settlement Conspirators' violations of the Virginia Computer Crimes Act, Eastern Point has sustained and will continue to sustain damages.

### COUNT X
### ~~VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT~~

### VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030(g)

**(Against the Settlement Conspirators, Flatirons, Krochuk, and Trellis)**

446.Eastern Point reasserts the prior allegations in Paragraphs 1 through 445646 of this

647.    Amended Complaint as if fully set forth herein.

447.648.    Eastern Point houses and maintains the QSF 360™ Platform on a secured computer network and server located in the Commonwealth of Virginia.

448.649.    Eastern Point's secured computer network and server consist of high-speed data processing devices that perform logical, arithmetic, or storage functions related to the operation of the QSF 360™ Platform.

449.650.    All client interactions with the QSF 360™ Platform occur on Eastern Point's secured computer network and server located in Virginia.

450.651.    Eastern Point's secured computer network and server are used in and affect interstate and foreign commerce or communication because they facilitate economic transactions and communications between Eastern Point and clients utilizing the QSF 360™ Platform via internet connected devices located outside the Commonwealth of Virginia.

451.652.    While the JE Conspiracy was already underway, to mask their true intentions and maintain access to the QSF 360™ Platform, each of the Settlement Conspirators assented to the Terms of Use and the QSF Agreements on multiple occasions, thereby intentionally representing to Eastern Point that the Settlement Conspirators intended to use the QSF 360™ Platform solely for non-competitive purposes and abide by the obligations imposed under the Terms of Use.

452.653.    The Settlement Conspirators knew those representations were false when they made them, and that they had no intention of honoring their obligations under the Terms of Use, because the Settlement Conspirators had already decided to steal Eastern Point's trade secrets and confidential information from the QSF 360™ Platform and create a competing platform, Justice Escrow, through the derivative use of Eastern Point's trade secrets and confidential information.

confidential information from the QSF 360™ Platform and create a competing platform through the derivative use of Eastern Point's trade secrets and confidential information.

453.654.    The Settlement Conspirators' representations were material because Eastern Point would not have allowed the Settlement Conspirators to continue accessing the QSF 360™ Platform if it knew the representations were false when the Settlement Conspirators made them.

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

454.655.    In fact, had the Settlement Conspirators not clicked the "CONTINUE" and "LOG IN" action buttons when prompted during the account creation and login processes, access to the QSF 360™ Platform would have been impossible because, until each user acknowledges their assent to the Terms of Use and Privacy Policy, the QSF 360™ Platform remains inaccessible to them.

455.656.    Because the Settlement Conspirators were longtime clients with no known or observable interest in entering the QSF market, repeated statements that they were solely focused on selling structured settlement insurance products because commission proceeds from such were so lucrative. Since it was reasonable for Eastern Point to rely upon the Settlement Conspirators' misrepresentations, and Eastern Point did, in fact, rely upon the Settlement Conspirators' misrepresentations to its detriment.

456.657.    The Settlement Conspirators, both individually and collectively, committed multiple violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA"), causing damage and loss to Eastern Point.

457.658.    First, the Settlement Conspirators, both individually and collectively, and through a persistent course of conduct, committed multiple violations of 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing Eastern Point's computer network and server on multiple occasions, without authority or in excess of authorized access, to obtain information from the QSF 360™ Platform.

458.659.    Second, the Settlement Conspirators, both individually and collectively, and through a persistent course of conduct, committed multiple violations of 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud, accessing Eastern Point's computer network and server on multiple occasions, without authority or in excess of authorized access, to further their intended

fraud and misappropriate Eastern Point's trade secrets and confidential information from the QSF 360™ Platform.

459.660.　　The Settlement Conspirators, Flatirons, Krochuk, and Trellis violated 18 U.S.C. § 1030(b) by conspiring to commit the above-described offenses under 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(4).

460.661.　　The violations of the CFAA committed by the Settlement Conspirators, Flatirons, Trellis, and Krochuk have caused and continue to cause Eastern Point to incur significant costs in responding to the offenses, resulting in loss aggregating at least $5,000 in value within any applicable 1-year period.

461.662.　　As a direct and proximate result of the above violations of the CFAA committed by the Settlement Conspirators, Flatirons, Trellis, and Krochuk, Eastern Point has sustained and will continue to sustain damages.

**COUNT XI**
**DEFAMATION**

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)**

**(Against** Amy Iberlin) **FBHC, Flatirons, Krochuk, and Trellis)**

462.Eastern Point reasserts the prior allegations in Paragraphs 1 through 461662 of this

663.　　Amended Complaint as if fully set forth herein.

463. Acting in both her individual capacity and her capacity as a WPDN shareholder, Iberlin went on a local media blitz to promote Flatirons and its copycat Justice Escrow QSF

platform, in which she primarily made false and disparaging statements about Eastern Point and the QSF 360™ Platform.

464. In an October 25, 2025, Oil City News article, Iberlin accused Eastern Point of filing a lawsuit against Flatirons that was "baseless and retaliatory" and part of a "campaign of corporate bullying and intimidation."

465. In an October 29, 2025, Glenrock Independent article, Iberlin went further and declared that "EPTC's business model appears to rely on threatening partners, clients and even municipalities with frivolous (and expensive) litigation to maintain its market dominance. They previously targeted the Wyoming Town of Lovell with threats of a $100,000,000 lawsuit, successfully bullying them into terminating their relationship with Flatirons."

466. Iberlin's statements about Eastern Point are provably false.

467. Eastern Point's business model does not depend on anticompetitive behavior, "corporate bullying," "intimidation," or threats to its partners or clients.

468. Eastern Point has not used the threat of litigation or other demands to prevent potential competitors from entering the QSF market.

469. Eastern Point has only engaged in a limited and valid effort to protect its trade secrets and confidential information from harmful misappropriation and misuse by a discrete group of bad actors—the JE Conspirators.

470. Eastern Point also did not bully the Town of Lovell into terminating its relationship with Flatirons.

471. Lovell voluntarily terminated its relationship with Flatirons based on concerns about the legality of the Justice Escrow operation and Flatirons's lack of transparency.

472. Indeed, in a declaration made under penalty of perjury, Town of Lovell Mayor Thomas Newman stated unequivocally that, "over the course of approximately three weeks," "Flatirons Bank and its officers repeatedly refused to provide the requested information, including but not limited to proof of tax returns, payment of tax obligations, and compliance with the operational aspects of 26 C.F.R. § 1.468B-1 *et seq*.," which "were necessary for the Town to fulfill its legal obligations" and which "[t]he Town of Lovell was led to believe, based on the representations of Flatirons, that access to such data was available upon demand," and that those

"denials persisted until the date of termination of the contract with Flatirons Bank." *See* Newman Declaration, attached as **Exhibit D**.

473. Iberlin's provably false statements about Eastern Point are defamatory because they make Eastern Point appear odious, infamous, or ridiculous.

474. Iberlin's provably false statements about Eastern Point are defamatory *per se* because they prejudice Eastern Point in its trade or profession and impute a pattern or criminal conduct.

475. Iberlin intentionally and maliciously published the statements knowing them to be

false or with reckless disregard for the truth or falsity of the statements.

476. Alternatively, at the very least, Iberlin failed to exercise reasonable care in determining the truth or falsity of her statements prior to publishing them.

477. As a direct and proximate result of Iberlin's false and defamatory statements, Eastern Point has sustained and will continue to sustain reputational harm and damages, including but not limited to measurable client loss.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(b) OF THE "RICO" ACT**
**18 U.S.C. § 1964(c)**

(Against Flatirons, Krochuk, and Trellis)

478. Eastern Point reasserts the prior allegations in Paragraphs 1 through 477 of this Amended Complaint as if fully set forth herein.

479.664.    Under 18 U.S.C. § 1962(b), it is "unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in … any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

480.665.    Flatirons, Krochuk, and Trellis (collectively, the "1962(b) Defendants") each violated 18 U.S.C. § 1962(b) by acquiring and maintaining a membership interest in FBHC, either directly or indirectly, through a pattern of racketeering activity.

481.666.    Each of the 1962(b) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Krochuk) or an entity (Flatirons and Trellis) capable of holding a legal or beneficial interest in property.

482. FBHC is an "enterprise," as defined by 18 U.S.C. § 1961(4), engaged in interstate commerce, or whose activities affect interstate or foreign commerce, because it is a legal entity—here, a limited liability company—with a proprietary interest in the commercial marks used by

667.    Flatirons as the trade name and image of Flatirons'sFlatirons' Justice Escrow QSF service, which service Flatirons markets and makes available to clients across the country, and which use by Flatirons is, on information and belief, permitted by FBHC under the terms of a licensing or other agreement entitling FBHC to some form of compensation from Flatirons.

483.668.     Each of the 1962(b) Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two of the predicate acts listed under 18 U.S.C. § 1961(1).

484.669.     The QSF 360™ Platform is a product or service used in or intended for use in interstate commerce.

485.670.     Flatirons, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.     First, in violation of 18 U.S.C. § 1832(a)(1), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

i.     Specifically, Flatirons participated in the development and launch of a platform known as Justice Escrow, which was built from Eastern Point's Trade Secrets and confidential information.

ii.     Flatirons not only participated in building the Justice Escrow platform, but it also formed a special subsidiary between its holding company, Flatirons FBHC Holding Company, and Trellis Software and its subsidiaries to create a special purpose entity related to the development of software, specifically FBHC Software.

iii.     Moreover, Flatirons Bank and FBHC Holding Company, in conjunction with FBHC Software, filed for a trademark for Justice Escrow, further indicating Flatirons Bank's active involvement.

iv.   Prior to creating Justice Escrow, Flatirons obtained Eastern Point's Trade Secrets and confidential information derived from the QSF 360™ Platform. Eastern Point's Trade Secrets and confidential information included, among other things, Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information.

v.   Eastern Point's Trade Secrets and confidential information contained identifying information, including its name and branding, and reflected internal processes not publicly available and safeguarded by the Non-Compete and Non-Disclosure provisions in Eastern Point's Terms of Use.

vi.   In or around 2023 and 2024, Flatirons obtained Eastern Point's Trade Secrets and confidential information in connection with discussions with the Settlement Conspirators regarding the creation of a competing QSF platform.

vii.   Flatirons knew or had reason to know that the materials and processes being used were derived from Eastern Point's Trade Secrets and confidential information and had been obtained through access to by prior users subject to contractual restrictions on use and disclosure.

viii.   Despite this, Flatirons proceeded to use Eastern Point's Trade Secrets and confidential information in connection with the development and commercialization of Justice Escrow.

ix.   Therefore, Flatirons obtained, took, and/or appropriated Eastern Point's Trade Secrets and confidential information through the fraud, artifice, and/or deception.

b.   Second, in violation of 18 U.S.C. § 1832(a)(2), Flatirons, with intent to

b.      convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

i.    Specifically, the Settlement Conspirators had access to the QSF 360™ Platform, which is restricted to authorized users who agree to contractual limitations prohibiting the use, copying, and disclosure of Eastern Point's Trade Secrets and confidential information.

ii.    During the period in which the Settlement Conspirators had access to the QSF 360™ Platform, Eastern Point's Trade Secrets and confidential information—including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information—were copied, compiled, and preserved outside the platform environment.

iii.    In or around 2023 and 2024, Flatirons obtained the unauthorized copies, compilations, and downloads of Eastern Point's Trade Secrets and confidential information in connection with efforts to develop a competing QSF platform.

iv.    Flatirons then made unauthorized copies, compilations, and downloads of Eastern Point's Trade Secrets and confidential information to give to Trellis and Krochuk to use in connection with the design, structure, and functionality of the Justice Escrow platform.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Flatirons, with intent to

c.      convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that

such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

i.   Specifically, the Settlement Conspirators had access to the QSF 360™ Platform, which is restricted to authorized users who agree to contractual limitations prohibiting the use, copying, and disclosure of Eastern Point's Trade Secrets and confidential information.

ii.   Eastern Point's Trade Secrets and confidential information contained identifying information, including its name and branding, and reflected internal processes not publicly available and safeguarded by the Non-Compete and Non-Disclosure provisions in Eastern Point's Terms of Use.

iii.   In or around 2023 and 2024, Flatirons received Eastern Point's Trade Secrets and confidential information in connection with efforts to develop a competing QSF platform.

iv.   Flatirons knew or had reason to know that it received Eastern Point's Trade Secrets and confidential information, which had been stolen or appropriated, obtained, or converted without authorization.

v.   Flatirons continues to possess Eastern Point's Trade Secrets and confidential information, which it knows or has reason to know had been stolen or appropriated, obtained, or converted without authorization.

d.   Fourth, in violation of 18 U.S.C. § 1832(a)(5), Flatirons, with intent to

d.   convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to

**Formatted:** List Paragraph, Left, Indent: Left: 0", First line: 0.94", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

i.    ~~e.~~    Specifically, the Settlement Conspirators had access to the QSF 360™ Platform, which is restricted to authorized users who agree to contractual limitations prohibiting the use, copying, disclosure, of Eastern Point's Trade Secrets and confidential information.

ii.    Through this access, the Settlement Conspirators the Settlement Conspirators knowingly stole, duplicated, transmitted, and used Eastern Point's Trade Secrets, including Eastern Point's business information contained in its QSF 360™ Platform; confidential workflows, intake processes, and questionnaires; user interface designs and configurations; and other confidential and proprietary information.

iii.    Also, the Settlement Conspirators obtained Eastern Point's Trade Secrets by means that they knew exceeded the scope of their authorized use and in direct violation of express contractual prohibitions on copying, preserving, disclosing, or using those materials for any competitive purpose.

iv.    In addition, the Settlement Conspirators received and possessed Eastern Point's Trade Secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization in a manner that violated the Settlement Conspirator's contractual limitations in the Terms of Use.

v.    In or around 2023 through 2024, after being presented with Eastern Point's Trade Secrets, Flatirons and its agents met with the Settlement Conspirators with the common goal of developing a platform, later known as Justice Escrow, to offer QSF-related services, in violation of the Settlement Conspirator's contractual limitations in the Terms of Use.

vi.    In furtherance of this goal, Flatirons agreed to participate in the conspiracy to provide the financial backing and appearance of legitimacy for Justice Escrow.

vii.    Flatirons then transmitted Eastern Point's Trade Secrets to Trellis and Krochuk to incorporate and repackage Eastern Point's Trade Secrets into the design and functionality of the Justice Escrow platform.

viii.    Accordingly, Flatirons knowingly conspired to use and convert Eastern Point's Trade Secrets with the intent to confer substantial commercial and competitive benefit upon themselves and the Settlement Conspirators, while simultaneously inflicting competitive, economic, and reputational harm on Eastern Point. These coordinated actions constitute willful, knowing misappropriation undertaken with the purpose and effect of benefiting other persons and entities.

Fifth, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), Flatirons conducted or

e.    attempted to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.

i.    For purposes of this Paragraph 485670(e), "financial transaction" means movement of funds, by wire or other means affecting interstate or foreign commerce, to effectuate the transfer, delivery, or disposition of those funds from Flatirons to anyone one of FBHC,

i.    Norman, Coccimiglio, Bunnell, Upchurch, the Town of Glenrock, the Town of Evansville, or the Town of Lovell, Wyoming.

**Formatted:** List Paragraph, Left, Indent: Left:  0", First line:  1", Right:  0", Space After:  0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at:  5.5" + Indent at:  5.75"

**Formatted:** Not Highlight

**Formatted:** List Paragraph, Left, Indent: Left:  0", First line:  1.5", Right:  0", Space After:  0 pt, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.31" + Indent at:  1.44"

ii. ~~For purposes of this Paragraph~~ ~~485~~670(e), "specified unlawful activity"

ii. means acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § ~~$~~1832(a)(5).

iii. ~~For purposes of this Paragraph~~ ~~485~~670(e), "proceeds of specified

iii. unlawful activity" means funds or other gross receipts derived from, obtained, or retained, directly or indirectly, through acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

iv. Specifically, Flatirons conducted financial transactions involving revenue, deposits, and fee income generated from the use of Eastern Point's stolen Trade Secrets by launching Justice Escrow, which produced a 36% increase in deposits and millions in new non-interest income.

v. Flatirons knew the economic gains it received were derived from misappropriated Eastern Point' Trade Secrets because the Settlement Conspirators provided Flatirons with Eastern Point's proprietary workflows, document templates, and banking-network information with the goal of replicating the QSF 360™ Platform violated the Settlement Conspirator's contractual limitations in the Terms of Use.

vi. Moreover, Flatirons itself had accessed the Eastern Point Trust Company website approximately 70 times, thereby agreeing to the terms of use, which equally bound it to non-competitive terms of the Terms of Use agreement and agreed not to misappropriate Eastern Point's intellectual property.

vii. Flatirons promoted continuation of the conspiracy by using the profits derived from Justice Escrow to fund ongoing operations and expansion of the platform built from

---

**Formatted:** List Paragraph, Left, Indent: Left: 0", First line: 1.5", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at: 1.31" + Indent at: 1.44"

**Formatted:** List Paragraph, Left, Indent: Left: 0", First line: 1.5", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at: 1.31" + Indent at: 1.44"

Eastern Point's proprietary methods and its coconspirators, including FBHC, Norman, Coccimiglio, Bunnell, Upchurch, Murray, Iberlin, Glenrock, Evansville, or Lovell.

671.    Krochuk, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Krochuk knowingly stole; or

a.    without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Krochuk knowingly,

b.    without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Krochuk knowingly received

c.    or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Krochuk knowingly

d.    conspired with one or more other persons to commit violations of 18. U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy. U.S.C. § 1832(a)(1) (3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

487.672.    Trellis, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Trellis knowingly stole; or

a.    without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Trellis knowingly, without

b.    authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Trellis knowingly received or

c.    possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Trellis conspired with one or

d.    more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

488.    As a direct and proximate result of the violations of the 18 U.S.C. § 1962(b) committed by Flatirons, Krochuk, and Trellis, Eastern Point has sustained and will continue to sustain injury and damages. As a direct and proximate result of the violations of the 18 U.S.C. § 1962(b) committed by Flatirons, Krochuk, and Trellis, Eastern Point has sustained

and will continue to sustain injury and damages. FHBC holding company and FBHC software profit off the efforts of Flatirons, Krochuk, and Trellis. For example, and without limitation, Eastern Point estimates that it failed to realize approximatelyat least $10,000,000.00 in QSF-associated revenue from clients who, but for the unlawful activities described herein, would not have moved any QSF business to the Justice

673.    Escrow platform and would have continued utilizing Eastern Point's QSF 360™ Platform. Eastern Point further estimates that the QSFs associated revenue loss continues to accrue at least at a rate of $500,000 a month due to the activities of the JE conspiracy.

COUNT XIII VIOLATIONSXII VIOLATIONS OF 18 U.S.C. § 1962(c) OF THEOF THE "RICO" ACT ACT
18 U.S.C. § 1964(c)

**(Against the Settlement Conspirators, Murray, Iberlin, Flatirons, FBHC, FBHC Software, Krochuk, and Trellis, Taylor and Mayor Roumell)**

489.Eastern Point reasserts the prior allegations in Paragraphs 1 through 488673 of this

674.    Amended Complaint as if fully set forth herein.

490.675.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

676.    The Settlement Conspirators, Murray, Iberlin, Flatirons, Krochuk, and Trellis, Taylor and Mayor Roumell (collectively, the "1962(c) Defendants") each violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the JE Conspiracy's affairs through a pattern of racketeering activity.

491.677.    Each of the 1962(c) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Norman, Coccimiglio, Bunnell, Upchurch, Iberlin, and Krochuk) or an entity (Flatirons and Trellis) capable of holding a legal or beneficial interest in property.Each of the 1962(c) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Norman, Coccimiglio, Bunnell, Upchurch, Iberlin, and Krochuk) or an entity (Flatirons and Trellis) capable of holding a legal or beneficial interest in property.

492.The JE Conspiracy is an "enterprise," as defined by 18 U.S.C. § 1961(4), engaged in interstate commerce, or whose activities affect interstate or foreign commerce, because it is a union or group of individuals associated in fact, although not a legal entity, which individuals reside in various states across the country, crossed state lines to meet or otherwise communicate with each other, and worked collectively to organize, launch, operate, and otherwise advance the interests of the Justice Escrow platform—a product or service marketed by Flatirons and made available to clients across the country—by first using an interstate internet connection to misappropriate Eastern Point's trade secrets and confidential information located in Virginia, then transmitting Eastern Point's trade secrets and confidential information through emails travelling over interstate wires, then participating in the creation of a Delaware limited liability company with a principal office located in Colorado—FBHC Software LLC—to hold assets related to the

678.    Justice Escrow platform, including three applied-for trademarks, which Flatirons uses to market Justice Escrow nationally.

Formatted: List Paragraph, Left, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: single

493.679.    Each of the 1962(c) Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two of the predicate acts listed under 18 U.S.C. § 1961(1).

494.680.    The QSF 360™ Platform is a product or service used in or intended for use in interstate commerce.

495.681.    Norman committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Norman, with intent to

b.    convert Eastern Point's trade secrets related to the QSF 360™ Platform, a

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

product or service used in or intended for use in interstate commerce, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent, communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure

Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d. Fourth, in violation of 18 U.S.C. § 1832(a)(5), Norman, with intent to

d. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e. Fifth, in violation of 18 U.S.C. § 1343, Norman, having devised or intending

e. to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

496. Coccimiglio committed the following acts indictable under the provisions of title

682. 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a. First, in violation of 18 U.S.C. § 1832(a)(1), Coccimiglio, with intent to

a. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Coccimiglio, with intent to

b.    convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Coccimiglio, with intent to

c.    convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Coccimiglio, with intent to

d.    convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e.    Fifth, in violation of 18 U.S.C. § 1343, Coccimiglio, having devised or

e.    intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses,

representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

497.683.    Bunnell committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Bunnell, with intent to

b.    convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Bunnell, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Bunnell, with intent to

**Formatted:** List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

d. convert Eastern Point's trade secrets related to the QSF 360™ Platform, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e. Fifth, in violation of 18 U.S.C. § 1343, Bunnell, having devised or intending

e. to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

498.684. Upchurch committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a. First, in violation of 18 U.S.C. § 1832(a)(1), Upchurch, with intent to

a. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b. Second, in violation of 18 U.S.C. § 1832(a)(2), Upchurch, with intent to

b. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied,

duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

~~c.~~ Third, in violation of 18 U.S.C. § 1832(a)(3), Upchurch, with intent to

c. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

~~d.~~ Fourth, in violation of 18 U.S.C. § 1832(a)(5), Upchurch, with intent to

d. convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18. U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

~~e.~~ Fifth, in violation of 18 U.S.C. § 1343, Upchurch, having devised or

e. intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

~~secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in~~

~~interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.~~

~~499.~~685.      Iberlin committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.      First, in violation of 18 U.S.C. § 1832(a)(2), Iberlin, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of herself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent, communicated, or conveyed Eastern Point's trade secrets.

~~b.~~  Second, in violation of 18 U.S.C. § 1832(a)(3), Iberlin, with intent to

b.      convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of herself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

c.      Third, in violation of 18 U.S.C. § 1832(a)(5), Iberlin, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of herself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

~~500.~~686.      Flatirons committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.      First, in violation of 18 U.S.C. § 1832(a)(1), Flatirons, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.——Second, in violation of 18 U.S.C. § 1832(a)(2), Flatirons, with intent to

b.     convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.——Third, in violation of 18 U.S.C. § 1832(a)(3), Flatirons, with intent to

c.     convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.——Fourth, in violation of 18 U.S.C. § 1832(a)(5), Flatirons, with intent to

d.     convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to

commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

e. Fifth, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), Flatirons conducted or

e. attempted to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.

i. For purposes of this Paragraph 501(e), "financial transaction" means

i. movement of funds, by wire or other means affecting interstate or foreign commerce, to effectuate the transfer, delivery, or disposition of those funds from Flatirons to anyone one of FBHC, Norman, Coccimiglio, Bunnell, Upchurch, WPDN, the Town of Glenrock, the Town of Evansville, or the Town of Lovell, Wyoming.

ii. For purposes of this Paragraph 501(e), "specified unlawful activity"

ii. means acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

iii. For purposes of this Paragraph 501(e), "proceeds of specified

iii. unlawful activity" means funds or other gross receipts derived from, obtained, or retained, directly or indirectly, through acts involving the violation of one or more of the following: 18 U.S.C. § 1030(b); 18 U.S.C. § 1832(a)(2), 18 U.S.C. § 1832(a)(3), or 18 U.S.C. § § 1832(a)(5).

501. 687. Krochuk, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and

intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a. First, in violation of 18 U.S.C. § 1832(a)(1), Krochuk knowingly stole; or

a. without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b. Second, in violation of 18 U.S.C. § 1832(a)(2), Krochuk knowingly,

b. without authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c. Third, in violation of 18 U.S.C. § 1832(a)(3), Krochuk knowingly received

c. or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d. Fourth, in violation of 18 U.S.C. § 1832(a)(5), Krochuk knowingly

d. conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

502.688. Trellis, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of itself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

Formatted: List Paragraph, Left, Indent: Left: 0", First line: 1", Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 5.5" + Indent at: 5.75"

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Trellis knowingly stole; or

a.    without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.    Second, in violation of 18 U.S.C. § 1832(a)(2), Trellis knowingly, without

b.    authorization, copied, duplicated, downloaded, replicated, transmitted, sent communicated, or conveyed Eastern Point's trade secrets.

c.    Third, in violation of 18 U.S.C. § 1832(a)(3), Trellis knowingly received or

c.    possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.    Fourth, in violation of 18 U.S.C. § 1832(a)(5), Trellis knowingly conspired

d.    with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

689.    Murray committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.    First, in violation of 18 U.S.C. § 1832(a)(1), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly stole; or without authorization appropriated; or by fraud, artifice, or deception obtained Eastern Point's trade secrets.

b.      Second, in violation of 18 U.S.C. § 1832(a)(2), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, a product or service used in or intended for use in interstate commerce, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly, without authorization, copied, duplicated, downloaded, replicated, transmitted, sent, communicated, or conveyed Eastern Point's trade secrets.

c.      Third, in violation of 18 U.S.C. § 1832(a)(3), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly received or possessed Eastern Point's trade secrets, knowing the trade secrets to have been stolen or appropriated, obtained, or converted without authorization.

d.      Fourth, in violation of 18 U.S.C. § 1832(a)(5), Norman, with intent to convert Eastern Point's trade secrets related to the QSF 360™ Platform, to the economic benefit of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, knowingly conspired with one or more other persons to commit violations of 18 U.S.C. § 1832(a)(1)-(3), and one or more of such persons undertook acts to effectuate the object of that conspiracy.

690.    Fifth, in violation of 18 U.S.C. § 1343, Norman, having devised or intending to devise a scheme or artifice to defraud Eastern Point, or to obtain Eastern Point's trade secrets and intellectual property by means of false or fraudulent pretenses, representations, or promises, transmitted and caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice

691. Mayor Roumell, with intent to the economic and/or noneconomic benefits of himself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a. In violation of 18 U.S.C. § 1343, Mayor Roumell used wire communications with material falsehoods in furtherance of an executed a scheme to defraud to Flatirons into believing that Glenrock had authority to approve QSFs in an effort to capitalize off Justice Escrow, which utilizes Eastern Point's Trade Secrets and unfairly competes directly with Eastern, at a rate of $100 or $150 per QSF.

i. Specifically, beginning in or around early 2025, Mayor Roumell participated in a coordinated course of conduct with representatives of Flatirons and others relating to the approval of QSFs through Glenrock.

ii. On or about March 18, 2025, Mayor Roumell approved his first QSF on behalf of Flatirons and Justice Escrow.

iii. Since then, Mayor Roumell continues to approve QSFs on behalf of Glenrock for Flatirons and Justice Escrow.

iv. In or about March of 2025, Mayor Roumell misrepresented, directly or by implication, to claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons that such QSFs were validly approved by a governmental authority acting within its lawful authority. Mayor Roumell further misrepresented, directly or by implication, to claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons that Glenrock maintained continuing jurisdiction over the QSFs.

v.    At the time Mayor Roumell issued such misrepresentations and QSF approvals, the Town Council had not authorized those approvals in a public meeting in violation of Wyo. Stat. Ann. § 16-4-403. Mayor Roumell further admitted under oath that Glenrock did not retain continuing jurisdiction over the QSFs

vi.    Upon information and belief, such misrepresentations occurred through wire communications, including emails and telephone communications, from Glenrock, Wyoming. Such communications either: (i) exist or have been withheld in violation of the Wyoming Public Records Act; (ii) have been destroyed, and/or (iii) Taylor has allowed such communications to spoliate by taking no affirmative steps to preserve such communications in violation of Wyoming law and Eastern Point's demand to preserve such public records.

vii.    Despite such misrepresentations, Mayor Roumell approved QSF submissions on behalf of Glenrock despite the absence of authorization from the Glenrock Town Council in a public meeting.

viii.    The misrepresentations and implications associated with Mayor Roumell's approvals of QSFs were material because QSFs require approval by a governmental authority acting within its lawful authority.

ix.    Entities relying on Mayor Roumell's approvals, including claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons, depended on the validity of such approvals to establish and administer QSFs. Such entities would not have entered into a Justice Escrow QSF.

x.    Because of these misrepresentations, Mayor Roumell's misrepresentations have given Justice Escrow legitimacy and diverted Eastern Point's potential customers to Justice Escrow.

xi.   The misrepresentations are a pattern because Mayor Roumell continues to use wire communications, including email and telephone communications, to approve QSF petitions, each time misrepresenting Glenrock has authority and exercises continuing jurisdiction over the funds.

xii.   As a result, Mayor Roumell obtained economic and/or noneconomic benefits, either through garnering political favor with constituents through Glenrock receiving compensation. Specifically, Roumell receives financial benefit through the indemnification agreement account, which immunizes him from all resulting liability arising from his Uutra virus QSFs activity, allowing the spoliation of evidence and the non-production of public documents and  the associated the financial consequences of such, at a minimum.

692.   Taylor, with intent to the economic and/or noneconomic benefits of herself and persons other than Eastern Point, and intending or knowing that such conduct would injure Eastern Point, committed the following acts indictable under the provisions of title 18, U.S.C. and included in the definition of "racketeering activity" under 18 U.S.C. § 1961(1):

a.   In violation of 18 U.S.C. § 1343, Taylor used wire communications with material falsehoods in furtherance of an executed a scheme to defraud to Flatirons into believing that Glenrock had authority to approve QSFs in an effort to capitalize off Justice Escrow, which utilizes Eastern Point's Trade Secrets and unfairly competes directly with Eastern, at a rate of $100 or $150 per QSF.

i.    Specifically, beginning in or around early 2025, Mayor Roumell participated in a coordinated course of conduct with representatives of Flatirons and others relating to the approval of QSFs through Glenrock for which Taylor.

ii.    On or about March 18, 2025, Mayor Roumell approved his first QSF on behalf of Flatirons and Justice Escrow.

iii.    Since then, Mayor Roumell continues to approve QSFs on behalf of Glenrock for Flatirons and Justice Escrow.

iv.    In or about March of 2025, Mayor Roumell misrepresented, directly or by implication, to claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons that such QSFs were validly approved by a governmental authority acting within its lawful authority. Mayor Roumell further misrepresented, directly or by implication, to claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons that Glenrock maintained continuing jurisdiction over the QSFs.

v.    At the time Mayor Roumell issued such misrepresentations and QSF approvals, the Town Council had not authorized those approvals in a public meeting in violation of Wyo. Stat. Ann. § 16-4-403. Mayor Roumell further admitted under oath that Glenrock did not retain continuing jurisdiction over the QSFs

vi.    Upon information and belief, such misrepresentations occurred through wire communications, including emails and telephone communications, from Glenrock, Wyoming. Such communications either: (i) exist or have been withheld in violation of the Wyoming Public Records Act; (ii) have been destroyed, and/or (iii) Taylor has allowed such

communications to spoliate by taking no affirmative steps to preserve such communications in violation of Wyoming law and Eastern Point's demand to preserve such public records.

vii.    Despite such misrepresentations, Mayor Roumell approved QSF submissions on behalf of Glenrock despite the absence of authorization from the Glenrock Town Council in a public meeting.

viii.    The misrepresentations and implications associated with Mayor Roumell's approvals of QSFs and Taylor's spoliation were material because QSFs require approval by a governmental authority acting within its lawful authority.

ix.    Entities relying on Mayor Roumell's approvals, including claimants in QSF transactions, claimants' attorneys, defendants paying settlement funds, Justice Escrow, and Flatirons, depended on the validity of such approvals to establish and administer QSFs. Such entities would not have entered into a Justice Escrow QSF.

x.    Because of these misrepresentations and spoliation, Taylor has given Justice Escrow legitimacy and diverted Eastern Point's potential customers to Justice Escrow.

xi.    The spoliation is a pattern because Taylor continues to fail to properly safeguard documents related to Mayor Roumell's approvals of QSF petitions, each time misrepresenting Glenrock has authority and exercises continuing jurisdiction over the funds.

xii.    As a result, Taylor obtained economic and/or noneconomic benefits, either through garnering political favor with Mayor Roumell and with constituents through Glenrock receiving compensation. Specifically, Taylor receives financial benefit through the indemnification agreement account, which immunizes her from all resulting liability arising from Mayor Roumell's Uutra virus QSFs activity, allowing the spoliation of evidence and the non-

production of public documents and   the associated the financial consequences of such, at a minimum personal cost.

503.693.    As a direct and proximate result of the violations of the 18 U.S.C. § 1962(c) committed by the Settlement Conspirators, Murray, Iberlin, Flatirons, Krochuk, and Trellis, Mayor Roumell, and Taylor, Eastern Point has sustained and will continue to sustain injury and damages. For example, and without limitation, Eastern Point estimates that it failed to realize approximately $10,000,000.00 in QSF-associated revenue from clients who, but for the unlawful activities described herein, would not have moved any QSF business to the Justice Escrow platform and would have continued utilizing Eastern Point's QSF 360™ Platform.

Point's QSF 360™ Platform.

COUNT XIV VIOLATIONSXIII
VIOLATIONS OF 18 U.S.C. § 1962(d) OF THEOF THE "RICO" ACT ACT
**18 U.S.C. § 1964(c)**

**(Against the JE Conspirators, Trial Lawyers for Justice, and Justice for Life)**

505.Eastern Point reasserts the prior allegations in Paragraphs 1 through 504693 of this

694.    Amended Complaint as if fully set forth herein.

506.Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any

695.    of the provisions of subsection (a), (b), or (c) of this section"

507.696.    The JE Conspirators, Trial Lawyers for Justice, and Justice for Life (collectively, the "1962(d) Defendants") each violated 18 U.S.C. § 1962(d) by agreeing to act in concert with the enterprise and each other to achieve a common purpose through a course of conduct requiring the violation of sections (b) and (c) of 18 U.S.C. § 1962.

508. Each of the 1962(d) Defendants is a "person," as defined by 18 U.S.C. § 1961(3), because each one is an individual (Norman, Coccimiglio, Bunnell, Upchurch, Krochuk, Barber,

697.   Iberlin, and Mayor Roumell, and Taylor) or an entity (Flatirons, Trellis, Trial Lawyers for Justice, Justice for Life, and Town of Glenrock) capable of holding a legal or beneficial interest in property.

509.698.       The fact that the 1962(d) Defendants took concerted actions in furtherance of the enterprise and/or in aid of their common purpose that, in fact, involved violations of sections (b) and (c) of 18 U.S.C. § 1962, as alleged under Counts XII and XIII, manifests that the 1962(d) Defendants operated in agreement with each other.

510.699.       As a direct and proximate result of the violations of the 18 U.S.C. § 1962(d) committed by the JE Conspirators, Trial Lawyers for Justice, and Justice for Life, Eastern Point has sustained and will continue to sustain injury and damages including but not limited loss of business opportunities and reputational harm. For example, and without limitation, Eastern Point estimates that it failed to realize approximately $10,000,000.00 in QSF-associated revenue from clients who, but for the unlawful activities described herein, would not have moved any QSF business to the Justice Escrow platform and would have continued utilizing Eastern Point's QSF 360™ Platform.

360™ Platform.

**COUNT XV**
**CONSPIRACY TO INJURE A BUSINESS VA. TRADE AND PRODUCT DISPARAGEMENT**
**(Against the Norman, Flatirons, Iberlin, Glenrock, and Mayor Roumell)**

CODE § 18.2-500

(Against the JE Conspirators)

511. Eastern Point reasserts the prior allegations in Paragraphs 1 through 510670 of this

700.    Amended Complaint as if fully set forth herein.

701.    The Settlement Conspirators, Flatirons, Iberlin, Glenrock, Taylor, and Mayor Roumell published false statements that discredit the quality or utility of the Eastern Point's product.

702.    On or about September 23, 2025, through September 25, 2025, Flatirons went on a media blitz after filing a baseless lawsuit against Eastern Point in the United States District Court for the District of Wyoming. Such statements were made to several national media outlets.

703.    In several articles, Flatirons' representatives stated that Eastern Point's product "was broken," and "[i]t was opaque accounting, too many middlemen, and far too much room for delay, risk, and error." This statement is false.[26]

704.    Flatirons further states: "Specifically, EPTC has concocted a fictitious and outlandish narrative that Flatirons' proprietary QSF platform, which Flatirons created from scratch, somehow copies or infringes on EPTC's outdated QSF offering." This statement is false.

705.    Flatirons further states: "Rather than competing on the merits by improving its own outdated QSF platform, EPTC is using coercive threats against clients and business partners to block market access for Flatirons. This conduct is designed not to protect consumers, but to

---

[26] By way of example of the falsity of this statement, Eastern Point was the QSF provider which pioneered same-day distributions. If a distribution petition was received by 1 PM Eastern Standard Time in good form and without any other reason existing for denial by the trustee, the distribution was made the same day. This is an industry innovation that did not exist prior to Eastern Point's entrance into the marketplace.

preserve EPTC's complacent monopoly in the QSF market and stifle the very innovation and efficiency that competition is meant to foster." This statement is false.

706. Norman endorsed Justice Escrow in the same articles.

707. Iberlin and Glenrock likewise published false statements to the media.

708. Iberlin described Eastern Point as "a bully who threatened us with a frivolous lawsuit if we didn't acquiesce to their settlement demands — and because we didn't fold, we are being sued." This statement is false.

709. An article further states: "Iberlin's statement also characterizes Justice Escrow as the superior product to Eastern Point's QSF 360 Platform." This statement is false.

710. Iberlin further stated: "Eastern Point Trust Company is a Virginia company coming into Wyoming, bullying people, threatening people, saying they're going to threaten all these people and basically ruin their lives and take their firstborn children if they don't stop these qualified settlement agreements." This statement is false.

711. Iberlin further stated: "Eastern Point Trust Company is just mad because they made a better product, Flatirons made a better product." This statement is false.

712. Iberlin further stated that Flatirons "developed a new, more efficient and user-friendly QSF platform. Seeing a legitimate and promising business opportunity that would benefit our community, the Town of Glenrock partnered with Flatirons Bank." This statement is false.

713. Glenrock, through its representatives Iberlin and Mayor Roumell, stated: "This lawsuit is an affront not only to the Town of Glenrock and its representatives but to the principles of fair competition and innovation that drive our economy … EPTC may believe its corporate power and Virginia-based lawyers can bully a small Wyoming town into submission, but they are sorely mistaken." This statement is false.

714. Glenrock, through its representatives Iberlin and Mayor Roumell, further stated: "We intend to fight these allegations vigorously and expose this lawsuit for what it is: a desperate attempt by a market incumbent to crush a competitor who dared to create a new product." This statement is false.

715. Glenrock, through its representatives Iberlin and Mayor Roumell, further stated that "they are proud of their decision to partner with an innovator that 'brought a better product to the market.'"

716. In his deposition, Mayor Roumell approved this statement on behalf of Glenrock.

717. Flatirons', Iberlin's, Mayor Roumell's, and Glenrock's statements were intended to cast doubt on Eastern Point's product quality or reasonably understood to cast such doubt by indicating that Justice Escrow was superior to Eastern Point's QSF 360™ Platform, which is housed and maintained in Virginia.

718. Flatirons, Iberlin, Mayor Roumell, and Glenrock knew of the falsity or reckless disregard for the truth or, alternatively, made such statements with malice, ill will, or intent to interfere unprivileged with business interests.

719. In fact, Iberlin and Mayor Roumell both testified under oath that neither had knowledge of the merits of Flatirons and Eastern Point's products.

720. In isolation, these statements are irregular, given that a governmental entity would stand nothing to gain from which QSF platform is better. In the context of Iberlin's, Mayor Roumell's, and Glenrock's relationship with Flatirons and Norman, however, it demonstrates that they were instructed to make such statements at the behest of Flatirons, Iberlin and Coccimiglio and Norman.

721. Thus, upon information and belief, Norman, Iberlin and Coccimiglio and Flatirons directed Iberlin, Mayor Roumell, and Glenrock to make such statements.

722. Given the falsity and the inflammatory statements of Eastern Point's products, it was foreseeable that the statements would likely result in pecuniary loss to Eastern Point.

723. Because of the statements, Eastern Point has suffered damages, including loss of business and harm to its reputation.

**COUNT XIV**
**CONSPIRACY TO INJURE A BUSINESS**
**VA. CODE § 18.2-500**

**(Against the JE Conspirators)**

724. Eastern Point reasserts the prior allegations in Paragraphs 1 through 723 of this Amended Complaint as if fully set forth herein.

~~512.~~725. As demonstrated by the actions and conduct alleged herein, the JE Conspirators combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring Eastern Point in its reputation, trade, business, or profession.

~~513.~~726. For specific reference, Eastern Point incorporates the prior allegations in Paragraphs 131 through 334, which describe the conspiracy and the harm to Eastern Point in detail.

727. ~~The JE Conspirators then, indeed,~~Specifically, sometime before February 10, 2022, the Settlement Conspirators agreed to unlawfully take Eastern Point's Trade Secrets, as defined by 18 U.S.C. § 1839 and outlined above, and other confidential information not qualifying as trade secrets from Eastern Point, in violation of the Non-Compete and Non-Disclosure provision, the Trade Secrets and Confidential Information provision, the Industrial Espionage and Industrial Property Protection provision in the Terms of Use. The unlawful agreement sought to willfully

Formatted: Underline color: Auto, All caps

Formatted: Font: Bold

Formatted: List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, No bullets or numbering

and maliciously injure Eastern Point in its reputation, trade, business, or profession and form a competing business, Justice Escrow.

728.    On or about February 10, 2022, the Settlement Conspirators traveled to Eastern Point's Virginia offices in further of the conspiracy to willfully and maliciously injure Eastern Point in its reputation, trade, business, or profession and form a competing business, Justice Escrow.

729.    In or around August 2022, on information and belief, the Settlement Conspirators began to recruit Flatirons into the conspiracy by demoing Eastern Point's QSF 360™ Platform and other confidential information with the purpose of replicating the same to willfully and maliciously injure Eastern Point in its reputation, trade, business, or profession and form a competing business, Justice Escrow.

730.    Flatirons joined the conspiracy to provide the financial backing and trust of consumers to give legitimacy to Justice Escrow.

731.    After Flatirons joined, the Settlement Conspirators and Flatirons, together or in isolation, pitched to Krochuk and Trellis how to replicate Eastern Point's QSF 360™ Platform by using Eastern Point's Trade Secrets and other confidential information not qualifying as trade secrets and/or demoed Eastern Point's QSF 360™ Platform in recruitment.

732.    In furtherance of the conspiracy, Krochuk and Trellis acting under the disguise of FBHC software developed Justice Escrow's software. Upon information and belief, Flatirons then transferred the software to FBHC Software for which FBHC Holding Company is a joint member.

733.    On or about February 8, 2023, after the software was ready to launch, Norman emailed Murray a zip folder titled "EPTC QSF Docs" in an effort to recruit the Evansville to be

the government-approving body. Upon information and belief, Murray disclosed the Eastern-Point-branded docs to Town Council.

734. After Evansville fell through, Norman contacted Lovell to be the government-approving body. After Lovell ceased its relationship with Justice Escrow because of suspected tax fraud, and the association violations of Wyoming law, which necessitated Lovell granting to Flatirons powers which Lovell did not possess, nor could confer onto Flatirons, Norman with the aid of Murray, then, contacted Iberlin on or about March 2, 2025.

735. In furtherance of the conspiracy, Iberlin put the existing conspirators in contact with Glenrock and promoted Justice Escrow to Glenrock.

736. Glenrock now serves as Justice Escrow's government-approving body.

737. Iberlin accepted compensation through monetary offers by Norman and Flatirons on a per-QSF basis and/or being added as *pro hac* counsel in Trial Lawyers for Justice's cases.

738. In furtherance of the conspiracy, Mayor Roumell approves QSFs for compensation to Glenrock.

739. Mayor Roumell further misrepresented that he had valid approval from the Town Council to approve QSFs and that he lacked continuing jurisdiction.

740. In furtherance of the conspiracy, Taylor allowed public records to spoliate or failed to retain public records as required by Wyoming law.

741. In furtherance of the conspiracy, Glenrock profits off Justice Escrow on a per-QSF basis and continues to profit.

742. All these actions gave Justice Escrow the unlawful advantage by using Eastern Point's Trade Secrets and confidential information to compete with Eastern Point.

514.743.    As the foregoing illustrates, the JE Conspirators undertook the acts and conduct alleged herein as part of a conspiracy to injure Eastern Point's reputation, trade, business and profession.

515.744.    The JE Conspirators did so intentionally, knowingly, willfully, and maliciously.

516. As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.

745.    As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.

**COUNT XVI**
**COMMON LAW CONSPIRACY**

**COMMON LAW CONSPIRACY**

**(Against the JE Conspirators)**

517. Eastern Point reasserts the prior allegations in Paragraphs 1 through 516745 of this

746.    Amended Complaint as if fully set forth herein.

518.747.    As demonstrated by the actions and conduct alleged herein, the JE Conspirators combined for the criminal or unlawful purposes—including violations of 18 U.S.C. § 1831—of obtaining an unfair business advantage over Eastern Point and generally inflicting injury and damage upon Eastern Point.

519.748.    For specific reference, Eastern Point incorporates the prior allegations in Paragraphs 131154 through 334414, which describe the conspiracy and the harm to Eastern Point in detail.

520.749.    As described by the actions and conduct alleged herein, the JE Conspirators employed criminal or unlawful means to effectuate the aims of the conspiracy.

1.    Beginning no later than 2020on or about 2022, the JE Conspirators expressly agreed to pursue a coordinated plan to replicate Eastern Point's platform, conceal their misuse of access credentials, and deploy misappropriated materials to develop, market, and operate Justice Escrow, with each Defendant performing distinct but interdependent roles in furtherance of that agreement.

750.

521.751.    As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.As a result of the JE Conspirators' actions committed in furtherance of the conspiracy, Eastern Point has sustained, and will continue to sustain, damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Eastern Point Trust Company prays for the following relief from

Defendants Jakob Z. Norman; Nicholas J. Coccimiglio; William Bunnell; Michael Upchurch; Courtney Barber; Timothy Krochuk; Trial Lawyers for Justice; Justice for Life; FBHC Software LLC; Trellis Software, Inc.; Town of Glenrock, Wyoming; Bruce Roumell; Amy Iberlin; Scott C. Murray; and John Does—an Order:

i.    Awarding Eastern Point damages for the breaches, statutory violations, and tortious conduct described herein in the amount of $350,000,000.00, with damages continuing to accrue at an estimated $500,000 per month, which damages include, but are not limited to, the following:

a. One Million U.S. Dollars ($1,000,000) per breach of the Misappropriation of Collective Intellectual Property and Trade Secrets provision in the Terms of Use;

~~b.~~ Five Million U.S. Dollars ($5,000,000) per breach of the Industrial

b. Espionage and Industrial Property provision of the Terms of Use;

c. One hundred fifty million U.S. Dollars ($150,000,000) to replace ongoing loss of Eastern Point's unique market position and market segments position as an innovation, thought, and compliance leader;

d. Fifty million U.S. Dollars ($50,000,000) to replace future and ongoing loss of competitive advantage and business scale;

e. One hundred million U.S. Dollars ($100,000,000) to replace future and ongoing general market penetration diminution, marketplace position erosion;

f. Ten million U.S. Dollars ($10,000,000) to replace future and ongoing productivity reductions due to foregone employee income opportunities resulting from loss of current and future customer base, marketplace erosion, and revenue opportunities;

ii. Granting permanent injunctive relief preventing Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through Defendants, or controlling Defendants or controlled by Defendants, or in active concert or participation with Defendants, from engaging in and continuing to benefit from the wrongful conduct described herein, and eliminating Defendants' inequitable advantages arising from the wrongful conduct; ~~iii.~~

**Formatted:** List Paragraph, Left, Indent: Left: 1", Hanging: 0.5", Right: 0", Space After: 0 pt, Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 1.25"

ii.    Requiring the Trade Secret Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Trade Secret

Defendants, or controlling the Trade Secret Defendants or controlled by the Trade

iii.    Secret Defendants, or in active concert or participation with the Trade Secret Defendants, to deliver to Eastern Point all materials embodying, deriving from, or otherwise revealing Eastern Point's trade secrets; iv.

iv.    Requiring disgorgement of all direct and indirect financial gain realized by the Settlement Conspirators as a result of the breaches of the Terms of Use and QSF Agreements alleged herein;

v.    Awarding Eastern Point damages for any unjust enrichment caused by the Trade Secret Defendants' misappropriation of trade secrets that is not addressed in computing damages for actual losses to Eastern Point; vi.

vi.    Awarding Eastern Point exemplary damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3), in an amount two (2) times the amount of the combined actual and unjust enrichment damages; vii. Awarding Eastern Point punitive damages under the Virginia Uniform Trade

vii.    Awarding Eastern Point punitive damages under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338; viii.

Awarding Eastern Point threefold damages under the Racketeer Influenced and

viii.    Corrupt Organizations Act, 18 U.S.C. § 1964(c); ix.

ix.    Awarding Eastern Point threefold damages under Va. Code § 18.2-500;

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 1 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 1"

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 1 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 1"

**Formatted:** List Paragraph, Left, Right: 0", Space After: 0 pt, Line spacing: single, Numbered + Level: 1 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 1"

x.    x. Awarding Eastern Point punitive damages in the maximum amount allowed by law for Defendants' tortious conduct; xi.

xi.    Awarding Eastern Point interest, reasonable attorneys' fees, and costs available under the law; xii.

xii.    Awarding Eastern Point reasonable attorney's fees and costs, as provided for under the Terms of Use and QSF Agreements; xiii. Awarding Eastern Point reasonable attorney's fees and costs under the Virginia

xiii.    Awarding Eastern Point reasonable attorney's fees and costs under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338.1; xiv.

Awarding Eastern Point the costs of suit under the Virginia Computer Crimes Act,

xiv.    Va. Code § 18.2-152.12; xv.

xv.    Awarding Eastern Point reasonable attorney's fees and costs under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

Awarding Eastern Point reasonable attorney's fees and costs under Va. Code §

xvi.    18.2-500; and xvii.

xvii.    Awarding Eastern Point such other, further, or different relief as the Court deems just and proper.

Respectfully Submitted,
EASTERN POINT TRUST COMPANY
By Counsel.

DYCIO & BIGGS

/s/ ~~Skyler R. Peacock~~~~T. Wayne Biggs~~Gershom A. Young, Esq.

Mark R. Dycio, Esq. (VSB No. 32741)
T. Wayne Biggs, Esq. (VSB No. 41281)
~~Skyler R. Peacock~~Clifford Clapp, Esq. (VSB No. ~~87894)~~ 85388)
Gershom A. Young, Esq. (VSB No. 93865)
10533 Main Street
Fairfax, Virginia 22030
T: (703) 383-0100
F: (703) 383-0101
mdycio@dyciolaw.com
twbiggs@dyciolaw.com ~~speacock~~
cclapp@dyciolaw.com
gayoung@dyciolaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this ~~9th~~ 27th day of ~~January~~~~March~~April, 2026, a true and correct copy of the foregoing was electronically filed via CM/ECF, which will send notice of the filing to all counsel of record.

/s/ ~~Skyler R. Peacock~~~~T. Wayne Biggs, Esq.~~

~~Skyler R. Peacock~~
~~T. Wayne Biggs~~Gershom A. Young, Esq.