**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| EASTERN POINT TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:25-cv-1787 |
| | ) | |
| FLATIRONS BANK et al. | ) | |

**PLAINTIFF EASTERN POINT TRUST COMPANY'S
OPPOSITON TO THE MOTION TO DISMISS OF
DEFENDANTS FLATIRONS BANK, JAKOB Z. NORMAN
NICHOLAS J. COCCIMIGLIO, WILLIAM BUNNELL,
MICHAEL UPCHURCH, COURTNEY BARBER,
TIMOTHY KROCHUK, TRIAL LAWYERS FOR JUSTICE
JUSTICE FOR LIFE, FBHC SOFTWARE LLC,
AND TRELLIS SOFTWARE, INC.**

COMES NOW YOUR Plaintiff, Eastern Point Trust Company ("EPTC" or "Eastern Point") and for its Opposition to the Motion to Dismiss of Defendants Flatirons Bank ("Flatirons"), Jakob Z. Norman ("Norman"), Nicholas J. Coccimiglio ("Coccimiglio"), William Bunnell ("Bunnell"), Michael Upchurch ("Upchurch"), Courtney Barber ("Barber"), Timothy Krochuk ("Krochuk"), Trial Lawyers for Justice ("TLJ"), Justice for Life ("JFL"), FBHC Software, LLC ("FBHC"), and Trellis Software, Inc. ("Trellis") (collectively, at times, "Defendants"), states as follows:

I.      **INTRODUCTION**[1]

This is a case about outright theft. Defendants Norman, Coccimiglio, Bunnell, Upchurch, TLJ, and JFL ("Contract Defendants") all entered into contracts with Eastern Point, the terms of which were repeatedly confirmed and agreed to over the course of years. The contracts related to

---

[1]      The Court should be made aware that at the time of filing this Opposition, Eastern Point has filed a Consent Motion for Leave to Amend the Complaint. However, this Opposition is being filed owing to the deadline that is still in effect from the Court's prior orders. Eastern Point does not waive or retract the Motion.

the establishment and management of Qualified Settlement Funds ("QSF") which are funds utilized for the orderly distribution of settlement funds, most often in the mass tort litigation context. In such contracts, the Contract Defendants agreed to terms which prohibited direct competition with Eastern Point and which prohibited the misappropriation of Eastern Point's trade secrets, namely Eastern Point's QSF 360™ platform. Contract Defendants ignored their contractual obligations and proceeded to steal Eastern Point's intellectual property and to use the same to directly compete with Eastern Point in the QSF industry. Contract Defendants further engaged and conspired with Flatirons, Krochuk, and Trellis Software—all of whom were fully aware of or on notice of Eastern Point's claims of right—to effectuate the breach of Contract Defendants' agreements and theft of Eastern Point's trade secrets. The actions of Defendants serve to subject them to the jurisdiction of the Commonwealth of Virginia either by way of contractual agreement, purposeful action directed to the Commonwealth or by causing tortious injury in the Commonwealth.

Defendants move to dismiss on personal jurisdiction grounds pursuant to Rule 12(b)(2) and pursuant to Rule 12(b)(6) on the grounds that the Amended Complaint does not state a claim. For the reasons that follow, the Motions to Dismiss of Defendants should be DENIED as to all Counts and personal jurisdiction should be found to exist.

For ease of reference and further clarity, Eastern Point here outlines the references to various combinations of Defendants as the same was stated in the Amended Complaint and as may be used in this Opposition Brief:

**"Contract Defendants"** as referenced above are Norman, Coccimiglio, Bunnell, Upchurch, TLJ, and JFL. These Defendants entered into contractual agreements with Eastern

Point and Counts I through VI of the Amended Complaint are breach of contract claims against these Defendants.

**"Settlement Defendants"** refers to Norman, Coccimiglio, Bunnell, and Upchurch as defined in the Amended Complaint in Section II(A) of the Amended Complaint, p. 25.

**"JE Conspirators"** refers to participants in the "JE Conspiracy" and are identified in paragraph 131 of the Amended Complaint as Norman, Coccimiglio, Bunnell, Upchurch, Barber, Flatirons, Krochuk, Trellis, Town of Glenrock, Roumell, Iberlin, Murray and John Does.[2]

**"Trade Secret Defendants"** are defined in the Amended Complaint on page 66 as Flatirons, Coccimiglio, Bunnell, Krochuk, Trellis, Iberlin and Murray.

## II.      12(b)(2)—This Court Has Personal Jurisdiction Over Defendants

### A.      Legal Standard

### 1.      Correct Evidentiary Standard

Under Rule 12(b)(2) "a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such challenge." *Grayson v. Anderson,* 816 F.3d 262, 267 (4th Cir. 2016). The question is generally resolved by the court as a preliminary matter. *Id.* Where the court resolves the question solely through consideration of motion papers, affidavits, legal memoranda, and the operative complaint a plaintiff need only establish a *prima facie* showing of personal jurisdiction. *Id.* at 268. Where the court requires a plaintiff to establish facts supporting personal jurisdiction, it must conduct an evidentiary hearing and a preponderance of the evidence standard applies. *Id.* (citing cases). In *Grayson*, the 4th Circuit held that an "evidentiary hearing" did not necessarily mean live testimony, but rather a "fair opportunity to present both the relevant jurisdictional

---

[2]      Glenrock, Iberlin, and Roumell, have filed a separate Motion to Dismiss to which Eastern Point is filing a separate opposition brief.  Murray has not yet entered an appearance in this case.

evidence and their legal arguments." *Id.* Recently, the 4th Circuit gave further guidance on what is required by an "evidentiary hearing" and whether to apply a *prima facie* or preponderance standard. In *OSRX v. Anderson*, 2025 U.S. App. LEXIS 12083 (4th Cir. 2025) (Unpub.), the Court vacated a Rule 12(b)(2) dismissal where the trial court did not apply the *prima facie* standard. *Id.* *18. The trial court in *OSRX* had actually convened a hearing but it was limited to legal argument with the parties being limited to 25 minutes of oral argument each. *Id.* at *17-18. This was not a fair opportunity to present "any jurisdictional evidence" and the *prima facie* evidence standard applied. *Id.* at *18.

In this case, the Court has already announced that it will resolve the motions to dismiss without an oral hearing. Docket Entry dated Feb. 23, 2026 ("Per RDA's chambers, motions set for 5/6/2026 will be decided on the papers; no oral argument will be heard"). Accordingly, Eastern Point submits that the *prima facie* standard applies here and that the "allegations and available evidence relating to personal jurisdiction" must be taken in the light most favorable to Eastern Point. *Grayson*, 816 F.3d at 268. Indeed, a court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Baker*, 886 F.2d 673, 676 (4th Cir. 1989).

### 2. Personal Jurisdiction Standards

In this diversity case, the Virginia "long arm statute" is applicable and this Circuit has interpreted Virginia law to grant the full extent of personal jurisdiction permitted under the due process clause. *Consulting Engineers Corp. v. Geometrics LTD.*, 561 F.3d 273, 277 4th Cir. 2009); *see also*, § 8.01-328.1 Va. Code Ann. Under the due process clause, a state may exercise either general ("all purpose") jurisdiction or specific ("case-linked") jurisdiction. *al-Suyid v. Hifter*, 139

F.4th 368, 376 (4th Cir. 2025).  Eastern Point makes no claim that these Defendants are "at home" in Virginia and thus subject to general jurisdiction.  *Id.*

To exercise specific personal jurisdiction, a defendant must have "minimum contacts" such that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice"  *Khashoggi v. NSO Grp. Techs. LTD.*, 138 F.4th 152, 159 (4th Cir. 2024).  This Circuit applies a 3-pronged test:  "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  *Id.*

### (i).  Purposeful Availment

In assessing purposeful availment regarding the conduct of business, the 4th Circuit has stated that this prong is not susceptible to "mechanical application."  *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020).  The Court has also provided the following list of "nonexclusive" factors to consider:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc.* 963 F.3d at 352 (citing *Smeha Media Entm.t v. Associated Broad Co. P. Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018).

Further, of relevant consideration here is this Circuit's analysis of internet/electronic activity in the context of personal jurisdiction determinations. Adopting the *Zippo* model, the 4th Circuit has held that a court may exercise jurisdiction over a defendant based on electronic activity where the defendant "(1) directs electronic activity into the State (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002); *see also, Zippo Manufacturing Co. v. Zippo Dot Com*, 952 F. Supp. 1119 (W.D. Pa. 1997). The *Zippo* model views electronic activity on a "sliding scale" judging the defendant's conduct as "interactive, semi-interactive or passive." *See ALS Scan, Inc.* 293 F.3d at 713-14. The query focuses on the "nature and quality of the commercial activity that [the defendant] conducts over the Internet." *Carfax, Inc. v. Accu-Trade, LLC*, 2022 U.S. Dist. LEXIS 38853, *14-15 (E.D. Va. 2022) (internal citations omitted).

The second area of internet-based analysis is the "effects test." *Id.* at *15. Specific jurisdiction can be found to exist where "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed the "tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Id.* (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 n.7 (4th Cir. 2003)). "Whether the defendant expressly aimed the tortious conduct at the forum depends on whether the defendant knew or reasonably should have known such conduct would occur in the forum." *Carfax, Inc.* at *15 (internal quotations omitted). It is not necessary that a defendant have actual knowledge of a server location so long as the "defendant's conduct connects [it] to the forum in a meaningful way" and such conduct is not "random, fortuitous or attenuated." *Id.* at *16 (citing *Walden v. Fiore*, 571

U.S. 277, 285, 290 (2014)); *see also*, *Aitken v. Comms. Workers of Am.*, 496 F. Supp.2d 653, 660 (E.D. Va. 2007) (knowledge of the "precise location" of a "server is of no constitutional moment."). Of further importance here is the fact that Virginia's long-arm statute defines an "act . . . in this Commonwealth" to include "using a computer or computer network located in the Commonwealth." § 8.01-328.1(B) Va. Code Ann.

### (ii) Purposeful Availment Is Established

Turning to the facts alleged in the Amended Complaint, a prima facie case of purposeful availment is established. To be clear, while Eastern Point is alleged to have been incorporated in the U.S. Virgin Islands, the operative location for Eastern Point is its affiliate offices in Warrenton, Virginia. Am. Comp. ¶ 39. The major thrust of Eastern Point's complaint is Defendants' theft and misappropriation of trade secrets and other confidential information related to the QSF 360™ platform. Am. Comp. ¶¶ 1-3. That platform is housed on a network of computers and servers located in Virginia. Am. Comp. ¶ 78-79. Access to that network necessarily occurs in Virginia where server-side code execution is actually occurring. Am. Comp. ¶ 80.

The Contract Defendants are alleged to have each entered into a contractual agreement with Eastern Point related to the establishment and administration of QSFs and to have had business relationship with Eastern Point spanning years. Am. Comp. pp. 25-30. Norman, Coccimiglio, Bunnell and Upchurch are all alleged to be registered users of the QSF 360™ Platform and to have created such user accounts by utilizing a computer network located in the Commonwealth of Virginia. Am. Comp., ¶ 138-39. That the agreements at issue were "clickwrap" agreements established through an online platform is of no moment as it is well-established that such agreements are perfectly enforceable. *See e.g., Hosseini v. Upstart Network, Inc.*, 2020 U.S. Dist. LEXIS 20332 (E.D. Va. 2020).

As alleged in the Amended Complaint, all Contract Defendants, by virtue of having entered into their respective agreements with Eastern Point agreed to certain Terms of Use. In pages 15 through 24, the Amended Complaint recites various provisions of the Terms of Use as relating to agreements not to compete with Eastern Point, not to conduct industrial espionage, among other duties. The Terms of Use also included language that put the Contract Defendants on specific notice that they were doing business in Virginia.

Attached hereto as **Exhibit A** is the Declaration of Sam Kott, Eastern Point's Vice President and Corporate Counsel. As set forth in the Kott Declaration, the Terms of Use advised that the "associated code" of the Platform was being executed and hosted on a "computer network located in Virginia." Kott Decl. ¶ 8. Further, the Terms of Use contained language that conclusively establishes purposeful availment and essentially waives the jurisdictional defense asserted here as it related to the Contract Defendants. Kott Decl. ¶ 9. Specifically, the Terms of Use provided that "You Agree that, by Accessing and using servers and computer networks located in Virginia, You have purposefully availed Yourself of Virginia law jurisdiction." *Id.* The Kott Declaration goes on to confirm that Mr. Kott has emailed Norman, Coccimiglio, and Bunnell at the email addresses identified with the creation of their QSF 360$^{TM}$ Platform accounts. Similarly, the Kott Declaration confirms two email accounts related to Upchurch and confirms multiple logins as to all such accounts. Kott Decl. ¶¶ 10-15.

The allegations in the Amended Complaint further establish purposeful availment, Norman is alleged to have created his account on or about September 4, 2019, and to have logged in to his account at least 120 times through May 28, 2025, each time reaffirming the Terms of Use associated with the account. Am. Comp. ¶¶ 142-43, 145. Norman's account is associated with creation and administration of 104 QSFs between 2019-2024. Am. Comp. ¶ 147. Each and every

distribution of settlement proceeds related to these QSFs would have been requested by submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

Coccimiglio is alleged to have created his account on or about November 18, 2018, and to have logged in to his account at least 4,900 times through May 28, 2025, each time reaffirming the Terms of Use associated with the account. Am. Comp. ¶¶ 150-51, 153. Coccimiglio's account is associated with creation and administration of 622 QSFs between 2018-2024. Am. Comp. ¶ 155. Each and every distribution of settlement proceeds related to these QSFs would have been requested by submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

Bunnell is alleged to have created his account on or about May 29, 2019, and to have logged in to his account at least 576 times through May 28, 2025, each time reaffirming the Terms of Use associated with the account. Am. Comp. ¶¶ 158-59, 161. Bunnell's account is associated with creation and administration of 625 QSFs between 2018-2024. Am. Comp. ¶ 163. Each and every distribution of settlement proceeds related to these QSFs would have been requested by submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

Upchurch is alleged to have created his account on or about February 10, 2022, and to have logged in to his account at least 576 times through May 28, 2025, each time reaffirming the Terms of Use associated with the account. Am. Comp. ¶¶ 167-68, 170. Upchurch's account is associated with creation and administration of 31 QSFs between 2017-2024. Am. Comp. ¶ 172. Each and every distribution of settlement proceeds related to these QSFs would have been requested by

submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

Through agents authorized to act on its behalf, TLJ is alleged to have created its account on or about March 1, 2019, and to have logged in at least 454 times through May 28, 2025, each time reaffirming the Terms of Use Associated with the account. Am. Comp. ¶¶ 372-75. TLJ's account is associated with creation and administration of 150 QSFs between 2019-2025. Am. Comp. ¶ 377. Each and every distribution of settlement proceeds related to these QSFs would have been requested by submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

Through agents authorized to act on its behalf, JFL is alleged to have created its account on or about April 16, 2019, and to have logged in at least 4,934 times through May 28, 2025, each time reaffirming the Terms of Use Associated with the account. Am. Comp. ¶¶ 387-90. JFL's account is associated with creation and administration of 625 QSFs between 2018-2024. Am. Comp. ¶ 392. Each and every distribution of settlement proceeds related to these QSFs would have been requested by submitting to Eastern Point a Petition for Distribution which also re-affirmed the Terms of Use. Am. Comp. ¶ 130.

As noted above, each of these Contract Defendants entered into contractual agreements with Eastern Point regarding the establishment and administration of QSFs which required their assent to Terms of Use and reaffirmation of those terms of use with each login. Am. Comp., ¶¶ 90-101. The establishment of the Contract Defendants' accounts and all additional interface regarding the establishment of QSFs occurred through use and access of computer networks located in Virginia. Am. Comp. ¶ 78. The relationship with the Contract Defendants spanned over the course of multiple years with thousands of logins to QSF 360™ Platform and with

hundreds of QSFs established.  These were not "random" or "fortuitous" interactions with the Commonwealth but rather a sustained and continuous business relationship over the course of years.  It would defy credulity for any of the Contract Defendants to deny they were aware that they were doing business in Virginia.  Regardless, their actions in using the computer network located in Virginia constituted an act within the Commonwealth.  § 8.01-328.1(B) Va. Code Ann.

There were also direct physical contacts with Eastern Point within the Commonwealth. Norman, Coccimiglio, Upchurch and Barber are alleged to have physically visited Eastern Point offices in Virginia on March 20, 2020.  Am. Comp. ¶ 198.  This visit was plainly "regarding the business relationship" during which it is alleged that detailed questions about the Eastern Point's business practices were asked.  Am. Comp. ¶ 199.   In light of this visit, there can be little doubt that Coccimiglio, Upchurch, Norman, and Barber knew they were doing business in Virginia as a result of the hours-long meeting which included a tour of Eastern Point's offices.  *Id.*   The knowledge obtained by the visitors can fairly be imputed to the other Contract Defendants. Additionally, it is alleged that Coccimiglio called the Virginia offices multiple times seeking sensitive process information regarding Eastern Point's banking relationships some of which was provided in partial response.  Am. Comp. ¶¶ 205-08.  Certainly, Coccimiglio, understood who he calling and that he was engaging with persons in Virginia.  Similarly, it is alleged that Coccimiglio and Bunnell both made phone inquiries in the fall of 2023, seeking information about Eastern Points process for obtaining Employment Identification Numbers (EIN).  Am. Comp. ¶ 213. Bunnell additionally made requests to Eastern Point personnel asking for notice of tax changes and QSF funding information.  Am. Comp. ¶ 216.

Purposeful availment is also established by the tortious conduct of the Contract Defendants. Under § 8.01-328.1(A)(3) Va. Code Ann. of Virginia's long-arm statute, personal jurisdiction is

permissible for tortious injury by act or omission in this Commonwealth.  Under subsection (A)(4), jurisdiction is available for tortious injury in this Commonwealth by act or omission outside the Commonwealth provided that the defendant regularly does business in the Commonwealth or engages in other types of persistent conduct in the Commonwealth.  Subsection B of the statute establishes that using a "computer network located in the Commonwealth shall constitute an act in the Commonwealth."  *Id.*  A person "uses" a "computer network" when they cause a "computer network to perform or stop performing computer operations.  § 18.2-152.2 Va. Code Ann. "Computer operation" means, *inter alia*, "storage and retrieval functions" and "includes, but is not limited to, communication with, storage of data to, or retrieval of data from any device . . ."  *Id.*

Eastern Point alleges multiple claims for tortious injury and they all arise from Contract Defendants use of Eastern Point's computer network which can be fairly imputed to the Settlement Conspirators, JE Conspirators, and Trade Secret Defendants.   The gravamen of Eastern Point's tort claims is related to the Defendants' theft of trade secret and confidential information related to QSF 360$^{TM}$ Platform.  The Amended Complaint alleges that over the course of years, Settlemetn Conspirators "exploited their close relationship with Eastern Point to extract as much information about QSF 360$^{TM}$ Platform as possible."  Am. Comp. ¶ 197.  The only way to engage with the QSF 360$^{TM}$ Platform was to log in to one's account and, therefore, utilize or engage Eastern Point's computer network located in Virginia.

Without use of Eastern Point's computer network, the Settlement Conspirators and Trade Secret Defendants could not have accomplished the trade secret theft which forms the foundation for all tort claims of Eastern Point and the foundation of the JE Conspirator's actions.  As alleged in the Amended Complaint, Flatirons and the Settlement Conspirators recruited Krochuk and Trellis to create the Justice Escrow platform using trade secret and confidential information—

obtained from the computer network in Virginia—in order to create a platform that substantially matches the QSF 360$^{TM}$ Platform in language, form, style, design, and functionality.  Am. Comp. ¶¶ 232-38.   Further, it is alleged that Settlement Conspirators—specifically Bunnell at Norman's direction—emailed a zip folder entitles "EPTC QSF Docs" to Defendant Scott Murray which contained documents related to a specific QSF administered through the QSF 360$^{TM}$ Platform, thus misappropriated through use of the Eastern Point computer network.  Am. Comp. ¶¶ 248-50. Among other trade secrets contained in the zip document, the documents included a "breakdown" of Eastern Point's bank system, "QSF Creation Docs" generated by the QSF 360$^{TM}$ Platform including trust agreements and petitions for QSF approval and QSF summary documents.  Am. Comp. ¶ 250.  The folder also contained a "trust flow" document describing the process that allows Eastern Point to perform same-day processing among various others QSF-relating procedures. Am. Comp. ¶ 252.  During the process of soliciting the Town of Evansville Wyoming to act as the "governmental authority" to approve Justice Escrow QSFs, the Complaint further alleges that Norman outright told Defendant Murray that the intent was to replicate the QSF 360$^{TM}$ Platform and that documents—misappropriated from Eastern Point's website-- that still bore Eastern Point's name were utilized as exemplars for Justice Escrow. Am. Comp.  ¶¶ 253-59.  The harm flowing from the misappropriation of this information has been felt in Virginia by Eastern Point in the form of lost revenue, diminished market share, loss of client relationships and goodwill.  Am. Comp.  § 327.

### (iii)    The Exercise of Personal Jurisdiction Would Be Reasonable

The exercise of personal jurisdiction here would be constitutionally reasonable here.   The factors to be considered are (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4)

shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in further substantive social policies. *Consulting Eng'rs. Corp. v. Geometic Ltd.*. 561 F. 3d 273, 279 (4th Cir. 2009).

Beginning with the Contract Defendants, while there would be some burden as they are not Virginia residents, all have a contract with Eastern Point and have been doing business with Eastern Point in Virginia for years to include the establishment and administration of hundreds of QSFs. As set forth in the Kott Declaration, Contract Defendants have acknowledged, through the Terms of Use that they have availed themselves of jurisdiction in Virginia. Further as to the Settlement Conspirators and Trade Secret Defendants, they have all committed directly or participated in a conspiracy related to tortious conduct directed to the Commonwealth of Virginia. Virginia. Virginia certainly has an interest in adjudicating breach of contract actions and protecting citizens from tortious conduct. Further, Eastern Point has a direct interest in the efficient resolution of this suit. Accordingly, exercising jurisdiction would be constitutionally reasonable. *See Belmora LLC v. Midway Importing, Inc.*, 2018 U.S. Dist. LEXIS 125561, *8 (E.D. Va. 2018).

### (iv)    The Connection of the Co-Conspirators

Aside from jurisdictional bases related to the Contract Defendants, it would be reasonable and appropriate to exercise jurisdiction over the other defendants based upon co-conspirator jurisdiction. The Fourth Circuit recognizes that courts may exercise personal jurisdiction over non-resident defendants based on their co-conspirators' contacts with the forum state. *See Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). To establish conspiracy jurisdiction, plaintiffs must make a plausible claim that: "(1) that a conspiracy existed; (2) that the [] defendants participated in the conspiracy; and (3) that a co-conspirator's activities in furtherance of the

Page **14** of **31**

conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Id.*

First, EPTC alleges sufficient facts demonstrating a conspiracy existed. The Complaint alleges that "the JE Conspirators combined for the criminal or unlawful purposes of obtaining an unfair business advantage over Eastern Point and generally inflicting injury and damage upon Eastern Point." Am. Comp. ¶ 518. As set forth in ¶¶ 131 through 320 Amended Complaint, EPTC alleges specific facts supporting this result.   Summarized, Settlement Conspirators obtained confidential information subject to nondisclosure agreements and under false pretenses. Am. Comp. ¶¶ 198–218. After adding Krochuk and Trellis (who created the knockoff software meant to replicate the QSF 360™ Platform) and Flatirons to the conspiracy, Settlement Conspirators began to enlist governmental entities to approve their QSFs. Am. Comp. ¶ 246. This included the conspirators using Eastern Point's documents to recruit small Wyoming governmental entities to be its authorizing body. Am. Comp. ¶¶ 248–63. Iberlin joined the conspiracy to help recruit these Wyoming governmental entities ultimately resulting in the addition of Glenrock and Roumell to the JE Conspiracy.  Am. Comp. ¶¶ 270-320.   These allegations demonstrate that a conspiracy existed, that Defendants participated in the conspiracy, and that certain of the co-conspirators (i.e. Settlement Conspirators) had sufficient contacts with Virginia to support jurisdiction.

> (v)    **The Affidavits Do Not Rebut the Prima Facie Case.**

As part of its 12(b)(2) Motion to Dismiss, various Defendants have attached affidavits in support.  The affidavits are, on the whole, self-serving and selective in the areas that they address. More telling, is the areas that they do not address.  Under the correct procedural posture of this case, with the allegations in the Amended Complaint are taken as true and inferences being made in Plaintiff's favor, the affidavits do not serve to rebut the *prima facie* case for jurisdiction made

out by the Amended Complaint.  Eastern Point would further state that as to any factual dispute, at this stage, the Court should accept Eastern Point's allegations as true and resolve any doubt in its favor.

Beginning with Coccimiglio's Declaration (**Dkt. 58-1**), Coccimiglio admits to visiting Eastern Point in Virgini but disputes the date of the visit claiming it to be February 10, 2022, rather than March 20, 2020.  None of the details otherwise alleged in the Amended Complaint about that visit are disputed.    Though Coccimiglio notes that he is not the only person with access to his account referenced in the Amended Complaint, he does not deny creating the account or accessing Eastern Point's website.  Importantly, he does not deny accepting and agreeing to the Terms of Use of the website and does not deny his contractual relationship with Eastern Point.  Coccimiglio claims that Justice for Life has not used Eastern Point to establish QSFs for Virginia-based clients, but the point is frankly irrelevant.  There is no denial that Justice for Life has used Eastern Point to set up QSFs for clients otherwise—and no denial that Justice for Life accepted the Terms of Use and has a contractual relationship with Eastern Point.  Coccimiglio denies knowledge of the location of Eastern Point's servers, but as noted above, that knowledge is of no constitutional moment.

Norman's affidavit (Dkt. 58-2) similarly disputes the date of the meeting at Eastern Point's Virginia offices but admits that the visit occurred.   Norma also claims not to be the only user of the account referenced in the Amended Complaint but does not deny having established the account, does not deny agreeing to the Terms of Use, and does not deny having a contractual relationship with Eastern Point.  As with Coccimiglio and Justice for Life, Norman claims that Trial Lawyers for Justice has no Virginia based clients, but there is no denial Trial Lawyers for Justice has used Eastern Point to set up QSFs for clients otherwise—and no denial that Trial

Lawyer for Justice accepted the Terms of Use and has a contractual relationship with Eastern Point. Norman, too, denies knowledge of the server location.

Bunnell's terse affidavit (**Dkt. 58-3**) does nothing of substance except deny that he was on the visit to Eastern Point's Virginia offices.  No other allegation of substance against Bunnell is even addressed, much less denied.

Upchurch's affidavit (**Dkt 58-4**) is more notable in that he denies having visited Eastern Point's Virginia offices and also denies having logged onto Eastern Point's website or the QSF 360 platform and denies accepting the Terms and Conditions.  It is notable that Mr. Upchurch does not deny that anyone acting at his direction utilized Eastern Point's website or accepted the Terms of Use.  It is further notable that none of the other jurisdictionally relevant allegations against Mr. Upchurch are denied.

Barber's affidavit (**Dkt 58-5**) generally denies "business dealings" with Eastern Point and denies accepting any Terms an Conditions.  She does not deny the visit to Eastern Point and does not address any other jurisdictionally relevant allegations.

Kent Jones' affidavit (**Dkt. 58-6**) on behalf of Flatirons only denies any contractual relationship between Flatirons and Eastern Point and denies accepting any Terms and Conditions. It is further notable that none of the other jurisdictionally relevant allegations against Flatirons are denied.

Krochuk's individual affidavit (**Dkt. 58-7**) only denies any contractual relationship between Flatirons and Eastern Point and denies accepting any Terms and Conditions.  It is further notable that none of the other jurisdictionally relevant allegations against Flatirons are denied.  His affidavit as to FBHC Software LLC  (**Dkt. 58-8**) makes similar denials while identify the members of the LLC.  His affidavit as Trellis Software (**Dkt. 58-9**) makes similar denials while also denying

that Trellis was involved in the creation of "Flatirons Bank's QSF escrow products and services known as Justice Escrow."  It is telling that a similar denial is not made on behalf of himself individually.

III.    **12(b)(6)—The Amended Complaint States Plausible Claims Against All Defendants.**

A.  **Standard of Review.**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint on the grounds that the complaint fails to state a claim upon which relief may be granted. *Fed. R. Civ. P.* 12(b)(6).  Under the relevant "Iqbal/Twombly" standard, a 12(b)(6) motion should not be granted if the complaint states a plausible claim on its face and "facial plausibility" is met when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *see also*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). A plaintiff states a claim if the plaintiff pleads facts sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly,* 550 U.S. at 555 (internal citations omitted).  A complaint provides fair notice of the claim if it pleads facts sufficient to rise "above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 570 (internal citations omitted).  Even if it appears that "recovery is very remote and unlikely," a complaint may nevertheless survive a motion to dismiss.  *Id.* at 556 (internal citations and quotations omitted).

B.    **Counts I-VI against the "Contract Defendants"**

Beginning on page 12, Section II of the Brief in Support, Defendants own pleading identifies Norman, Coccimiglio, Bunnell, Upchurch, TLJ, and JFL as the "Contract Defendants."

The Contract Defendants assert that the contractual claims fail because the terms of the contract at issue are overbroad and unenforceable restrictive covenants under Virginia law.   The assertion fails on numerous fronts.

As noted by Contract Defendants, in evaluating restrictive covenants, courts consider the relationship between the parties but Contract Defendants have the analysis exactly backwards. Brief, p. 14.   Contract Defendants call themselves "mere clients" as if that designation would put them on some more exacting plateau of analysis than an employee.   In the context of restrictive covenants in the employer/employee relationship, the test is often stated as the court must determine if the restraint "is narrowly drawn to protect the ***employer's*** legitimate business interest, is not unduly burdensome on the ***employee's*** ability to earn a living, and is not against public policy." *Omniplex World Serv. V. US Investigations Servs.,* 270 Va. 246, 249 (2005) (emphasis added).   Where the relationship is "more than the conventional one of employer and employee," courts may look at the relationship between the parties more and judge their respective positions accordingly.  *Meissel v. Finley*, 198 Va. 577, 583 (1956).

Where the relationship is not an employer/employee relationship but that of an arms-length transaction between business interests, the Virginia Supreme Court has applied a different standard.  In *Therapy Services v. Crystal City Nursing Center, Inc.*, 239 Va. 385 (1990), the Supreme Court of Virginia reversed a trial court's finding that a restrictive covenant between two businesses was void as against public policy.  Noting that the restriction at issue in *Therapy Services* was not one between employer and employee but rather a "contract between two businesses," the Court asserted that the test was whether the restraint as issue afforded "fair protection" to the one seeking to enforce the restraint and also whether the restraint was not so large as to "interfere with the interest of the public." *Id.* at 388 (citing *Merriman v. Cover*, 104 Va.

428, 436 (1905)).  The Fourth Circuit has applied the *Merriman* test in restraint on trade cases where an employer/employee relationship did not exist.  *BP Prods. N. Am. v. Stanley*, 669 F.3d 184, 188 (4th Cir. 2012); *see also, Lumber Liquidator Inc. v. Cabinets to Go, LLC*, 415 F. Supp.3d 703, 715-16 (W.D. Va 2015) (discussing the distinctions between employer/employee restrictions vs. business-to-business restrictions).

In this case, there is no employer/employee relationship.  The Contract Defendants are alleged to be an attorney (Norman), settlement planner (Coccimiglio), settlement professional (Bunnell), an executive of a settlement company (Upchurch), and entities formed by Contract Defendants to effectuate their common scheme.  Am. Comp.  ¶¶ 132-137.  As such, these "mere clients" are all sophisticated business persons who entered into a contractual relationship with EPTC and all of whom repeatedly assented to the Terms of Use which form the basis for that contractual relationship.  Am. Comp. ¶¶ 142-174.  To that end, the proper test for analysis is that announced in *Therapy Services* and *BP Prods*—whether the contract is "unreasonable between the parties or injurious to the public"- and not the factors recited in employment cases.  *Lumber Liquidator Inc.,* 415 F. Supp.3d at 716.

Putting aside the correct test issue, the Contract Defendants' analysis contains a more gaping hole in its review of restrictive covenants.  At no point do the Contract Defendants cite *Assurance Data, Inc. v. Malyevac*, 286 Va. 137 (2013).  Given the duty of candor to the tribunal, it is unclear why Contract Defendants would altogether ignore controlling precedent, but given the practical effect of such precedent, it is clear why they would hope the Court would do so.  Under *Assurance Data*, questions regarding the scope, reasonableness, and enforceability of restrictive covenants, cannot be resolved as a matter of law at the pleading stage of litigation. Rather, the

litigant seeking to enforce a restrictive covenant must be afforded the opportunity to present evidence as to the reasonableness of the restrictions.

In *Assurance Data*, the trial court sustained a demurrer after finding that a restrictive covenant was overly broad on its face—thus, overly broad as a matter of law. *Id.* at 139. The Supreme Court reversed and in so doing held that cases involving enforceability of restraints on competition must be "determined on [their] own facts" and that litigant seeking to enforce the restriction bears the "burden to show that the restraint is no greater than necessary to protect a legitimate business interest, is not unduly harsh or oppressive . . . and its reasonable in light of sound public policy." *Id.* at 144. The long and the short of *Assurance Data*'s impact in this area of law was to make clear that covenants not to compete could not be judged in a "factual vacuum" and determined unenforceable as a matter of law. *Id.* Indeed "[an] employer may prove a seemingly overbroad restraint to be reasonable under the particular circumstances of the case." *Id.*

Federal courts interpreting restrictive covenants in light of *Assurance Data* have recognized that the impact of *Assurance Data* is that facial challenges to restrictive covenants are either heavily discouraged if not outright foreclosed. *Empower AI, Inc. v. Dillahay*, 2024 U.S. Dist. LEXIS 178186, *15 (E.D. Va 2024); *see also*, *Lumber Liquidator, Inc., supra*; *Neustar, Inc. v. Rapp,* 2019 U.S. Dist. 234597, *2 (E.D. Va. 2019); *S. Trust Mortgage, LLC v. Carson*, 2023 U.S. Dist. LEXIS 101756, *5 (E.D. Va 2023). Regardless of the appropriate test, Virginia law is clear that facial challenges to restrictive covenants are premature and the litigant seeking to enforce a restraint should be afforded the opportunity to present evidence to support the enforceability of the restriction. For avoidance of doubt, EPTC respectfully demands the opportunity to present such evidence.

**C.    Counts VII-VIII against the Trade Secret Defendants**

Beginning on page 15, Section III of the Memorandum in Support, Defendants identify Coccimiglio, Bunnell, Krochuk, Trellis, and Flatirons as the "Trade Secret Defendants." Sufficiently plausible claims are asserted against the Trade Secret Defendants to state claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.* (Count VII) and under the Virginia Uniform Trade Secrets Act ("VUTSA"), §§ 59.1-336 *et seq*. (Count VII).

Under both the DTSA and the VUTSA, a plaintiff must show (1) "the existence of a protectable trade secret" and (2) "the misappropriation of that trade secret." *Laz Karp Assocs. v. Starre*, 2025 U.S. Dist. LEXIS 257871, *18 (E.D. Va. 2025) (internal quotations omitted). The DTSA contains the additional element that the trade secret must be shown to implicate interstate or foreign commerce. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018); *see also*, *OSI Sys. KM-Logix LLC*, 2021 U.S. Dist. LEXIS 241624, *6 n.1 (E.D. Va. 2021) ("With the exception of element 3 [interstate commerce] the elements of a cause of action under VUTSA are nearly identical to the federal DTSA.") (internal quotations omitted). "[N]early any type of information can be subject to trade secret protections . . . so long as the information (i) has independent economic value by virtue of its being secret and (ii) is subject to reasonable efforts to maintain that secrecy." *Variable Annuity Life. Ins. v. Coreth*, 535 F. Supp. 3d 488, 513 (E.D. Va. 2021). At the pleading stage and allegation that trade secrets were subject to the confidentiality provisions of a contract is sufficient to establish that reasonable efforts to maintain secrecy were made. *Samuel Sherbrooke Corp. Ltd. v. Mayer*, 159 F.4th 252, 257 (4th Cir. 2025); *see also*, *JTH Tax, LLC v. Manzo*, 2024 U.S. Dist. LEXIS 229187, *11-12 (E.D. Va. 2024) (failure to return and use of confidential information in violation of a terminated franchise agreement sufficient to demonstrate improper means and misappropriation). At the motion to dismiss stage, allegations that a plaintiff's business are both national and international are sufficient to establish

Page **22** of **31**

the interstate/ foreign commerce prong. *TK Elevator Corp. v. Shropshire*, 2022 U.S. Dist. LEXIS 32108, \*14 (W.D. Va 2022).

"[A] protectable trade secret broadly encompasses all forms and types of financial, business, scientific, technical, economic, or engineering information, including compilations thereof , that (i) derive economic value from not being known to and not readily ascertainable by others and (ii) are the subject of reasonable efforts to maintain its secret." *Laz Karp. Assoc.* 2024 U.S. Dist. at \*18-19 (citing 18 U.S.C. § 1839(3)).   Here, Eastern Point alleges that its business information which includes Eastern Point's workflows, intake processes, questionnaires, user interface designs and configurations, QSF documentation templates, and other specialized features related to the establishment and administration of QSFs.  Am. Comp. ¶¶ 50–67. In addition, Eastern Point limits its access solely to authorized users of its platform. Am. Comp. ¶ 81. Eastern Point further bound Norman, Coccimiglio, Bunnell, and other users to the confidentiality provisions in the Terms of Use. Am. Comp. ¶¶ 95–130; *see MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts."). In addition to preventing users from disclosing to the public, such information is not generally known to the public and competitors because the platform operates on a server-side basis, such that "the user's browser merely acts as a passive display device to display the output of the server-side code execution," and Eastern Point "does not offer a downloadable client-side application." Am. Comp. ¶ 80. Therefore, Eastern Point satisfies its burden at the pleading stage to demonstrate it owns multiple trade secrets.

For the second element, the Trade misappropriated the trade secrets when they exceeded their scope of authorized access under the Terms of Use the Settlement Conspirators. Am. Comp.

¶¶ 3, 131–32. A "misappropriation" when "disclosure or use of a trade secret of another without express or implied consent by a person who … derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret," or even "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B). Here, the Settlement Conspirators acquired the trade secrets in violation of their duties to maintain confidentiality and prohibited use for economic espionage. Am. Comp. ¶¶ 104–14. Therefore, Eastern Point sufficiently alleges the second element.

Third, Eastern Point has sufficiently alleged that the trade secrets implicate interstate commerce. Specifically, Eastern Point has alleged that its business is international with clients all over the world. Am. Comp. ¶ 29. Further, Eastern Point alleges that the JE Conspiracy was an "enterprise" that engaged in interstate and foreign commerce during the course of its misappropriation and use of Eastern Point's trade secrets. Am. Comp. ¶ 493. Eastern Point's trade secrets clearly relate to services intended to be used in interstate and foreign commerce. *See Space Sys.,* 306 F. Supp.3d at 854.

### D.    Counts IX & X

Counts IX and X assert, respectively, claims for violations of the Virginia Computer Crimes Act and the federal Computer Fraud and Abuse Act. Defendants content that, as to the latter claim, Plaintiff's claim fails under *Van Buren v. United States*, 593 U.S. 374 (2021) which holds that "exceeds authorization" is not related to "motive." Defendants ignore, however, the Plaintiff also alleges unauthorized logins based on fake or unauthorized credentials. Am. Comp. ¶ 204. Accordingly, the computer use was not authorized in the first place. As to the VCCA, Defendants claim that the Count is preempted by copyright law pursuant to *Open Risk LLC v.*

*Microstrategy Servs. Corp.,* 876 F.3d 518, 524 (4th Cir. 2017).  Eastern Point responds that while it understands the 4th Circuit's ruling, Eastern Point urges that the rulings of other Circuits that find rights generated by contract to be outside of copyright are the better reasoned decisions.  *See e.g. ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453-54 (7th Cir. 1996).

**E.      Counts XII through XIV—Plaintiff's RICO Claims**

As an initial matter, Defendants' Motion and Brief are deficient in that all 3 RICO Counts are lumped together in one section of the Brief.  The three Counts assert 3 separate claims under RICO with different allegations attributed to different Defendants.  Defendants were required to state their arguments with particularity as to each Count.  *See Local Rule* 7(a).  Without such particularity, it is unclear which arguments specifically apply to which Counts. Any point regarding any Count not specifically addressed should be deemed adequately pled.  The Motion should, therefore, be denied as to these Counts for this reason.  Without waiving this position, Plaintiff will nevertheless respond to the best of its ability

**(i)      RICO Standard**

In order to establish a civil claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a plaintiff must allege facts that demonstrate that defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Dickerson v. TLC The Laser Ey Cts. Inst., Inc.*, 483 Fed. Appx. 390 (4th Cir. 2012) (citing *Sedima v. Imrex Co., 473 U.S. 479, 496 (1985)).*  The injury suffered under a RICO claim must be an injury to a plaintiff's business.  *Sedima,* 473 U.S. at 496.  The elements have also been stated as requiring allegations that establish the elements of a "(1) person, (2) an enterprise, (3) a pattern of (4) racketeering activity (5) which cause injury to the plaintiff."  *Myers v. Finkle*, 758 F. Supp. 1102,

1111 (E.D. Va. 1990).   The allegations in the Amended Complaint meet these and other RICO related standards.

### (ii) Predicate Acts

A RICO complaint must allege the conduct of an enterprise through a pattern of predicate acts responsible for committing racketeering activity. *Goodweather v. Parekh,* 2021 U.S. Dist. LEXIS 173736, *9 (E.D. Va. 2021) (internal citations omitted).   The Amended Complaint outlines the necessary predicate acts in Count XII at paragraphs 485-87 and in Count XIII at paragraphs 496-503.   In each instance, the relevant Defendants are not lumped in to a "collective" but the acts are specified to each person.

Defendants' Brief asserts that the predicate acts belong in 3 categories:   (1). theft of trade secrets (2). wire fraud and (3) money laundering.   Brief p. 24.   The entirety of Defendants' argument as to trade secrets rests on its prior arguments that Eastern Point has not stated claims for trade secret theft.   For all the reasons stated, *supra*, in Section III(C), Plaintiff has plausibly stated a claim for misappropriation of trade secrets.

### (iii) Enterprise

As noted above, to state a RICO claim, a plaintiff must allege an "enterprise:" responsible for committing racketeering activity.  *Nunes v. Fusion GPS*, 531 F. Supp. 3d 983, 1006 (E.D. Va. 2021).  A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* (internal citations omitted).  The enterprise is "separate and apart from the pattern of activity in which it engages" and is "distinct from a person under the RICO statute." *Id.* (internal citations omitted).  The enterprise exists if there is evidence of "ongoing organization" and "evidence that the various associates function as a unit." *Id.* (internal citations omitted).   Additionally, the

enterprise must contain 3 structural components: "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (internal citations omitted).

In this case, Plaintiff identifies FHBC as the "enterprise" formed by Flatirons, Krochuk, and Trellis to conduct the racketeering activity in Count XII. Am. Comp. ¶ 482. As to Count XIII, the "enterprise" is identified as the JE Conspiracy. Am. Comp. ¶ 493. The Brief finds supposed fault with the supposed failure to allege how the enterprises were formed "to function as a continuing unit" or facts showing "a continuing organizational structure." On the contrary, the Amended Complaint goes into great detail about the formation of the enterprises. *See* Am. Comp. ¶¶ 175-334.

### (iv) Operational Control

Defendants claim that Plaintiff fails to allege that any particular Defendant exercised control over the enterprise. Brief, p. 25. Defendants assert that "[only] those who operate the enterprise's affairs may be liable" and cite to *Reves v. Ernst & Young*, 507 U.S. 170, 178-85 (1993). However, this is not a correct statement of the law. In, *Salinas v. United States*, 522 U.S. 52 (1997), the Supreme Court held that a sheriff's deputy, who knew of a bribery scheme and agreed to facilitate that scheme but did not participate in the scheme, could be held liable under RICO. *Id.* at 63-65. The 9th Circuit has opined, therefore, the *Reves* is no longer good law on this point. *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004). Accordingly, it is not necessary for Plaintiff to allege operational control.

### (v) Pattern of Activity

Defendants next assert that Eastern Point has not sufficiently alleged a "pattern" because, according to Defendants, the allegations amount to a single scheme with a single victim. Brief, p.

26. However, Defendants ignore the allegations regarding Defendant's tax fraud scheme and other misrepresentations.   As alleged in paragraphs 175 through 195, Coccimiglio reportedly has received numerous complaints regarding misrepresentation of products and upselling plaintiffs unnecessarily.   But worse, Norman and Coccimiglio also engaged in a pattern of creating shell companies to act as a "borrower" from QSF funds using fraudulent promissory notes and not expectation of repayment.   Am. Comp. ¶ 182.   It was Eastern Point confrontation of Norman that led Norman and Coccimiglio to proceed to steal Eastern Point's trade secrets to continue their scheme unfettered.   Am. Comp. ¶ 191.   There are plainly more victims here than just Eastern Point.

### (vi) Injury and (vii) 1962(d)

Defendants contend that, as to the injury requirement and conspiracy requirement, Plaintiff has not pleaded specific facts or plausible facts under these prongs of the RICO statute.   However, Defendants simply (and willfully ignore) the full content of the Amended Complaint which sets for the conspiracy related to predicate acts in great detail.   *See* Section II(2)(iv), *supra.*   Plaintiff's damages claims and their damages relationship to the conspiracy of Defendants is also more than plausibly pled.

### D. Counts XV and XVI—Business and Common Law Conspiracy

Counts XV and XVI assert State law claims for statutory conspiracy pursuant to §§ 18.2-499-500, Va. Code Ann. and for common law conspiracy against the JE Conspirators.   The Amended Complaint plausibly alleges claims under both Counts.   As two initial matters, there is no Virginia state appellate court that adopt a heightened pleading standard for either statutory or common law conspiracy claims.   Brief, p. 27.

"The conspiracy statute provides, in pertinent part, that 'any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and

Page **28** of **31**

maliciously injuring another in his . . .trade [or] business . . . by any means whatever' shall be liable civilly for treble damages." *Commercial Business Sys. v. Bellsouth Servs.*, 249 Va. 39, 47 (2000) (citing §§ 18.2-499 and 500 Va. Code Ann.).  Proof of actual malice is not required; it is only necessary to prove that a defendant acted with "legal malice," i.e. intentionally and without lawful justification.  *Id.*  Further, a plaintiff does not have to prove that the conspirators "primary or overriding purpose" was to injure the plaintiff's business.  *Id.*  Contrary to Defendants' assertion, there is no requirement under statutory conspiracy to prove an "underlying tort."  For common law conspiracy, a plaintiff must show that "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by criminal or unlawful means."  *Id.* at 48 (internal citations omitted).   Common law conspiracy requires proof of an underlying tort.  *Almy v. Grisham*, 273 Va. 68, 80 (2007).

Here, the underlying tort for purposes of the common law conspiracy is, at the very least, the trade secret claims of Eastern Point, but also the computer trespass, theft, and RICO claims. Defendants' further argument that the Amended Complaint fails to allege concerted action makes little sense in light of the Amended Complaint as a whole in which the concerted actions of the Settlement Conspirators and JE Conspirators are alleged in expansive detail.  *See* Section II(2)(iv), *supra.*  A plausible claim has been stated for both statutory and common law conspiracy.

**IV.    Conclusion**

Wherefore Eastern Point prays that the Motions to Dismiss be denied.

Respectfully Submitted,
EASTERN POINT TRUST COMPANY,
By Counsel.

 /s/ Gershom A. Young, Esq.
Mark R. Dycio, Esq. (VSB No. 32741)
T. Wayne Biggs, Esq. (VSB No. 41281)
Clifford Clapp, Esq. (VSB No. 85388)
Gershom A. Young, Esq. (VCB No. 93865)

10533 Main Street
Fairfax, Virginia 22030
T: (703) 383-0100
F: (703) 383-0101
mdycio@dyciolaw.com
twbiggs@dyciolaw.com
cclapp@dyciolaw.com
gayoung@dyciolaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 7th day of April, 2026, a true and correct copy of the foregoing

was electronically filed via CM/ECF, which will send notice of the filing to all counsel of record.


  /s/ Gershom A. Young          
Gershom A. Young, Esq.